# EXHIBIT 12



*401960084RAGY*

| Control Number | WIID Number | Instrument Type |
|---|---|---|
| 401960084 | 2000196-000026 | RAG |



**WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE**
**(THIS PAGE FORMS PART OF THE INSTRUMENT)**
**\*\*\* DO NOT REMOVE \*\*\***

**THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**

**TYPE OF INSTRUMENT  RAG - REGISTERED AGREEMENT**
**FEE PAGES  58               TOTAL PAGES  58**

| RECORDING FEES | |
|---|---|
| STATUTORY CHARGE | $6.25 |
| RECORDING CHARGE | $174.00 |
| RECORD MGT. FUND | $4.75 |
| RP 5217 | $0.00 |
| TP-584 | $0.00 |
| CROSS REFERENCE | $1.00 |
| MISCELLANEOUS | $1.00 |
| | |
| TOTAL FEES PAID | $187.00 |

| MORTGAGE TAXES | |
|---|---|
| MORTGAGE DATE | 06/22/2000 |
| MORTGAGE AMOUNT | $0.00 |
| EXEMPT | |
| | |
| YONKERS | $0.00 |
| BASIC | $0.00 |
| ADDITIONAL | $0.00 |
| SUBTOTAL | $0.00 |
| MTA | $0.00 |
| SPECIAL | $0.00 |
| | |
| TOTAL PAID | $0.00 |

| TRANSFER TAXES | |
|---|---|
| CONSIDERATION | $0.00 |
| | |
| TAX PAID | $0.00 |
| TRANSFER TAX # | |

**SERIAL NUMBER**          CR15299
**DWELLING**

| RECORDING DATE | 08/03/2000 |
|---|---|
| TIME | 14:00:00 |

**THE PROPERTY IS SITUATED  IN**
**WESTCHESTER COUNTY, NEW YORK IN THE:**
**TOWN OF BEDFORD**
**TOWN OF NEW CASTLE**
**TOWN OF NORTH CASTLE**

WITNESS MY HAND AND OFFICIAL SEAL

*Leonard N. Spano*

**LEONARD N. SPANO**
**WESTCHESTER COUNTY CLERK**

Record & Return to:
**REED, SMITH, SHAW & MCKAY, ESQS.**
**2500 1 LIBERTY PLACE**
**1650 MARKET STREET**
**PHILADEPHIA, PA 19013**

$5/p$ Bed
Noc
Nec

# CONSOLIDATED AMENDED AND RESTATED MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS MORTGAGE made this 22nd day of June, 2000, from SEVEN SPRINGS LLC, a New York limited liability company with an address of c/o The Trump Organization, 725 Fifth Avenue, New York, New York 10022 ("Mortgagor"), to ROYAL BANK OF PENNSYLVANIA, a Pennsylvania banking institution with offices at 732 Montgomery Avenue, Narberth, Pennsylvania 19072 ("Mortgagee").

## WITNESSETH:

WHEREAS, Mortgagor is the maker of those certain promissory notes (the "Existing Notes") described on Schedule "A" annexed hereto and made a part hereof, in the aggregate principal balance of $8,000,000.00. The Existing Notes are secured by those certain mortgages (the Existing Mortgages") described on Schedule "B" annexed hereto and made a part hereof. The Existing Mortgages now secure a maximum principal balance of $8,000,000.00 (the "Existing Indebtedness").

WHEREAS, on the date hereof the holder of the Existing Notes has assigned and/or endorsed the Existing Notes pursuant to an assignment, allonge or endorsement, without recourse, dated even date herewith, to Mortgagee, and the mortgagee under the Existing Mortgages has assigned its interest under the Existing Mortgages to Mortgagee pursuant to a certain assignment of mortgage, dated even date herewith.

WHEREAS, Mortgagor and Mortgagee are modifying, amending and restating the Existing Notes pursuant to a certain Consolidated, Amended and Restated Promissory Note dated even date herewith under which Mortgagor promises to pay to the order of Mortgagee the principal sum of Eight Million Dollars ($8,000,000) lawful money of the United States of America, with interest thereon at the rate and times, in the manner and according to the terms and conditions specified in such note (that, together with any and all restatements thereof or amendments thereto, is referred to herein as the "Note"), all of which are incorporated herein by reference.

WHEREAS, Mortgagor and Mortgagee desire to consolidate, amend and restate in their entirety the Existing Mortgages securing the Existing Indebtedness as evidenced by the Existing Notes, so that, together they shall constitute but one mortgage, a single lien encumbering the Mortgaged Property (as defined herein), all upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the indebtedness, and as security for payment to Mortgagee of (a) the principal with interest, and all other sums provided for in the Note and in this Mortgage, and as further security for the full and faithful performance by Mortgagor of its obligations under the Note, according to the terms and conditions, and for performance of the agreements, conditions, covenants, provisions and stipulations contained herein and therein, and in certain other agreements and instruments made and given by Mortgagor to Mortgagee in connection therewith (the Note, and all other agreements and instruments executed in connection with the loan evidenced thereby, being sometimes hereinafter collectively referred to as the "Loan Documents"); and (b) the repayment of any future advances with interest thereon, made by Mortgagee to Mortgagor pursuant to Paragraph 22 hereof; Mortgagor has granted, conveyed, assigned and mortgaged, and by these presents does hereby grant, convey, assign and mortgage unto Mortgagee, all that certain tract or parcel of land located in the County of Westchester, State of New York and more particularly described in Exhibit "A" attached hereto and made a part hereof (hereinafter referred to as the "Land").

PHLLB-0356286.03-CLHEFPLE
June 21, 2000  4:41 PM

TOGETHER WITH all of Mortgagor's right, title and interest now owned or hereafter acquired in:

(a)     all easements, rights-of-way, gores of land, streets, ways, alleys, passages, rights, waters, water courses, water rights and powers, riparian rights, mineral rights, privileges, tenements, hereditaments and appurtenances whatsoever in any way belonging, relating or appertaining to any of the Land or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Mortgagor, and the reversions and remainders; and

(b)     all rents, issues and profits thereof; and

(c)     all buildings and other improvements erected or hereafter erected upon the Land and all building materials, fixtures, building machinery and building equipment delivered on site to the Land during the course of, or in connection with, the construction of, or reconstruction of, or remodeling of any buildings and improvements from time to time during the term hereof; and

(d)     all fixtures, appliances, machinery, furniture and equipment of any nature whatsoever, and other articles of personal property now or at any time hereafter installed in, attached to or situated in or upon the Land or any buildings and improvements now or hereafter erected on, upon, under or forming a part of the Land, or used or intended to be used in connection with the Land, or in the operation of any buildings and improvements now or hereafter erected thereon, or in the operation or maintenance of any such building or improvement, plant or business situate thereon, whether or not the personal property is or shall be affixed thereto; and

(e)     all licenses (including but not limited to operating licenses or similar matters), contracts, management contracts or agreements, franchise agreements, permits, bonds, authorities or certificates required or used in connection with the ownership of, or the operation or maintenance of the real property or improvements or personal property, provided that no such contract, agreement, license or the like shall be binding upon Mortgagee except with Mortgagee's prior consent; and

(f)     all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards.

All of the Land, buildings and improvements, fixtures, machinery, furniture, equipment, tenements, hereditaments and appurtenances, proceeds and other property interests above described and hereby mortgaged are sometimes collectively referred to herein as the "Mortgaged Property".

Uniform covenants. Mortgagor and Mortgagee covenant and agree as follows:

1.     Mortgagor's Representations.   Mortgagor warrants and represents that it possesses a good and insurable title to an indefeasible fee simple estate in the Mortgaged Property; that Mortgagor has full power and lawful authority to subject the Mortgaged Property to the lien of this Mortgage in the manner and form herein provided; that it shall be lawful for Mortgagee at all times to enter upon, hold, occupy and enjoy the Mortgaged Property and every part thereof; that the Mortgaged Property is free from all liens and encumbrances subject only to those title exceptions listed in the mortgagee title insurance policy approved by and issued to Mortgagee, insuring the priority of the lien of this Mortgage; that all information, reports, papers and data

-2-

given to Mortgagee with respect to the Mortgaged Property or Mortgagor are accurate in all material respects; that no notice of taking by eminent domain or condemnation of any part of the Mortgaged Property has been received, and Mortgagor has no knowledge that any of such is contemplated; that the Mortgaged Property and the present use and occupancy thereof are in compliance with all applicable laws, rules, ordinances, statutes and regulations; and that no part of the Mortgaged Property is located in an area designated by any federal, state or local governmental entity as having a special flood hazard.

2.    Payment and Performance.  Mortgagor shall pay to Mortgagee, in accordance with the terms of the Note and this Mortgage, the principal and interest, and other sums therein set forth; shall perform and comply with all the agreements, conditions, covenants, provisions and stipulations of the Loan Documents and this Mortgage; and shall timely perform all of its material obligations and duties as landlord under any lease of all or any portion of the Mortgaged Property now or hereafter in effect.

3.    Maintenance of Mortgaged Property.  Mortgagor shall keep and maintain or cause to be kept and maintained all buildings and improvements now or at any time hereafter erected on the Mortgaged Property and the sidewalks and curbs abutting them, in good order and condition and in a rentable and tenantable state of repair, and will make or cause to be made, as and when necessary for such purpose, all repairs, renewals and replacements, structural and nonstructural, exterior and interior, ordinary and extraordinary, foreseen and unforeseen. Mortgagor shall abstain from and shall not permit the commission of waste in or about the Mortgaged Property; and, except in connection with a casualty or condemnation shall not, in any material manner, remove or demolish, or alter the structural character of, any building erected at any time on or constituting a part of the Mortgaged Property or alter the exterior of the building, without the prior written consent of Mortgagee; and shall not permit the Mortgaged Property to become vacant, deserted or abandoned. Mortgagor further covenants and agrees to maintain in good condition on the Mortgaged Property all items of inventory, equipment and any other personal property necessary for or used in the maintenance and operation of the Mortgaged Property, free of any security interest (except a security interest in favor of Mortgagee), and, upon request, to furnish to Mortgagee financing statements, continuation certificates and such other documents necessary to perfect and maintain in favor of Mortgagee a security interest in such personal property.

4.    Insurance.

(a)    Mortgagor shall keep the Mortgaged Property continuously insured, to the extent of its full insurable value, against loss or damage by fire, with extended coverage and against such other hazards (including, without limitation, coverage against loss or damage by vandalism, malicious mischief, sprinkler leakage and flood) as Mortgagee may reasonably require, and shall maintain commercial general liability property damage and workmen's compensation insurance, in an insurance company or companies qualified to insure property located in New York and satisfactory to Mortgagee, and in such total amounts as Mortgagee may reasonably require from time to time. Such insurance shall contain agreed amount endorsements, inflation guard endorsements and replacement cost endorsements reasonably satisfactory to Mortgagee. During the course of any construction or repair of improvements on the Mortgaged Property for which builder's risk insurance may be obtained, Mortgagor shall acquire and maintain builder's completed value risk insurance against all risks of physical loss, including collapse and transit coverage, during construction of such improvements, with deductibles not to exceed $10,000 in non-reporting form, covering the total value of work performed and equipment, supplies and materials furnished. Mortgagor shall also obtain insurance affording protection against rental loss in an amount of not less than the rent payable during the then current twelve (12) month period in the event of any damage caused by the perils referred to above. All policies of insurance, including policies for any amounts carried in excess of the

-3-

required minimum and policies not specifically required by Mortgagee, shall be in form reasonably satisfactory to Mortgagee, shall name Mortgagee as one of the insured, shall be maintained in full force and effect, shall be assigned and delivered to Mortgagee, with premiums prepaid, as collateral security for payment of the indebtedness secured hereby, shall name Mortgagee as the loss payee, shall be endorsed with a standard mortgagee clause in favor of Mortgagee (substantially equivalent to the New York standard mortgagee endorsement) not subject to contribution, and shall provide for at least thirty (30) days' notice of cancellation, termination, modification, refusal to renew or reduction to Mortgagee. If the insurance, or any part thereof, shall expire, or be withdrawn, or become void or unsafe by Mortgagor's breach of any condition thereof, or become void or unsafe by reason of the failure or impairment of the capital of any company in which the insurance may then be carried, or if for any reason in the reasonable opinion of Mortgagee the insurance shall be unsatisfactory to Mortgagee, Mortgagor shall place new insurance on the Mortgaged Property satisfactory to Mortgagee. All renewal policies, with premiums paid, shall be delivered to Mortgagee at least thirty (30) days before expiration of the old policies.

(b)     In the event of loss, Mortgagor will give immediate notice thereof to Mortgagee, and Mortgagee may make proof of loss if not made promptly by Mortgagor. Each insurance company concerned is hereby authorized and directed to make payment under such insurance, including return of unearned premiums, directly to Mortgagee instead of to Mortgagor and Mortgagee jointly, and Mortgagor appoints Mortgagee, irrevocably, as Mortgagor's attorney-in-fact to endorse any draft therefor. Mortgagee shall have the right to retain and apply the proceeds of any such insurance, at its election, to reduction of the indebtedness secured hereby, or to restoration or repair of the property damaged on such terms as Mortgagee may specify, at Mortgagee's sole and absolute discretion. If Mortgagee elects to retain and apply such proceeds to the reduction of the indebtedness secured hereby, Mortgagee shall have the right in its sole and absolute discretion to apply any such proceeds, in such order and in such amounts as Mortgagee may elect, against:  (i) any amounts payable by Mortgagor hereunder or under the Loan Documents, and/or (ii) accrued and unpaid interest under the Note, and/or (iii) the outstanding principal balance of the Note.  No application of insurance proceeds to the payment of the Note shall postpone any of the current installments of principal or interest becoming due under such Note until such Note and all interest and other sums due hereunder and thereunder have been paid in full.

(c)     Such policies of insurance and all renewals thereof are hereby assigned to Mortgagee as additional security for payment of the indebtedness hereby secured and Mortgagor hereby agrees that any values available thereunder upon cancellation or termination of any of said policies or renewals, whether in the form of return of premiums or otherwise, shall be payable to Mortgagee as assignee thereof. If Mortgagee becomes the owner of the Mortgaged Property or any part thereof by foreclosure or otherwise, such policies, including all right, title and interest of Mortgagor thereunder, shall become the absolute property of Mortgagee. In addition, Mortgagor will deliver the originals or certified copies of all such policies to Mortgagee, and, not less than thirty (30) days prior to the expiration date of each such policy, will deliver to Mortgagee a renewal policy or policies (or certified copies of such policies) marked "premium paid" or accompanied by other evidence of payment satisfactory to Mortgagee. Mortgagor shall not change the present use of any portion of the Mortgaged Property in any manner or permit any condition to exist on the Mortgaged Property which would permit an insurer to cancel or increase the premium for any insurance policy or invalidate such policy in whole or in part. Mortgagor shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Paragraph 4 unless Mortgagee is included thereon as a named insured with loss payable to Mortgagee under a non-contributory mortgagee clause satisfactory to Mortgagee. Mortgagor shall immediately notify Mortgagee whenever any such separate insurance is taken out, specifying the insurer thereunder and full particulars as to the policies evidencing the same.

5.     Taxes and Other Charges.  Mortgagor shall pay at least fifteen (15) days before they are due and payable and before any interest, charge or penalty is due thereon, without any deduction, defalcation or abatement, all taxes, assessments, levies, liabilities, obligations, encumbrances, water and sewer rents and all other charges or claims of every nature and kind which may be imposed, suffered, placed, assessed, levied, or filed at any time against Mortgagor, the Mortgaged Property or any part thereof or against the interest of Mortgagee therein, or with respect to the Note or Mortgage and/or the ownership of either thereof by Mortgagee, or which by any present or future law may have priority over the indebtedness secured hereby either in lien or in distribution out of the proceeds of any judicial sale, without regard to any law heretofore or hereafter to be enacted imposing payment of the whole or of any part upon Mortgagee; and insofar as any such tax, assessment, levy, liability, obligation or encumbrance is of record, the same shall be promptly satisfied and discharged of record and the original official document (such as, for instance, the tax receipt or the satisfaction paper officially endorsed or certified) shall be placed in the hands of Mortgagee not later than five (5) days prior to the due date thereof.  Provided, however, that if, pursuant to this Mortgage or otherwise, Mortgagor shall have deposited with Mortgagee before the due date thereof sums sufficient to pay any such taxes, assessments, levies, water and sewer rents, charges or claims, and Mortgagor is not otherwise in default, they shall be paid by Mortgagee; and provided further, that if Mortgagor is not in default hereunder and in good faith and by appropriate legal action shall contest the validity of any such item, or the amount thereof, and shall have established on its books or by deposit of cash with Mortgagee, as Mortgagee may elect, a reserve for the payment thereof in such amount as Mortgagee may require (including any interest and penalties which may be payable in connection therewith), then Mortgagor shall not be required to pay the item or to produce the required receipts, while the reserve is maintained and so long as the contest operates to prevent collection, and is maintained and prosecuted with diligence, and shall not have been terminated or discontinued adversely to Mortgagor.  Further, Mortgagor will not apply for or claim any deduction, by reason of this Mortgage, from the taxable value of all or any part of the Mortgaged Property.  It is expressly agreed that no credit shall be claimed or allowed on the interest payable on the Note because of any taxes or other charges paid.

6.     Installments for Insurance, Taxes and Other Charges.  Without limiting the effect of Paragraphs 4 and 5 hereof, Mortgagee may require Mortgagor to pay to Mortgagee (or to such other entity as Mortgagee shall designate), monthly with the monthly installments of interest (or the monthly installments of principal and interest when applicable), an amount equal to one-twelfth (1/12) of the annual premiums for the insurance policies referred to hereinabove and the annual real estate taxes, water and sewer rents, any special assessments, charges or claims and any other item which at any time may be or become a lien upon the Mortgaged Property prior to the lien of this Mortgage; and on demand from time to time Mortgagor shall pay to Mortgagee any additional sums necessary to pay the premiums and other items, all as estimated by Mortgagee.  The amounts so paid shall be security for the premiums and other items and shall be used in payment thereof if Mortgagor is not otherwise in default hereunder.  No amount so paid shall be deemed to be trust funds but may be commingled with general funds of Mortgagee and no interest shall be payable thereon.  If, pursuant to any provision of this Mortgage or the Note, the whole amount of the unpaid principal debt becomes due and payable, Mortgagee shall have the right, in its sole and absolute discretion, to apply any amount so held, in such order and in such amounts as Mortgagee may elect, against: (a) any amounts payable by Mortgagor hereunder or under the Loan Documents, and/or (b) accrued and unpaid interest under the Note, and/or (c) the outstanding principal balance of the Note.  At Mortgagee's option, Mortgagee from time to time may waive, and after any such waiver may reinstate, the provisions of this paragraph requiring the monthly payments.  Mortgagor will furnish to Mortgagee bills and other requests for payment in sufficient time to enable Mortgagee to pay such taxes, assessments, levies, charges and fees as provided above.

7.   <u>Corporate Existence and Taxes</u>.  If Mortgagor or any successor or grantee of Mortgagor is a corporation, it shall keep in effect its existence and rights as a corporation under the laws of the state of its incorporation and its right to own property and transact business in the state in which the Mortgaged Property is situated during the entire time that it has any ownership interest in the Mortgaged Property.  For all periods during which title to the Mortgaged Property or any part thereof shall be held by a corporation or association subject to corporate taxes or taxes similar to corporate taxes, Mortgagor shall file returns for such taxes with the proper authorities, bureaus or departments and it shall pay, when due and payable and before interest or penalties are due thereon, all taxes owing by Mortgagor to the United States, to such state of incorporation and to the state in which the Mortgaged Property is situated and any political subdivision thereof, and shall produce to Mortgagee receipts showing payment of any and all such taxes, charges or assessments prior to the last dates upon which such taxes, charges or assessments are payable without interest or penalty charges, and within ten (10) days of receipt thereof all settlements, notices of deficiency or overassessment and any other notices pertaining to Mortgagor's tax liability which may be issued by the United States, such state of incorporation, the state in which the Mortgaged Property is situated and any political subdivision thereof.

8.   <u>Documentary and Other Stamps</u>.  If at any time the United States, the state in which the Mortgaged Property is located or any political subdivision thereof, or any department or bureau of any of the foregoing, shall require documentary, revenue or other stamps on the Note secured hereby or this Mortgage, Mortgagor on demand shall pay for them with any interest or penalties payable thereon.

9.   <u>Future Taxes</u>.  If hereafter any law or ordinance shall be adopted imposing a tax directly or indirectly on Mortgagee with respect to the Mortgaged Property, the value of Mortgagor's equity therein, or the indebtedness evidenced by the Note and secured by this Mortgage, Mortgagee, at its election, shall have the right at any time after the tax has been imposed to give Mortgagor written notice declaring that the principal debt, with interest and other appropriate charges, shall be due on a specified date not less than sixty (60) days thereafter which notice shall specify the nature of the tax which is the basis for acceleration; provided, however, that such election shall be ineffective if, prior to the specified date, Mortgagor lawfully pays the tax (in addition to all other payments required hereunder) and agrees to pay the tax whenever it becomes due and payable thereafter, which agreement shall then constitute a part of this Mortgage.

10.   <u>Security Agreement</u>.

(a)   This Mortgage constitutes a security agreement within the meaning of the Uniform Commercial Code this date in the State of New York (the "Uniform Commercial Code").  Mortgagor hereby grants to Mortgagee a security interest in all that property included in the Mortgaged Property which might otherwise be deemed "personal property", including, but not limited to, all furniture, furnishings, fixtures, equipment, machinery, inventory, goods, leases, rents, issues, profits, contract rights, accounts, documents, instruments, chattel paper, general intangibles and all other property used or useable in connection with the Mortgaged Property, whether now owned or hereafter acquired by Mortgagor, and all substitutions, accretions, and component parts, replacements thereof, and additions thereto and all cash and non-cash proceeds thereof.

(b)   Mortgagor shall execute, deliver, file and refile any financing statements, continuation statements, or other security agreements Mortgagee may require from time to time to confirm the lien of this Mortgage with respect to such property.  Without limiting the foregoing, Mortgagor hereby irrevocably appoints Mortgagee attorney-in-fact for Mortgagor to execute, deliver and file such instruments for and on behalf of Mortgagor.  Mortgagor shall pay,

or at Mortgagee's election shall reimburse Mortgagee for, all filing fees in connection therewith. Mortgagor shall not change its principal place of business without giving Mortgagee at least thirty (30) days prior written notice thereof, which notice shall be accompanied by new financing statements executed by Mortgagor in the same form as the financing statements delivered to Mortgagee on the date hereof except for the change of address.

(c)     Upon any Event of Default hereunder or under the Note, Mortgagee shall have, in addition to any other rights and remedies hereunder or under the Note, all of the rights and remedies granted to a secured party under the Uniform Commercial Code with respect to such personal property. To the extent permitted by law, Mortgagor and Mortgagee agree that the items set forth on the financing statements shall be treated as part of the real estate and improvements regardless of the fact that such items are set forth in the financing statements. Such items are contained in the financing statements to create a security interest in favor of Mortgagee in the event such items are determined to be personal property under the law. Notwithstanding any release of any or all of that property included in the Mortgaged Property which is deemed "real property", any proceedings to foreclose this Mortgage or its satisfaction of record, the terms hereof shall survive as a security agreement with respect to the security interest created hereby and referred to above until the repayment or satisfaction in full of the obligations of Mortgagor as are now or hereafter evidenced by the Note.

(d)     To the extent permitted under the Uniform Commercial Code, Mortgagor waives all rights of redemption and all other rights and remedies of a debtor thereunder and all formalities prescribed by law relative to the sale or disposition of the personal property after the occurrence of an Event of Default hereunder and to all other rights and remedies of Mortgagor with respect thereto. In exercising its right to take possession of the personal property upon the occurrence of an Event of Default hereunder, Mortgagee may enter upon the Mortgaged Property without being guilty of trespass or any other wrong-doing, and without liability for damage thereby occasioned.

(e)     Mortgagor shall reimburse Mortgagee, on demand, for all reasonable expenses of retaking, holding, preparing for sale, lease or other use or disposition, selling, leasing or otherwise using or disposing of the personal property which are incurred or paid by Mortgagee, including, without limitation, all attorneys' fees, legal expenses and costs, and all such expenses shall be added to Mortgagor's obligations to Mortgagee and shall be secured hereby.

11.     Compliance with Laws and Regulations. Mortgagor shall comply with all laws, ordinances, regulations and orders of all federal, state, municipal and other governmental authorities relating to the Mortgaged Property. Mortgagor will pay all license fees and similar municipal charges for the use of the Mortgaged Property and any other areas now or hereafter comprising part thereof or used in connection therewith and will not, unless so required by a governmental agency having jurisdiction, discontinue use or occupancy of any portion of the Mortgaged Property without the prior written consent of Mortgagee. The Mortgagor shall not take or permit any action with respect to the Mortgaged Property which will in any manner impair the security of this Mortgage.

12.     Inspection. Mortgagee and any persons authorized by Mortgagee shall have the right at any time, to enter the Mortgaged Property at a reasonable hour to inspect and photograph its condition and state of repair and/or for the purpose of appraising the same.

13.     Declaration of No Set-Off. Within one (1) week after being requested to do so by Mortgagee, Mortgagor shall certify to Mortgagee or to any proposed assignee of this Mortgage, in a writing duly acknowledged, the amount of principal, interest and other charges then owing on the obligation secured by this Mortgage and by prior liens, if any, and whether Mortgagor

claims any set-offs or defenses against Mortgagor's obligation to pay such amounts, and if so the precise basis for such set-offs or defenses.

14.     Financial Information. So that Mortgagee will have a full and clear understanding of the operation of the Mortgaged Property and the financial standing of Mortgagor, Mortgagor agrees to make the books and accounts relating to the Mortgaged Property and Mortgagor's operations available for inspection by Mortgagee, or its representatives, upon written request at any reasonable time and further agrees to furnish Mortgagee with such additional financial information which relates to the Mortgaged Property or Mortgagor as may be reasonably requested from time to time by Mortgagee.

15.     Required Notices. Mortgagor shall notify Mortgagee promptly of the occurrence of any of the following:

(a)     a fire or other casualty causing damage to the Mortgaged Property;

(b)     receipt of notice of eminent domain proceedings or condemnation of all or any part of the Mortgaged Property;

(c)     receipt of notice from any governmental authority relating to the structure, use or occupancy of the Mortgaged Property;

(d)     receipt of any notice from any tenant of all or any portion of the Mortgaged Property;

(e)     substantial change in the occupancy of the Mortgaged Property;

(f)     commencement of any litigation affecting the Mortgaged Property other than accident claims fully covered by insurance and for which the insurance carrier has acknowledged liability; or

(g)     receipt of any notice from the holder or claimant of any lien or security interest in the Mortgaged Property or any part thereof.

16.     Condemnation.

(a)     In the event of any condemnation or taking of any part of the Mortgaged Property by eminent domain, or other injury to or decrease in the value of the Mortgaged Property by any public or quasi-public authority or corporation, all proceeds (that is, the award or agreed compensation for the damages sustained) allocable to Mortgagor are hereby assigned by Mortgagor to Mortgagee to further secure the payment of the indebtedness secured hereby. No settlement for damages sustained shall be made by Mortgagor without Mortgagee's prior written approval. Mortgagee is authorized and empowered (but not required) to collect and receive any such condemnation award and all condemnation proceeds which then shall be applied in the·order and in the amounts that Mortgagee, in Mortgagee's sole discretion, may elect, to the reduction of the indebtedness secured hereby, or toward payment to Mortgagor, on such terms as Mortgagee may specify, to be used for the sole purpose of altering, restoring or rebuilding any part of the Mortgaged Property which may have been altered, damaged or destroyed as a result of the taking, or other injury to the Mortgaged Property. Mortgagor shall execute such further assignments of any such awards as Mortgagee may require. If Mortgagee elects to apply such proceeds to reduction of the indebtedness secured hereby, Mortgagee shall have the right in its sole and absolute discretion to apply any such proceeds, in such order and in such amounts as Mortgagee may elect, against: (i) any amounts payable by Mortgagor hereunder or under the

-8-

Loan Documents, and/or (ii) accrued and unpaid interest under the Note, and/or (iii) the outstanding principal balance of the Note.

(b)     If prior to the receipt of the proceeds by Mortgagee the Mortgaged Property shall have been sold on foreclosure of this Mortgage, Mortgagee shall have the right to receive the proceeds to the extent of:

(i)     any deficiency found to be due to Mortgagee in connection with the foreclosure sale, with legal interest thereon, and

(ii)     counsel fees, costs and disbursements incurred by Mortgagee in connection with collection of the proceeds and the proceedings to establish the deficiency.

(c)     If the amount of the initial award of damages for the condemnation is insufficient to pay in full the indebtedness secured hereby with interest and other appropriate charges, Mortgagee shall have the right to prosecute to final determination or settlement an appeal or other appropriate proceedings in the name of Mortgagee or Mortgagor, for which Mortgagee is hereby appointed irrevocably as attorney-in-fact for Mortgagor. In that event, the expenses of the proceedings, including counsel fees, shall be paid first out of the proceeds and only the excess, if any, paid to Mortgagee shall be credited against the amounts due under this Mortgage.

(d)     Nothing herein shall limit the rights otherwise available to Mortgagee, at law or in equity, including the right to intervene as a party to any condemnation proceeding.

(e)     No application of condemnation proceeds to the payment of the Note shall postpone any of the current installments of principal or interest becoming due under such Note until the Note and all interest and other sums due thereunder and hereunder are paid in full.

17.     Leases.

(a)     Mortgagor hereby assigns to Mortgagee all existing and future leases (the "Leases") and all rents and profits of the Mortgaged Property as further security for the payment of the indebtedness hereby secured and Mortgagor grants to Mortgagee the right to enter upon the Mortgaged Property for the purposes of collecting the same and to let the Mortgaged Property or any part thereof. This assignment and grant shall continue in effect until the indebtedness secured by this Mortgage is paid. Mortgagee hereby waives the right to collect said rents and profits, and Mortgagor shall be entitled to collect and receive the same until default in this Mortgage or the Loan Documents, and Mortgagor agrees to use such rents and profits in payment of principal and interest becoming due on this Mortgage and in payment of taxes, assessments, sewer rents, water rents and charges becoming due as aforesaid, but such privilege of Mortgagor may be revoked by Mortgagee upon default without notice. Mortgagor shall not, without the written consent of Mortgagee, receive or collect rent or other charge for a period of more than one month in advance. Mortgagee shall not be deemed to have accepted the assignment except as a pledge or be obligated as lessor by virtue of this assignment except by a separate and express written agreement of Mortgagee.

(b)     Mortgagor hereby authorizes and instructs each and every present and future tenant of any of the Mortgaged Property to pay all rents directly to Mortgagee and to perform all other obligations of that tenant for the direct benefit of Mortgagee, as if Mortgagee were the landlord under the lease with that tenant, immediately upon receipt of a demand by Mortgagee to make such payment or perform such obligations. No tenant shall have any responsibility to ascertain whether such demand is permitted hereunder or whether a default shall have occurred. Mortgagor hereby waives any right, claim or demand it may now or hereafter

-9-

have against any such tenant by reason of such payment of rents or performance of obligations to Mortgagee; and any such payment or performance to Mortgagee shall discharge the obligations of the tenant to make such payment or performance to Mortgagor. Mortgagor shall indemnify Mortgagee and hold Mortgagee harmless from any and all liability under any lease and for any and all claims and demands which may be asserted against Mortgagee by reason of any alleged obligations to perform any provision of any lease, except as to Mortgagee's own gross negligence or willful misconduct.

(c)     Mortgagor will deliver to Mortgagee upon written request a statement under oath setting forth the names of all tenants occupying space in the Mortgaged Property, a brief description of the space occupied, the rental payable and the date of expiration of the respective leases, and the status of the rental payments due thereunder.

(d)     Mortgagor shall promptly (i) perform all of the provisions of the Leases on the part of the landlord thereunder to be performed; (ii) enforce all of the provisions of the Leases on the part of the tenants thereunder to be performed; and (iii) appear in and defend any action or proceeding arising under, growing out of or in any manner connected with the Leases or the obligations of Mortgagor as landlord or of the tenants thereunder.

(e)     Mortgagor shall not enter into any new Leases or amend any of the terms of any of the existing Leases without obtaining the prior written approval of Mortgagee.

18.     No Other Financing or Liens.  Without the prior written consent of Mortgagee, which Mortgagee can grant or withhold in its sole and absolute discretion, Mortgagor shall not create or cause or permit to exist any lien on, or security interest in the Mortgaged Property or any part thereof (whether or not such lien or security interest is subordinate to the lien of this Mortgage), including any furniture, fixtures, appliances, machinery, equipment, or other items of personal property which are intended to be or become part of the Mortgaged Property, or securing repayment of monies paid to or for the benefit of Mortgagor.

19.     No Transfer.  Without the prior written consent of Mortgagee, which Mortgagee can grant or withhold in its sole and absolute discretion, Mortgagor will abstain from and will not cause or permit any transfer of title to, beneficial interest in, or any estate or other interest in the Mortgaged Property or any part thereof, or any interest in Mortgagor, voluntarily or by operation of law, whether by sale, exchange, conveyance, merger, division, consolidation or otherwise, if such will result in the transfer of control of all or any portion of the Mortgaged Property to other than Mortgagor, or in a change in the ownership and/or control of Mortgagor.  Any consent given by Mortgagee hereunder shall pertain only to the proposed transfer for which the consent was requested and shall not obligate Mortgagee to approve any further transfers.  Notwithstanding the foregoing, a transfer of the membership interests in Mortgagor by will or intestacy shall not require the consent of Mortgagee.

20.     Right to Remedy Defaults.  In the event that Mortgagor should fail to pay corporate taxes, real estate or other taxes, assessments, water and sewer rents, charges and claims on or before the date on which any penalty may be imposed with respect thereto, or fail to pay insurance premiums, or fail to make necessary repairs, or permit waste, or fail to comply with any other provision of this Mortgage or the Loan Documents, Mortgagee, at its election and without notice to Mortgagor, shall have the right to make any payment or expenditure and to take any action which Mortgagor should have made or taken, or which Mortgagee deems advisable to protect the security of this Mortgage or the Mortgaged Property, without prejudice to any of Mortgagee's rights or remedies available hereunder or otherwise, at law or in equity.  All such sums, as well as costs, advanced by Mortgagee pursuant to this Mortgage shall be due immediately from Mortgagor to Mortgagee, shall be secured hereby, and shall bear interest at the Default Rate (as defined in the Note) from the date of payment by Mortgagee until the date of

repayment.  The rights of Mortgagee herein specified shall be in addition to Mortgagee's rights under Section 254 of the New York Real Property Law.

21.  Actions of Mortgagee.  Mortgagee may, at any time and from time to time, without notice to and without the consent of any other person or entity (except for Mortgagor in the case of a modification of the terms of the Note or this Mortgage), (1) extend or accelerate the time of payment of the indebtedness secured hereby, (2) agree to modify the terms of the Note or this Mortgage, including increasing payments of interest and principal, (3) release any person liable for payment of any indebtedness secured hereby or for performance of any obligation, (4) release all or any part of the security held for the indebtedness secured hereby or (5) exercise or refrain from exercising or waive any right Mortgagee may have.  Mortgagee shall have such rights and may exercise them without affecting the lien or priority of this Mortgage upon the Mortgaged Property or any part thereof notwithstanding the fact that junior mortgages, judgments or other claims or encumbrances may be impaired, prejudiced or otherwise adversely affected thereby.

22.  Additional Advances; Future Indebtedness.  Without limiting any other provisions of this Mortgage, Mortgagee may make future advances, and this Mortgage shall secure repayment of such advances and the interest thereon, when evidenced by promissory notes stating that said notes are secured hereby, for the payment of taxes, assessments, maintenance charges, insurance premiums, or costs similar or dissimilar incurred for the protection of the Mortgaged Property or for the lien of this Mortgage, expenses incurred by Mortgagee by reason of default by Mortgagor, or advances made under a construction loan to enable the completion of the improvements for which the construction loan was originally made.  This Mortgage shall further constitute security for any and all present and future loans and advances that may be made by Mortgagee to Mortgagor at any time or times hereafter whether or not any reference is made to this Mortgage at the time that such loans or advances are made.  Notwithstanding anything to the contrary contained in this Mortgage, the maximum amount of principal indebtedness secured by this Mortgage or which under any contingency may be secured by this Mortgage is Eight Million Dollars ($8,000,000) plus (a) taxes, charges or assessments which may be imposed by law upon the Mortgaged Property; (b) premiums on insurance policies covering the Mortgaged Property; (c) expenses incurred in upholding the lien of this Mortgage, including, but not limited to (i) the expenses of any litigation to prosecute or defend the rights and lien created by this Mortgage; (ii) any amount, cost or charges to which the Mortgagee becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority and (iii) interest, default interest and other charges at the rate and in the amounts set forth in the Loan Documents.  Mortgagor will receive advances hereunder subject to the trust fund provisions of Section 13 of the New York Lien Law.

23.  Events of Default.  Each of the following shall constitute an event of default (hereinafter called "Event of Default" or "Default") hereunder:

(a)  The occurrence of an event of default under any of the other Loan Documents, following the expiration of the applicable notice and grace periods, if any.

(b)  Mortgagor's noncompliance or nonperformance of any other term, covenant or condition contained in this Mortgage or the other Loan Documents.

(c)  Breach of any warranty or untruth of any representation contained in this Mortgage or the other Loan Documents.

(d)  If Mortgagor shall be in default under any mortgage or other lien against all or any portion of the Mortgaged Property or any document executed or delivered in connection therewith.

-11-

(e)     If Mortgagor shall cause or permit any transfer of title to, beneficial interest in, or any estate or other interest in the Mortgaged Property or any part thereof, or any interest in Mortgagor, voluntarily or by operation of law (other than by execution on the Note or foreclosure under this Mortgage), whether by sale, exchange, conveyance, merger, division, consolidation or otherwise, if such will result in the transfer of control of all or any portion of the Mortgaged Property to other than Mortgagor, or in a change in the ownership and/or control of Mortgagor, except as otherwise permitted in Paragraph 19 herein.

(f)     If any inferior lien encumbers the Mortgaged Property or any part thereof.

(g)     Should any federal or state tax lien or any claim or lien for labor or materials be filed of record against Mortgagor or the Mortgaged Property or any part thereof.

24.     <u>Remedies</u>.

(a)     Upon the happening of any Event of Default, the entire unpaid balance of the principal, the accrued interest and all other sums secured by this Mortgage shall become immediately due and payable, without notice or demand.

(b)     When the entire indebtedness shall become due and payable, either because of maturity or because of the occurrence of any Event of Default, or otherwise, then forthwith:

(i)     <u>Foreclosure</u>.  Mortgagee may institute an action of mortgage foreclosure against the Mortgaged Property, or take such other action at law or in equity for the enforcement of this Mortgage and realization on the mortgage security or any other security herein or elsewhere provided for, as the law may allow, and may proceed therein to final judgment and execution for the entire unpaid balance of the principal debt, with interest at the rate stipulated in the Note to the date of default, and thereafter at the Default Rate (as defined in the Note), together with all other sums due by Mortgagor in accordance with the provisions of the Note and this Mortgage, including all sums which may have been loaned by Mortgagee to Mortgagor after the date of this Mortgage, and all sums which may have been advanced by Mortgagee for taxes, water or sewer rents, charges or claims, payments on prior liens, insurance, utilities or repairs to the Mortgaged Property, all costs of suit, together with interest at such rate on any judgment obtained by Mortgagee from and after the date of any Sheriff's or other judicial sale until actual payment is made of the full amount due Mortgagee, and a reasonable attorney's commission for collection which shall not exceed five percent (5%) of the total of the foregoing sums; or

(ii)     <u>Possession</u>.  Mortgagee may enter into possession of the Mortgaged Property, manage, lease and operate the Mortgaged Property, collect therefrom all rentals (which term shall also include sums payable for use and occupancy) and, after deducting all costs of collection and administration expense, apply the net rental to any or all of the following in such order and amounts as Mortgagee, in Mortgagee's sole discretion, may elect: the payment of taxes, water and sewer rents, charges and claims, insurance premiums and all other carrying charges, and to the maintenance, repair or restoration of the Mortgaged Property, and on account and in reduction of the principal or interest, or both, hereby secured; in and for that purpose Mortgagor hereby assigns to Mortgagee all rentals due and to become due under any lease or leases or rights to use and occupancy of the Mortgaged Property hereafter created, as well as all rights and remedies provided in such lease or leases or at law or in equity for the collection of the rentals; or

-12-

(iii)   Receiver.  Mortgagee may, upon any proper action or proceeding being commenced for the foreclosure of this Mortgage, apply for, and Mortgagee as a matter of right, without consideration of the value of the Mortgaged Property as security for the amount due Mortgagee, or of the solvency of any person, firm or corporation obligated for the payment of such amount, shall be entitled to, the appointment by any competent court or tribunal, without prior demand or notice to any party, of a receiver of rents and profits and rental value of the Mortgaged Property, with power to take possession of the Mortgaged Property, including possession from Mortgagor if in possession and occupying any portion of the Mortgaged Property, and in the latter case to require Mortgagor, as a condition of remaining in possession and occupation, to pay the reasonable rental value for the use and occupation thereof, with further power to lease and repair the Mortgaged Property and to renovate same to suit new tenants and with such other powers as may be deemed necessary, and such receiver after deducting all proper charges and expenses attending the execution of the said trust as receiver, shall each month pay over to Mortgagee the residue of the said rents and profits and rental value, to be applied by Mortgagee to the payment of the amount remaining secured hereby, or to any deficiency (whether or not any judgment therefor may be entered and irrespective of the market value of the Mortgaged Property) which may exist in the event of foreclosure by sale after applying the proceeds of the sale of the Mortgaged Property to the payment of the amount due, including interest, costs and expenses of such foreclosure and sale, or in the event of strict foreclosure to the payment of any deficiency existing thereunder. A receiver, while in possession of the Mortgaged Property, shall have the right to make repairs and to make improvements necessary or advisable in its or his opinion to preserve the Mortgaged Property, or to make and keep them rentable to the best advantage, and Mortgagee may advance moneys to a receiver for such purposes. Any moneys so expended or advanced by Mortgagee or by a receiver shall be repaid so far as possible out of the rents collected after payment of other expenses properly chargeable against said rents, and any unpaid balance of moneys so advanced or expended shall be added to and become a part of the debt secured by this Mortgage.

(c)   Mortgagee shall have the right, from time to time, to bring an appropriate action to recover any sums required to be paid by Mortgagor under the terms of this Mortgage, as they become due, without regard to whether or not the principal indebtedness or any other sums secured by the Note and this Mortgage shall be due, and without prejudice to the right of Mortgagee thereafter to bring an action of mortgage foreclosure, or any other action, for any default by Mortgagor existing at the time the earlier action was commenced.

(d)   Any real estate sold pursuant to any writ or order of execution issued on a judgment obtained by virtue of the Note or this Mortgage, or pursuant to any other judicial proceedings under the Mortgage, may be sold in one parcel, as an entirety, or in such parcels, and in such manner or order as Mortgagee, in its sole discretion, may elect.

25.   Non-Merger.  Mortgagor intends and agrees that this Mortgage shall NOT merge into any judgment entered or recovered by Mortgagee against Mortgagor under the Note or under or pursuant to any other note, document or instrument. Notwithstanding the recovery or entry of any such judgment against Mortgagor, all of the terms, provisions, covenants, undertakings and agreements of Mortgagor whether hereunder or under the Note or any other note, instrument, document or undertaking of Mortgagor, whether relating thereto or not, shall remain in full force and effect and shall be enforceable strictly in accordance with their terms as fully as though no such judgment had been entered or recovered against Mortgagor.

26.   Cumulative Rights.  The rights and remedies of Mortgagee as provided in this Mortgage, the Note, and every Loan Document, shall be cumulative and concurrent; may be pursued separately, successively or together against Mortgagor or against the Mortgaged Property, or both, at the sole discretion of Mortgagee; and may be exercised as often as occasion

-13-

therefor shall arise. The failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof.

27.     No Waiver Implied. Any failure by Mortgagee to insist upon strict performance by Mortgagor of any of the terms and provisions of this Mortgage or the Note shall not be deemed to be a waiver of any of the terms or provisions of the Mortgage or Note, and Mortgagee shall have the right thereafter to insist upon strict performance by Mortgagor of any and all of them. Neither Mortgagor nor any other person now or hereafter obligated for payment of all or any part of the sums now or hereafter secured by this Mortgage shall be relieved of such obligation by reason of the failure of Mortgagee to comply with any request of Mortgagor or of any other person so obligated to take action to foreclose on this Mortgage or otherwise enforce any provisions of the Mortgage or the Note, or by reason of the release, regardless of consideration, of all or any part of the security held for the indebtedness secured by this Mortgage, or by reason of any agreement or stipulation between any subsequent owner of the Mortgaged Property and Mortgagee extending the time of payment or modifying the terms of the Mortgage or Note without first having obtained the consent of Mortgagor or such other person; and in the latter event Mortgagor and all such other persons shall continue to be liable to make payments according to the terms of any such extension or modification agreement, unless expressly released and discharged in writing by Mortgagee.

28.     Waiver of Jury Trial. Mortgagor and Mortgagee irrevocably waive jury trial and the right thereto in any and all disputes involving Mortgagor or Mortgagor's parent, affiliates or related entities or any officer, director, shareholder, attorney or partner of any of them, whether hereunder or under any other agreements, notes, papers, instruments or documents heretofore or hereafter executed or any other contract whether similar or dissimilar. This shall be deemed a covenant enforceable independently of all other provisions of this Mortgage.

29.     Other Waivers. Mortgagor hereby waives and releases, to the fullest extent permitted by law:

        (a)     all errors, defects and imperfections in any proceeding instituted by Mortgagee under the Note or this Mortgage, or both;

        (b)     all benefit that might accrue to Mortgagor by virtue of any present or future law exempting the Mortgaged Property, or any part of the proceeds arising from any sale thereof, from attachment, levy or sale on execution, or providing for any stay of execution, exemption from civil process or extension of time for payment;

        (c)     unless specifically required herein, all notices of Mortgagor's default or of Mortgagee's election to exercise, or Mortgagee's actual exercise of any option under the Note or this Mortgage;

        (d)     after sale or sales of the Mortgaged Property any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof; and

        (e)     any right to have the Mortgaged Property marshaled upon any foreclosure hereunder. The right is hereby given by Mortgagor and reserved by Mortgagee to make partial release or releases of security hereunder, agreeable to Mortgagee without notice to, or the consent, approval or agreement of other parties in interest, which partial release or releases shall not impair in any manner the validity of or priority of this Mortgage on the security remaining, nor release the personal liability of Mortgagor for the debt hereby secured.

        Mortgagor hereby expressly waives all benefit or advantage of any such law or laws to the extent that it lawfully may, and covenants not to hinder, delay or impede the

execution of any power herein granted or delegated to Mortgagee, but to suffer and permit the execution of every power as though no such law or laws had been made or enacted.

30.   Environmental Matters.

(a)   For purposes of this Paragraph 30, the term "Environmental Laws" shall mean all federal, state and local laws, regulations and orders, whether now or in the future enacted or issued, pertaining to the protection of land, water, air, health, safety or the environment. The term "Regulated Substances" shall mean all substances regulated by Environmental Laws, or which are known or considered to be harmful to the health or safety of persons, or the presence of which may require investigation, notification or remediation under the Environmental Laws. The term "Contamination" shall mean the discharge, release, emission, disposal or escape of any Regulated Substances into the environment.

(b)   Mortgagor represents and warrants that to the best of its knowledge, (i) no Contamination is present at, on or under the Mortgaged Property and that no Contamination is being or has been emitted onto any surrounding property; (ii) all operations and activities on the Mortgaged Property have been and are being conducted in accordance with all Environmental Laws, and Mortgagor has all permits and licenses required under the Environmental Laws; (iii) no underground or aboveground storage tanks are or have been located on or under the Mortgaged Property; and (iv) no legal or administrative proceeding is pending or threatened relating to any environmental condition, operation or activity on the Mortgaged Property, or any violation or alleged violation of Environmental Laws. These representations and warranties shall be true as of the date hereof, and shall be deemed to be continuing representations and warranties which must remain true, correct and accurate during the entire duration of the term of this Mortgage.

(c)   Mortgagor shall ensure, at its sole cost and expense, that the Mortgaged Property and the conduct of all operations and activities thereon comply and continue to comply with all Environmental Laws. Mortgagor shall notify Mortgagee promptly and in reasonable detail in the event that Mortgagor becomes aware of any violation of any Environmental Laws, the presence or release of any Contamination with respect to the Mortgaged Property, or any governmental or third party claims relating to the environmental condition of the Mortgaged Property or the conduct of operations or activities thereon.  Mortgagor also agrees not to permit or allow the presence of Regulated Substances on any part of the Mortgaged Property, except for those Regulated Substances (i) which are used in the ordinary course of Mortgagor's business, but only to the extent they are in all cases used in a manner which complies with all Environmental Laws; and (ii) those Regulated Substances which are naturally occurring on the Mortgaged Property. The Mortgagor agrees not to cause, allow or permit the presence of any Contamination on the Mortgaged Property.

(d)   Mortgagee shall not be liable for, and Mortgagor shall indemnify, defend and hold Mortgagee and all of its officers, directors, employees and agents, and all of their respective successors and assigns harmless from and against all losses, costs, liabilities, damages, fines, claims, penalties and expenses (including reasonable attorneys', consultants' and contractors' fees, costs incurred in the investigation, defense and settlement of claims, as well as costs incurred in connection with the investigation, remediation or monitoring of any Regulated Substances or Contamination) that Mortgagee may suffer or incur (including as holder of the Mortgage, as mortgagee in possession or as successor in interest to Mortgagor as owner of the Mortgaged Property by virtue of a foreclosure or acceptance of a deed in lieu of foreclosure) as a result of or in connection with (i) any Environmental Laws (including the assertion that any lien existing or arising pursuant to any Environmental Laws takes priority over the lien of the Mortgage); (ii) the breach of any representation, warranty, covenant or undertaking by Mortgagor in this Paragraph 30; (iii) the presence on or the migration of any Contamination or Regulated Substances on, under or through the Mortgaged Property; or (iv) any litigation or claim by the government or by any third

-15-

party in connection with the environmental condition of the Mortgaged Property or the presence or migration of any Regulated Substances or Contamination on, under, to or from the Mortgaged Property.

31.     Further Assurances.  Mortgagor will execute and deliver such further instruments and perform such further acts as may be requested by Mortgagee from time to time to confirm the provisions of this Mortgage or the Note, to carry out more effectively the purposes of this Mortgage or the Loan Documents securing the Note, or to confirm the priority of the lien created by this Mortgage on any property, rights or interest encumbered or intended to be encumbered by the lien of this Mortgage or the Loan Documents.

32.     Indemnification.  Mortgagor hereby irrevocably agrees to indemnify and save harmless Mortgagee from and against any and all loss or damage of whatsoever kind and from any suits, claims or demands, including, without limitation, Mortgagee's legal fees and expenses, on account of any matter or thing arising out of this Mortgage or in connection herewith.

33.     Counsel Fees.  If Mortgagee becomes a party to any suit or proceeding affecting the Mortgaged Property or title thereto, the lien created by this Mortgage or Mortgagee's interest therein, or if Mortgagee engages counsel to collect any of the indebtedness or to enforce performance of the agreements, conditions, covenants, provisions or stipulations of this Mortgage or the Loan Documents, Mortgagee's costs, expenses and reasonable counsel fees, whether or not suit is instituted, shall be paid to Mortgagee by Mortgagor, on demand, with interest at the then effective rate set forth in the Note, and until paid they shall be deemed to be part of the indebtedness evidenced by the Note and secured by this Mortgage.

34.     Communications.  All communications required under this Mortgage shall be in writing, and shall be sent in accordance with the terms of the "Notices" section of the Loan and Security Agreement of even date herewith between Mortgagor and Mortgagee.

35.     Covenant Running with the Land.  Any act or agreement to be done or performed by Mortgagor shall be construed as a covenant running with the land and shall be binding upon Mortgagor and its successors and assigns as if they had personally made such agreement.

36.     Amendment.  This Mortgage cannot be changed or amended except by agreement in writing signed by the party against whom enforcement of the change is sought.

37.     Applicable Law.  This Mortgage shall be governed by and construed according to the laws, including the conflict of law rules, of the State of New York.

38.     Interpretation.  Whenever used in this Mortgage, unless the context clearly indicates a contrary intent:

        (a)     The word "Mortgagor" shall mean the entity which executes this Mortgage and any subsequent owner of the Mortgaged Property and their respective heirs, executors, administrators, successors and assigns;

        (b)     The word "Mortgagee" shall mean the person or entity specifically named herein as "Mortgagee" or any subsequent holder of this Mortgage;

        (c)     The word "entity" shall mean individual, corporation, partnership or unincorporated association;

        (d)     The use of any gender shall include all genders;

-16-

(e)    The singular number shall include the plural and the plural the singular as the context may require.

39.    Captions. The captions preceding the text of the paragraphs or subparagraphs of this Mortgage are inserted only for convenience of reference and shall not constitute a part of this Mortgage, nor shall they in any way affect its meaning, construction or effect.

40.    Special New York Local Law Provisions.

(a)    In the event of any inconsistencies between the terms and conditions of this Paragraph 40 and the other provisions of this Mortgage, the terms and conditions of this Paragraph 40 shall control and be binding.

(b)    Pursuant to Section 13 of the New York Lien Law, Mortgagor shall receive the advances secured hereby and shall hold the right to receive the advances as a trust fund to be applied first for the purpose of paying the cost of any improvement and shall apply the advances first to the payment of the cost of any such improvement on the Mortgaged Property before using any part of the total of the same for any other purpose.

(c)    Mortgagor represents that this Mortgage does not encumber real property principally improved or to be improved by one or more structures containing in the aggregate not more than six residential dwelling units, each having its own separate cooking facilities.

(d)    The provisions of Subsection 4 of Section 254 of the New York Real Property Law covering the insurance of buildings against loss by fire shall not apply to this Mortgage. In the event of any conflict, inconsistency or ambiguity between the provisions of Paragraph 4 of this Mortgage and the provisions of Subsection 4 of Section 254 of the New York Real Property Law covering the insurance of buildings against loss by fire, the provisions of Paragraph 4 of this Mortgage shall control.

(e)    Mortgagee shall have all of the rights against lessees of the Mortgaged Property set forth in Section 291-f of the New York Real Property Law.

(f)    The clauses and covenants contained in this Mortgage that are construed by Section 254 of the New York Real Property Law shall be construed as provided in those paragraphs (except as provided in Paragraph 40(d)). The additional clauses and covenants contained in this Mortgage shall afford rights supplemental to and not exclusive of the rights conferred by the clauses and covenants construed by Section 254 and shall not impair, modify, alter or defeat such rights (except as provided in Paragraph 40(d)), notwithstanding that such additional clauses and covenants may relate to the same subject matter or provide for different or additional rights in the same or similar contingencies as the clauses and covenants construed by Section 254. The rights of Mortgagee arising under the clauses and covenants contained in this Mortgage shall be separate, distinct and cumulative and none of them shall be in exclusion of the others. No act of Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision, anything herein or otherwise to the contrary notwithstanding. In the event of any inconsistencies between the provisions of Section 254 and the provisions of this Mortgage, the provisions of this Mortgage shall prevail.

41.    Consolidated Lien. Mortgagor and Mortgagee agree that the Existing Mortgages shall together constitute but one mortgage, a single lien encumbering the entire Mortgaged Property, subject to the terms and conditions set forth herein.

42.    Partial Release. Mortgagor has disclosed to Mortgagee its intention to convey by deed or grant a conservation easement to the Nature Conservancy a portion of the Mortgaged

Property consisting of approximately 31 acres, as shown on the plan attached as Exhibit "A" to the loan and security agreement of even date herewith between Mortgagor and Mortgagee (the "Conservation Parcel"). If Mortgagor desires to obtain a release of the Conservation Parcel from the lien of this Mortgage for such purposes, Mortgagee will deliver such release for no consideration within 20 days of Mortgagor's satisfaction, in Mortgagee's reasonable determination, of the following conditions: (1) no Event of Default shall have occurred and be continuing under any Loan Document, (2) the requested conveyance will not violate any applicable laws, and (3) the requested conveyance will be in conformity with all subdivision requirements, as applicable.

43.     Further Assignment. Upon notice from Mortgagor, and provided all sums payable pursuant to the Loan Documents are paid, Mortgagee shall assign the Loan, the Note and this Mortgage to any lender designated by Mortgagor in lieu of delivering a satisfaction of mortgage provided that such assignment will be without recourse, representation or warranty (other than that the Note and this Mortgage have not been further assigned).

IN WITNESS WHEREOF, Mortgagor and Mortgagee have duly executed this Mortgage to be effective as of the day and year first above written.

### MORTGAGOR

SEVEN SPRINGS LLC, a New York limited liability company

By its members:

Bedford Hills Corporation, Member

By: _____
Donald J. Trump, President

Attest: _____

Donald J. Trump, Member

### MORTGAGEE

ROYAL BANK OF PENNSYLVANIA, a Pennsylvania banking institution

By: _____
Murray Stempel
Vice-President

-18-

State of New York        )
                         ) ss.:
County of New York  )

On the  _22_  day of  _June_  in the year  _2000_  before me, the undersigned, a Notary
Public in and for said State, personally appeared  _Donald Trump_ , personally known to
me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is
(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the
individual(s), or the person upon behalf of which the individual(s) acted, executed the
instrument.

_____
Notary Public

GARY POLLARD
Notary Public, State of New York
No. 01PO4827351
Qualified in New York County
Commission Expires April 30, 2022

State of New York    )
                     ) ss.:
County of New York  )

On the  22  day of  June  in the year 2000  before me, the undersigned, a Notary Public in and for said State, personally appeared  MURRAY   Stempel , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

**GARY POLLARD**
Notary Public, State of New York
No. 01PO4827351
Qualified in New York County
Commission Expires April 30, 20__

## Schedule A

[existing notes]

1. Promissory Note dated December 22, 1995 from Seven Springs LLC to The First National Bank of Hope in the original principal sum of $4,000,000 and with an outstanding principal balance of $4,000,000.

2. Gap Promissory Note dated June 22, 2000 from Seven Springs LLC to Royal Bank of Pennsylvania in the original principal sum of $4,000,000.

## Schedule B

(Existing mortgages)

1. Mortgage dated December 22, 1995 from Seven Springs LLC to The First National Bank of Hope in the amount of $4,000,000.00 recorded December 28, 1995 in Liber 21194 mp 267 in the Westchester County Clerk's Office, Division of Land Records. As modified by a First Modification and Extension Agreement dated December 20, 1996 and recorded January 23, 1997 in Liber 22415 mp 255 and a Second Modification and Extension Agreement dated June 18, 1998 and recorded June 26, 1998 in Liber 24121 mp 181.

Assignment of Mortgage made by First Hope Bank f/k/a First National Bank of Hope to Royal Bank of Pennsylvania dated June 21, 2000 to be recorded concurrently herewith.

2. Gap Mortgage, Assignment of Rents and Security Agreement dated June 22, 2000 from Seven Springs LLC to Royal Bank of Pennsylvania in the Amount of $4,000,000.00 to be recorded concurrently herewith in the Westchester County Clerk's Office, Division of Land Records.

EXHIBIT "A"

PARCEL 1

ALL that certain plot, piece of parcel of land, situate, lying
and being partly in the Town of New Castle and partly in the Town
of Bedford, County of Westchester and State of New York, bounded
and described as follows:

.BEGINNING at a point on the easterly side of Woodside Road where
the same is intersected by the southwesterly corner of land now
or formerly of Gallager;

RUNNING THENCE from said point of beginning along said last
mentioned land and continuing along land now or formerly of
Roland, the following 42 courses and distances:

(1)   North 55 degrees 16 minutes 30 seconds East 22.12 feet;

(2)   North 62 degrees 03 minutes 30 seconds East 22.90 feet;

(3)   North 71 degrees 09 minutes 30 seconds East 44.68 feet;

(4)   North 71 degrees 52 minutes 50 seconds East 44.31 feet;

(5)   North 75 degrees 45 minutes 30 seconds East 43.08 feet;

(6)   North 63 degrees 31 minutes 30 seconds East 25.86 feet;

(7)   North 62 degrees 51 minutes 10 seconds East 14.99 feet;

(8)   North 70 degrees 41 minutes 20 seconds East 13.43 feet;

(9)   North 48 degrees 17 minutes 10 seconds East 10.11 feet;

(10)  North 66 degrees 42 minutes 50 seconds East 33.24 feet;

(11)  North 89 degrees 04 minutes 40 seconds East 8.70 feet;

(12)  North 68 degrees 33 minutes 00 seconds East 7.57 feet;

(13)  North 76 degrees 29 minutes 50 seconds East 20.56 feet;

(14)  North 61 degrees 28 minutes 10 seconds East 20.85 feet;

(15)  North 65 degrees 24 minutes 00 seconds East 56.31 feet;

(16)  North 75 degrees 50 minutes 50 seconds East 13.25 feet;

(17)  North 65 degrees 01 minutes 10 minutes East 57.73 feet;

(18)  North 77 degrees 18 minutes 25 seconds East 18.93 feet;

(19) South 80 degrees 49 minutes 50 seconds East 4.83 feet;

(20) North 79 degrees 19 minutes 30 seconds East 19.81 feet;

(21) North 84 degrees 50 minutes 45 seconds East 40.07 feet;

(22) South 80 degrees 19 minutes 00 seconds East 13.20 feet;

(23) North 81 degrees 21 minutes 50 seconds East 81.65 feet;

(24) South 75 degrees 39 minutes 50 seconds East 103.31 feet;

(25) North 33 degrees 43 minutes 10 seconds East 80.29 feet;

(26) South 89 degrees 41 minutes 15 seconds East 300.86 feet;

(27) North 73 degrees 00 minutes 05 seconds East 30.75 feet;

(28) North 78 degrees 02 minutes 10 seconds East 38.46 feet;

(29) North 70 degrees 54 minutes 15 seconds East 33.00 feet;

(30) North 66 degrees 36 minutes 55 seconds East 40.80 feet;

(31) North 78 degrees 30 minutes 45 seconds East 12.56 feet;

(32) North 59 degrees 02 minutes 00 seconds East 7.62 feet;

(33) North 79 degrees 58 minutes 00 seconds East 33.38 feet;

(34) North 51 degrees 31 minutes 45 seconds East 28.46 feet;

(35) North 56 degrees 01 minutes 00 seconds East 45.90 feet;

(36) North 39 degrees 16 minutes 00 seconds East 58.93 feet;

(37) North 36 degrees 20 minutes 20 seconds East 38.63 feet;

(38) North 42 degrees 27 minutes 40 seconds East 32.51 feet;

(39) North 43 degrees 19 minutes 10 seconds East 35.59 feet;

(40) North 48 degrees 55 minutes 15 seconds East 123.19 feet;

(41) North 47 degrees 22 minutes 00 seconds East 114.00 feet; and

(42) North 49 degrees 43 minutes 25 seconds East 87.25 feet to
the northwesterly corner of land now or formerly of Glueck;

Page 2 of 34

THENCE along said last mentioned land, the following 3 courses and distances:

(1)  South 09 degrees 44 minutes 20 seconds East 70.81 feet;

(2)  South 13 degrees 05 minutes 50 seconds East 28.19 feet; and

(3)  South 08 degrees 58 minutes 00 seconds East 70.24 feet to the northerly side of Oregon Road in the Town of Bedford;

THENCE along the northerly side of Oregon Road in the Town of Bedford and continuing along the northerly side of Lower Byram Lake Road in the Town of New Castle, southwesterly, northwesterly and southwesterly and partially along a stone wall, the following 24 courses and distances:

(1)  South 56 degrees 56 minutes 00 seconds West 123.00 feet;

(2)  South 50 degrees 48 minutes 00 seconds West 78.00 feet;

(3)  South 27 degrees 44 minutes 10 seconds West 66.55 feet;

(4)  South 34 degrees 12 minutes 20 seconds West 10.46 feet;

(5)  South 24 degrees 31 minutes 10 seconds West 47.98 feet;

(6)  South 18 degrees 32 minutes 15 seconds West 72.38 feet;

(7)  South 16 degrees 08 minutes 00 seconds West 104.40 feet;

(8)  South 18 degrees 35 minutes 45 seconds West 16.90 feet;

(9)  South 18 degrees 59 minutes 20 seconds West 34.70 feet;

(10) North 70 degrees 35 minutes 00 seconds West 20.01 feet;

(11) South 19 degrees 25 minutes 00 seconds West 185.02 feet to a point of curve;

(12) Southwesterly on a curve to the right having a radius of 165.00 feet, a distance of 136.12 feet;

(13) South 66 degrees 41 minutes 00 seconds West 138.42 feet to a point of curve;

(14) Southwesterly on a curve to the left having a radius of 110.00 feet, a distance of 66.68 feet;

Page 3 of 34

(15) South 31 degrees 57 minutes 00 seconds West 46.34 feet to a point of curve;

(16) Northwesterly on a curve to the right having a radius of 35.00 feet, a distance of 76.37 feet;

(17) North 23 degrees 02 minutes 00 seconds West 29.00 feet;

.(18) North 45 degrees 22 minutes 00 seconds West 70.87 feet to a point of curve;

(19) Westerly on a curve to the left having a radius of 50.00 feet, a distance of 70.02 feet;

(20) South 54 degrees 24 minutes 00 seconds West 59.87 feet;

(21) South 58 degrees 22 minutes 00 seconds West 63.00 feet;

(22) South 67 degrees 36 minutes 00 seconds West 167.90 feet to a point of curve;

(23) Southerly on a curve to the left having a radius of 50.00 feet, a distance of 52.71 feet; and

(24) South 07 degrees 12 minutes 00 seconds West 114.78 feet to a point of curve;

THENCE southwesterly on a curve to the right having a radius of 50.00 feet connecting the northerly side of Oregon Road in the Town of New Castle and the northwesterly side of Lower Byram Lake Road, a distance of 65.13 feet to a point on the northerly side of Oregon Road in the Town of New Castle;

THENCE westerly along the northerly side of Oregon Road in the Town of New Castle, the following 5 courses and distances:

(1) South 81 degrees 50 minutes 00 seconds West 238.89 feet;

(2) North 85 degrees 02 minutes 00 seconds West 70.00 feet;

(3) South 83 degrees 49 minutes 50 seconds West 102.94 feet;

(4) South 85 degrees 57 minutes 50 seconds West 4.83 feet; and

(5) North 53 degrees 07 minutes 20 seconds West 15.41 feet to a point on the easterly side of Woodside Road;

THENCE northerly along the easterly side of Woodside Road, the following 23 courses and distances:

(1)   North 16 degrees 04 minutes 10 seconds West 11.34 feet;

(2)   North 03 degrees 30 minutes 10 seconds West 70.19 feet;

(3)   North 01 degrees 13 minutes 40 seconds East 14.92 feet;

(4)   North 24 degrees 21 minutes 30 seconds East 22.31 feet;

(5)   North 09 degrees 59 minutes 20 seconds West 12.85 feet;

(6)   North 17 degrees 23 minutes 30 seconds West 17.20 feet;

(7)   North 32 degrees 53 minutes 50 seconds East 37.34 feet;

(8)   North 17 degrees 46 minutes 50 seconds East 56.16 feet;

(9)   North 13 degrees 36 minutes 50 seconds East 31.95 feet;

(10)  North 02 degrees 31 minutes 10 seconds East 20.02 feet;

(11)  North 17 degrees 43 minutes 50 seconds East 63.97 feet;

(12)  North 02 degrees 26 minutes 30 seconds West 46.26 feet;

(13)  North 06 degrees 35 minutes 30 seconds West 43.99 feet;

(14)  North 17 degrees 56 minutes 30 seconds West 27.92 feet;

(15)  North 08 degrees 59 minutes 05 minutes West 21.90 feet;

(16)  North 27 degrees 02 minutes 20 seconds West 16.19 feet;

(17)  North 09 degrees 58 minutes 35 seconds West 19.05 feet;

(18)  North 18 degrees 21 minutes 00 seconds West 27.57 feet;

(19)  North 26 degrees 49 minutes 10 seconds West 6.05 feet;

(20)  North 37 degrees 06 minutes 00 seconds West 11.42 feet;

(21)  North 45 degrees 59 minutes 40 seconds West 28.51 feet;

(22)  North 48 degrees 25 minutes 05 seconds West 21.23 feet; and

(23)  North 48 degrees 52 minutes 40 seconds West 35.75 feet to the aforesaid land now or formerly of Gallager, the point or place of BEGINNING.

Page 5 of 34

EXCEPTING THEREOUT AND THEREFROM the following premises, described as "Parcel II" in Deed made by Seven Springs Farm Center, Inc. to John S. Mazella and E. Patricia Mazella, his wife, dated February 6, 1976, recorded February 9, 1976 in Liber 7312 cp 521:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Town of Bedford, County of Westchester and State of New York, bounded and described as follows:

BEGINNING at the point on the northerly side of Oregon Road where the same is intersected by the boundary line between the Town of New Castle and the Town of Bedford;

THENCE RUNNING along said boundary line, North 10 degrees 08 minutes 51 seconds West 180.16 feet to lands now or formerly of Rolf R. Roland;

THENCE TURNING AND RUNNING along said lands and along a stone wall, the following 3 courses and distances:

(1)   North 51 degrees 53 minutes 15 seconds East 93.75 feet;

(2)   North 50 degrees 20 minutes 00 seconds East 114.00 feet; and

(3)   North 52 degrees 41 minutes 25 seconds East 87.25 feet to lands now or formerly of Richard M. and Joyce S. Glueck;

THENCE TURNING AND RUNNING along said lands and along a stone wall, the following 3 courses and distances:

(1)   South 06 degrees 46 minutes 20 seconds East 70.81 feet;

(2)   South 10 degrees 07 minutes 50 seconds East 28.19 feet; and

(3)   South 06 degrees 00 minutes 00 seconds East 70.24 feet to the northerly side of Oregon Road;

THENCE TURNING AND RUNNING along said northerly side of Oregon Road, the following 5 courses and distances:

(1)   South 59 degrees 54 minutes 00 seconds West 123.00 feet;

(2)   South 53 degrees 46 minutes 00 seconds West 78.00 feet;

(3)   South 30 degrees 42 minutes 10 seconds West 66.55 feet;

(4)   South 37 degrees 10 minutes 20 seconds West 10.46 feet; and

(5)   South 27 degrees 29 minutes 10 seconds West 22.08 feet to the point and place of BEGINNING.

Page 6 of 34

## PARCEL 2

ALL that certain plot, piece or parcel of land, situate, lying and being partly in the Town of Bedford, partly in the Town of North Castle and partly in the Town of New Castle, County of Westchester and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of Oregon Road in the Town of Bedford where the same is intersected by the dividing line between the premises herein described and the northeasterly corner of land now or formerly of Davis;

RUNNING THENCE northeasterly from said point of beginning along the southerly side of Oregon Road in the Town of Bedford, the following 12 courses and distances:

(1)   North 59 degrees 28 minutes 05 seconds East 24.06 feet;

(2)   North 59 degrees 37 minutes 40 seconds East 111.07 feet;

(3)   North 59 degrees 36 minutes 10 seconds East 82.49 feet;

(4)   North 61 degrees 51 minutes 55 seconds East 64.17 feet;

(5)   North 61 degrees 52 minutes 05 seconds East 137.88 feet;

(6)   North 61 degrees 19 minutes 40 seconds East 30.78 feet;

(7)   North 61 degrees 23 minutes 20 seconds East 38.07 feet;

(8)   North 62 degrees 13 minutes 50 seconds East 20.84 feet;

(9)   North 62 degrees 06 minutes 50 seconds East 90.37 feet;

(10) North 62 degrees 05 minutes 45 seconds East 97.99 feet;

(11) North 61 degrees 06 minutes 20 seconds East 119.52 feet; and

(12) North 59 degrees 19 minutes 50 seconds East 101.38 feet to the westerly line of land now or formerly of Heinz;

THENCE along said last mentioned land, South 18 degrees 39 minutes 30 seconds East 571.16 feet to a corner;

THENCE continuing along said last mentioned land, North 77 degrees 21 minutes 20 seconds East 11.51 feet to a monument;

THENCE continuing along said last mentioned land and partially along a stone wall, the following 9 courses and distances:

(1)   North 77 degrees 21 minutes 20 seconds East 67.72 feet;

(2)   North 78 degrees 48 minutes 30 seconds East 114.31 feet;

(3)   North 77 degrees 52 minutes 30 seconds East 303.46 feet;

(4)   North 78 degrees 37 minutes 30 seconds East 78.59 feet;

(5)   North 76 degrees 48 minutes 50 seconds East 97.84 feet;

(6)   North 79 degrees 12 minutes 50 seconds East 121.08 feet;

(7)   North 80 degrees 35 minutes 50 seconds East 114.21 feet;

(8)   North 83 degrees 52 minutes 40 seconds East 28.40 feet; and

(9)   North 77 degrees 50 minutes 00 seconds East 382.30 feet to the westerly boundary of the Village of Mount Kisco;

THENCE along the westerly boundary of the Village of Mount Kisco, the following 14 courses and distances:

(1)   South 08 degrees 53 minutes 40 seconds East 693.23 feet;

(2)   South 79 degrees 12 minutes 20 seconds West 227.80 feet;

(3)   South 17 degrees 32 minutes 40 seconds East 147.00 feet;

(4)   South 05 degrees 58 minutes 40 seconds East 280.00 feet;

(5)   South 30 degrees 16 minutes 20 seconds West 242.00 feet;

(6)   South 10 degrees 52 minutes 40 seconds East 117.00 feet;

(7)   South 09 degrees 45 minutes 20 seconds West 105.00 feet;

(8)   South 35 degrees 20 minutes 40 seconds East 188.00 feet;

(9)   South 12 degrees 29 minutes 40 seconds East 227.00 feet;

(10) South 11 degrees 44 minutes 20 seconds West 97.00 feet;

(11) South 05 degrees 48 minutes 40 seconds East 108.00 feet;

(12) South 21 degrees 16 minutes 20 seconds West 164.00 feet;

(13) South 04 degrees 21 minutes 40 seconds East 180.00 feet; and

(14) South 03 degrees 29 minutes 20 seconds West 131.00 feet to a point and other land owned by Eugene and Agnes E. Meyer Foundation;

THENCE along said last mentioned land, the following 12 courses and distances:

(1)   South 89 degrees 33 minutes 30 seconds West 418.17 feet;

(2)   North 84 degrees 02 minutes 25 seconds West 140.33 feet;

(3)   South 70 degrees 48 minutes 05 seconds West 77.82 feet;

(4)   South 57 degrees 03 minutes 20 seconds West 115.72 feet;

(5)   South 18 degrees 21 minutes 20 seconds West 835.19 feet;

(6)   South 82 degrees 27 minutes 20 seconds West 219.14 feet;

(7)   South 57 degrees 47 minutes 30 seconds West 196.34 feet;

(8)   North 84 degrees 08 minutes 25 seconds West 319.91 feet;

(9)   North 81 degrees 37 minutes 15 seconds West 22.17 feet;

(10) North 83 degrees 39 minutes 35 seconds West 66.92 feet;

(11) North 86 degrees 37 minutes 10 seconds West 28.66 feet; and

(12) North 84 degrees 18 minutes 40 seconds West 243.31 feet to the easterly side of Oregon Road in the Town of North Castle;

THENCE northerly and westerly along the easterly and northerly sides of Oregon Road, the following 86 courses and distances:

(1)   North 20 degrees 28 minutes 30 seconds East 9.06 feet;

(2)   North 25 degrees 43 minutes 10 seconds East 18.20 feet;

(3)   North 17 degrees 31 minutes 00 seconds East 37.48 feet;

(4)   North 12 degrees 12 minutes 20 seconds East 41.44 feet;

(5)   North 12 degrees 03 minutes 20 seconds East 49.07 feet;

(6)   North 08 degrees 54 minutes 10 seconds East 24.23 feet;

(7)   North 00 degrees 45 minutes 25 seconds East 53.73 feet;

(8)   North 00 degrees 00 minutes 50 seconds East 37.94 feet;

Page 9 of 34

)

(9)   North 74 degrees 59 minutes 50 seconds East 2.59 feet;

(10) North 13 degrees 48 minutes 10 seconds West 24.94 feet;

(11) North 08 degrees 26 minutes 25 seconds West 29.77 feet;

(12) North 08 degrees 09 minutes 10 seconds West 38.85 feet;

·(13) North 01 degrees 13 minutes 00 seconds West 16.00 feet;

(14) North 10 degrees 54 minutes 50 seconds East 128.81 feet;

(15) North 03 degrees 01 minutes 20 seconds West 12.90 feet;

(16) North 02 degrees 45 minutes 50 seconds East 102.66 feet;

(17) North 01 degrees 03 minutes 20 seconds East 72.67 feet;

(18) North 04 degrees 23 minutes 00 seconds East 50.25 feet;

(19) North 03 degrees 02 minutes 40 seconds East 39.72 feet;

(20) North 07 degrees 53 minutes 55 seconds West 9.10 feet;

(21) North 07 degrees 55 minutes 30 seconds East 13.49 feet;

(22) North 61 degrees 13 minutes 00 seconds West 36.64 feet;

(23) North 61 degrees 08 minutes 50 seconds West 80.86 feet;

(24) North 62 degrees 53 minutes 20 seconds West 41.74 feet;

(25) North 61 degrees 23 minutes 20 seconds West 54.34 feet;

(26) North 51 degrees 42 minutes 35 seconds West 4.12 feet;

(27) North 64 degrees 58 minutes 50 seconds West 47.10 feet;

(28) North 80 degrees 35 minutes 00 seconds West 34.72 feet;

(29) North 86 degrees 09 minutes 30 seconds West 54.62 feet;

(30) North 56 degrees 30 minutes 10 seconds West 3.30 feet;

(31) South 66 degrees 58 minutes 10 seconds West 5.80 feet;

(32) South 87 degrees 15 minutes 10 seconds West 23.16 feet;

(33) North 17 degrees 51 minutes 00 seconds West 22.64 feet;

(34) North 04 degrees 06 minutes 10 seconds West 15.10 feet;

(35) North 22 degrees 26 minutes 50 seconds West 30.77 feet;

(36) North 38 degrees 41 minutes 00 seconds West 7.90 feet;

(37) North 25 degrees 28 minutes 50 seconds West 13.95 feet;

.(38) North 32 degrees 45 minutes 30 seconds West 38.35 feet;

(39) North 47 degrees 05 minutes 20 seconds West 21.53 feet;

(40) North 26 degrees 02 minutes 40 seconds West 39.47 feet;

(41) North 56 degrees 15 minutes 20 seconds West 11.92 feet;

(42) North 32 degrees 26 minutes 20 seconds West 23.73 feet;

(43) North 27 degrees 25· minutes 50 seconds West 57.96 feet;

(44) North 36 degrees 18 minutes 25 seconds West 114.20 feet;

(45) North 27 degrees 43 minutes 30 seconds West 45.93 feet;

(46) North 18 degrees 11 minutes 00 seconds West 74.61 feet;

(47) North 37 degrees 26 minutes 10 seconds West 12.57 feet;

(48) North 19 degrees 59 minutes 45 seconds West 22.87 feet;

(49) North 12 degrees 18 minutes 50 seconds West 14.11 feet;

(50) North 24 degrees 11 minutes 40 seconds West 20.33 feet;

(51) North 16 degrees 06 minutes 45 seconds West 16.47 feet;

(52) North 00 degrees 22 minutes 45 seconds East 18.12 feet;

(53) North 13 degrees 02 minutes 40 seconds West 27.78 feet;

(54) North 07 degrees 25 minutes 45 seconds West 45.32 feet;

(55) North 12 degrees 51 minutes 50 seconds West 24.30 feet;

(56) North 00 degrees 07 minutes 00 seconds West 14.83 feet;

(57) North 15 degrees 09 minutes 40 seconds West 49.17 feet;

(58) North 32 degrees 13 minutes 50 seconds West 39.54 feet;

(59) North 30 degrees 20 minutes 40 seconds West 43.29 feet;

(60) North 20 degrees 51 minutes 55 seconds West 25.58 feet;

(61) North 02 degrees 49 minutes 30 seconds West 15.83 feet;

(62) North 29 degrees 38 minutes 50 seconds West 15.46 feet;

.(63) North 08 degrees 12 minutes 35 seconds West 12.18 feet;

(64) North 29 degrees 28 minutes 20 seconds West 17.01 feet;

(65) North 16 degrees 45 minutes 00 seconds West 17.31 feet;

(66) North 09 degrees 34 minutes 20 seconds West 28.32 feet;

(67) North 13 degrees 48 minutes 20 seconds West 36.16 feet;

(68) North 03 degrees 45 minutes 40 seconds East 12.35 feet;

(69) North 15 degrees 01 minutes 55 seconds West 46.88 feet;

(70) North 29 degrees 21 minutes 00 seconds West 53.50 feet;

(71) North 23 degrees 46 minutes 40 seconds West 17.29 feet;

(72) North 37 degrees 32 minutes 30 seconds West 14.49 feet;

(73) North 49 degrees 15 minutes 20 seconds West 44.49 feet;

(74) North 71 degrees 28 minutes 20 seconds West 11.64 feet;

(75) North 57 degrees 26 minutes 30 seconds West 10.54 feet;

(76) North 73 degrees 01 minutes 15 seconds West 37.09 feet;

(77) North 82 degrees 18 minutes 20 seconds West 47.87 feet;

(78) North 84 degrees 10 minutes 30 seconds West 22.47 feet;

(79) South 83 degrees 01 minutes 40 seconds West 22.16 feet;

(80) North 84 degrees 54 minutes 00 seconds West 17.10 feet;

(81) South 86 degrees 06 minutes 00 seconds West 27.49 feet;

(82) North 81 degrees 44 minutes 10 seconds West 153.53 feet;

(83) North 79 degrees 42 minutes 00 seconds West 134.00 feet;

Page 12 of 34

(84) North 84 degrees 39 minutes 00 seconds West 43.00 feet;

(85) North 89 degrees 32 minutes 00 seconds West 114.00 feet; and

(86) North 71 degrees 22 minutes 00 seconds West 85.00 feet to a
point of curve;

THENCE northeasterly on a curve to the right having a radius of
50.00 feet connecting the northeasterly side of Oregon Road and
the southeasterly side of Lower Byram Lake Road, a distance of
68.56 feet to a point on the southeasterly side of Lower Byram
Lake Road;

THENCE northerly, northeasterly, southeasterly and northeasterly
along the easterly and southerly sides of Lower Byram Lake Road
in the Town of New Castle and continuing along Oregon Road in the
Town of Bedford, the following 20 courses and distances:

(1)   North 07 degrees 12 minutes 00 seconds East 134.10 feet;

(2)   North 67 degrees 36 minutes 00 seconds East 171.94 feet;

(3)   North 58 degrees 22 minutes 00 seconds East 68.77 feet;

(4)   North 54 degrees 24 minutes 00 seconds East 61.60 feet;

(5)   South 45 degrees 22 minutes 00 seconds East 61.00 feet;

(6)   South 23 degrees 02 minutes 00 seconds East 19.13 feet to a
point of curve;

(7)   Northeasterly on a curve to the left having a radius of
85.00 feet, a distance of 185.47 feet;

(8)   North 31 degrees 57 minutes 00 seconds East 46.34 feet to a
point of curve;

(9)   Easterly on a curve to the right having a radius of 60.00
feet, a distance of 36.37 feet;

(10) North 66 degrees 41 minutes 00 seconds East 138.42 feet to a
point of curve;

(11) Northerly on a curve to the left having a radius of 215.00
feet, a distance of 170.59 feet;

(12) North 68 degrees 46 minutes 40 seconds West 10.74 feet;

(13) North 29 degrees 31 minutes 00 seconds East 13.38 feet;

(14) North 25 degrees 41 minutes 40 seconds East 43.31 feet;

(15) North 19 degrees 05 minutes 15 seconds East 15.26 feet;

(16) North 16 degrees 07 minutes 45 seconds East 224.55 feet;

(17) North 18 degrees 19 minutes 50 seconds East 34.60 feet;

(18) North 26 degrees 10 minutes 25 seconds East 63.52 feet;

(19) North 22 degrees 47 minutes 50 seconds East 65.76 feet; and

(20) North 31 degrees 15 minutes 05 seconds East 23.92 feet to the northwesterly corner of the aforesaid land now or formerly of Davis;

THENCE along said last mentioned land, the following 25 courses and distances:

(1)   South 34 degrees 56 minutes 00 seconds East 192.00 feet;

(2)   South 31 degrees 33 minutes 00 seconds East 59.52 feet;

(3)   South 08 degrees 31 minutes 00 seconds East 171.26 feet;

(4)   South 01 degrees 09 minutes 00 seconds East 135.20 feet;

(5)   South 05 degrees 33 minutes 00 seconds West 40.46 feet;

(6)   South 11 degrees 52 minutes 00 seconds West 49.65 feet;

(7)   South 07 degrees 24 minutes 00 seconds West 19.14 feet;

(8)   South 13 degrees 08 minutes 29 seconds West 88.58 feet;

(9)   South 66 degrees 36 minutes 00 seconds East 26.85 feet;

(10) South 71 degrees 10 minutes 00 seconds East 14.57 feet;

(11) South 56 degrees 16 minutes 00 seconds East 27.84 feet;

(12) South 24 degrees 05 minutes 00 seconds East 6.77 feet;

(13) South 49 degrees 43 minutes 00 seconds East 6.55 feet;

(14) South 71 degrees 15 minutes 00 seconds East 25.54 feet;

(15) North 89 degrees 31 minutes 00 seconds East 25.62 feet;

Page 14 of 34

(16) North 28 degrees 36 minutes 00 seconds East 70.39 feet;

(17) North 69 degrees 20 minutes 00 seconds East 89.16 feet;

(18) North 76 degrees 50 minutes 00 seconds East 59.96 feet;

(19) North 86 degrees 51 minutes 00 seconds East 16.51 feet;

(20) North 81 degrees 27 minutes 00 seconds East 42.48 feet;

(21) North 78 degrees 13 minutes 52 seconds East 121.74 feet;

(22) North 10 degrees 45 minutes 22 seconds West 242.59 feet;

(23) North 14 degrees 47 minutes 20 seconds West 42.12 feet;

(24) North 10 degrees 37 minutes 41 seconds West 179.17 feet; and

(25) North 12 degrees 08 minutes 58 seconds West 474.81 feet to the southerly side of Oregon Road in the Town of Bedford, the point or place of BEGINNING.

EXCEPTING THEREOUT AND THEREFROM the following premises, described as "Parcel I" in Deed made by Seven Springs Farm Center, Inc. to John S. Mazella and E. Patricia Mazella, his wife, dated February 6, 1976, recorded February 9, 1976 in Liber 7312 cp 521:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Town of Bedford, County of Westchester and State of New York, bounded and described as follows:

BEGINNING at the point on the southerly side of Oregon Road where the same is intersected by the boundary line between the Town of New Castle and the Town of Bedford;

THENCE RUNNING along said southerly side of Oregon Road,

North 25 degrees 45 minutes 50 seconds East 54.47 feet; and

North 34 degrees 13 minutes 05 seconds East 23.92 feet to land now or formerly of Mazella;

THENCE TURNING AND RUNNING along said land, the following 8 courses and distances:

(1)   South 31 degrees 58 minutes 00 seconds East 192.00 feet;

(2)   South 28 degrees 35 minutes 00 seconds East 59.52 feet;

(3)   South 05 degrees 33 minutes 00 seconds East 171.26 feet;

(4)   South 01 degrees 49 minutes 00 seconds West 135.20 feet;

(5)   South 08 degrees 31 minutes 00 seconds West 40.46 feet;

(6)   South 14 degrees 50 minutes 00 seconds West 49.65 feet;

(7)   South 10 degrees 22 minutes 00 seconds West 19.14 feet; and

(8)   South 16 degrees 06 minutes 29 seconds West 88.58 feet to a point;

THENCE TURNING AND RUNNING North 63 degrees 38 minutes 00 seconds West 21.52 feet to a point in the boundary line between the Town of New Castle and the Town of Bedford; and

THENCE TURNING AND RUNNING along said boundary line, North 10 degrees 08 minutes 51 seconds West 644.36 feet to the point and place of BEGINNING.

PARCEL 3

All that certain plot, piece or parcel of land, situate, lying and being in the Town of Bedford, County of Westchester and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of Oregon Road where the same is intersected by the southerly line of lands conveyed by H.J. Heinz II to Elizabeth Graham Weymouth by deed dated August 21, 1972, recorded August 29, 1972 in Liber 7077 cp 348;

RUNNING THENCE along said lands now or formerly of Elizabeth Graham Weymouth, the following 12 courses and distances:

(1)   South 71 degrees 40 minutes 20 seconds East 173.64 feet to a point of curve;

(2)   In a southerly direction on a curve to the right with a radius of 250 feet, a distance of 304.81 feet to a point of tangency;

(3)   South 01 degrees 48 minutes 50 seconds East 53.82 feet;

(4)   South 03 degrees 08 minutes 20 seconds West 97.52 feet;

(5)   South 04 degrees 25 minutes 30 seconds West 73.76 feet;

(6)   South 08 degrees 12 minutes 20 seconds West 77.16 feet to a point of curve;

(7)   In a southwesterly direction on a curve to the right with a radius of 300 feet, a distance of 196.17 feet to a point of tangency;

(8)   South 44 degrees 54 minutes 25 seconds West 64.15 feet;

(9)   South 38 degrees 19 minutes 40 seconds West 34.41 feet to a point of curve;

(10) In a southwesterly direction on a curve to the left with a radius of 130 feet, a distance of 64.42 feet;

(11) South 73 degrees 24 minutes 59 seconds East 493.65 feet; and

(12) North 77 degrees 41 minutes 50 seconds East 675.31 feet to lands now or formerly of the City of New York;

THENCE along the same, South 09 degrees 07 minutes 30 seconds East 251.91 feet to lands now or formerly of Eugene Meyer, Jr.;

Page 17 of 34

THENCE along said lands now or formerly of Eugene Meyer, Jr., the following 10 courses and distances:

(1)    South 77 degrees 41 minutes 50 seconds West 382.30 feet;

(2)    South 83 degrees 44 minutes 30 seconds West 28.40 feet;

(3)    South 80 degrees 27 minutes 40 seconds West 114.21 feet;

(4)    South 79 degrees 04 minutes 40 seconds West 121.08 feet;

(5)    South 76 degrees 40 minutes 40 seconds West 97.84 feet;

(6)    South 78 degrees 29 minutes 20 seconds West 78.59 feet;

(7)    South 77 degrees 44 minutes 20 seconds West 303.46 feet;

(8)    South 78 degrees 40 minutes 20 seconds West 114.31 feet;

(9)    South 77 degrees 13 minutes 10 seconds West 79.23 feet; and

(10)   North 18 degrees 47 minutes 40 seconds West 616.16 feet to the easterly side of Oregon Road;

THENCE along the easterly side of Oregon Road, part of the way along a stone wall, the following 8 courses and distances:

(1)    North 16 degrees 31 minutes 40 seconds East 53.53 feet;

(2)    North 11 degrees 48 minutes 20 seconds East 173.64 feet;

(3)    North 13 degrees 18 minutes 20 seconds East 101.89 feet;

(4)    North 14 degrees 03 minutes 00 seconds East 31.05 feet;

(5)    North 11 degrees 48 minutes 30 seconds East 101.20 feet;

(6)    North 12 degrees 06 minutes 30 seconds East 184.69 feet;

(7)    North 11 degrees 33 minutes 40 seconds East 115.58 feet; and

(8)    North 10 degrees 46 minutes 50 seconds East 78.07 feet to the point and place of BEGINNING.

Page 18 of 34

The aforementioned Parcels 1 and 2 being the same premises as those shown on a map completed by RKW Land Surveying on November 15, 1995 and based on its survey completed on August 1972 and October 25, 1995. Parcels 1 and 2 are more particularly bounded and described on said survey as follows:

## PARCEL 1 AS PER SURVEY

ALL that certain plot, piece of parcel of land, situate, lying and being in the Town of New Castle, County of Westchester and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of Sarles Road (formerly Woodside Road) where the same is intersected by the southwesterly corner of land now or formerly of Camillo M. and Denise Santomero;

RUNNING THENCE from said point of beginning along said last mentioned land and continuing along land now or formerly of Roland as described in Deed recorded in Liber 5594 cp 112, the following 40 courses and distances:

(1)   North 55 degrees 16 minutes 30 seconds East 22.12 feet;

(2)   North 62 degrees 03 minutes 30 seconds East 22.90 feet;

(3)   North 71 degrees 09 minutes 30 seconds East 44.68 feet;

(4)   North 71 degrees 52 minutes 50 seconds East 44.31 feet;

(5)   North 75 degrees 45 minutes 30 seconds East 43.08 feet;

(6)   North 63 degrees 31 minutes 30 seconds East 25.86 feet;

(7)   North 62 degrees 51 minutes 10 seconds East 14.99 feet;

(8)   North 70 degrees 41 minutes 20 seconds East 13.43 feet;

(9)   North 48 degrees 17 minutes 10 seconds East 10.11 feet;

(10) North 66 degrees 42 minutes 50 seconds East 33.24 feet;

(11) North 89 degrees 04 minutes 40 seconds East 8.70 feet;

(12) North 68 degrees 33 minutes 00 seconds East 7.57 feet;

(13) North 76 degrees 29 minutes 50 seconds East 20.56 feet;

(14) North 61 degrees 28 minutes 10 seconds East 20.85 feet;

(15) North 65 degrees 24 minutes 00 seconds East 56.31 feet;

(16) North 75 degrees 50 minutes 50 seconds East 13.25 feet;

(17) North 65 degrees 01 minutes 10 minutes East 57.73 feet;

(18) North 77 degrees 18 minutes 25 seconds East 18.93 feet;

(19) South 80 degrees 49 minutes 50 seconds East 4.83 feet;

(20) North 79 degrees 19 minutes 30 seconds East 19.81 feet;

(21) North 84 degrees 50 minutes 45 seconds East 40.07 feet;

(22) South 80 degrees 19 minutes 00 seconds East 13.20 feet;

(23) North 81 degrees 21 minutes 50 seconds East 81.65 feet;

(24) South 75 degrees 39 minutes 50 seconds East 103.31 feet;

(25) North 33 degrees 43 minutes 10 seconds East 80.29 feet;

(26) South 89 degrees 41 minutes 15 seconds East 300.86 feet;

(27) North 73 degrees 00 minutes 05 seconds East 30.75 feet;

(28) North 78 degrees 02 minutes 10 seconds East 38.46 feet;

(29) North 70 degrees 54 minutes 15 seconds East 33.00 feet;

(30) North 66 degrees 36 minutes 55 seconds East 40.80 feet;

(31) North 78 degrees 30 minutes 45 seconds East 12.56 feet;

(32) North 59 degrees 02 minutes 00 seconds East 7.62 feet;

(33) North 79 degrees 58 minutes 00 seconds East 33.38 feet;

(34) North 51 degrees 31 minutes 45 seconds East 28.46 feet;

(35) North 56 degrees 01 minutes 00 seconds East 45.90 feet;

(36) North 39 degrees 16 minutes 00 seconds East 58.93 feet;

(37) North 36 degrees 20 minutes 20 seconds East 38.63 feet;

(38) North 42 degrees 27 minutes 40 seconds East 32.51 feet;

(39) North 43 degrees 19 minutes 10 seconds East 35.59 feet; and

(40) North 48 degrees 55 minutes 15 seconds East 29.44 feet to
the approximate town line between the Town of New Castle and
the Town of Bedford;

THENCE running along said approximate town line and along land
now or formerly of John S. and E. Patricia Mazella as described
in Deed recorded in Liber 7312 cp 521, South 13 degrees 06
minutes 51 seconds East 180.16 feet to the northerly side of
Lower Byram Lake Road;

THENCE along the northerly side of Lower Byram Lake Road,
southwesterly, northwesterly and southwesterly and partially
along a stone wall, the following 20 courses and distances:

(1)   South 24 degrees 31 minutes 10 seconds West 25.90 feet;

(2)   South 18 degrees 32 minutes 15 seconds West 72.38 feet;

(3)   South 16 degrees 08 minutes 00 seconds West 104.40 feet;

(4)   South 18 degrees 35 minutes 45 seconds West 16.90 feet;

(5)   South 18 degrees 59 minutes 20 seconds West 34.70 feet;

(6)   North 70 degrees 35 minutes 00 seconds West 20.01 feet;

(7)   South 19 degrees 25 minutes 00 seconds West 185.02 feet to a
point of curve;

(8)   Southwesterly on a curve to the right having a radius of
165.00 feet, a distance of 136.12 feet;

(9)   South 66 degrees 41 minutes 00 seconds West 138.42 feet to a
point of curve;

(10) Southwesterly on a curve to the left having a radius of
110.00 feet, a distance of 66.68 feet;

(11) South 31 degrees 57 minutes 00 seconds West 46.34 feet to a
point of curve;

(12) Northwesterly on a curve to the right having a radius of
35.00 feet, a distance of 76.37 feet;

(13) North 23 degrees 02 minutes 00 seconds West 29.00 feet;

(14) North 45 degrees 22 minutes 00 seconds West 70.87 feet to a
point of curve;

(15) Westerly on a curve to the left having a radius of 50.00
feet, a distance of 70.02 feet;

(16) South 54 degrees 24 minutes 00 seconds West 59.87 feet;

(17) South 58 degrees 22 minutes 00 seconds West 63.00 feet;

(18) South 67 degrees 36 minutes 00 seconds West 167.90 feet to a point of curve;

(19) Southerly on a curve to the left having a radius of 50.00 feet, a distance of 52.71 feet; and

(20) South 07 degrees 12 minutes 00 seconds West 114.78 feet to a point of curve;

THENCE southwesterly on a curve to the right having a radius of 50.00 feet connecting the northwesterly side of Lower Byram Lake Road and the northerly side of Oregon Road, a distance of 65.13 feet to a point on the northerly side of Oregon Road;

THENCE westerly along the northerly side of Oregon Road, the following 5 courses and distances:

(1)  South 81 degrees 50 minutes 00 seconds West 238.89 feet;

(2)  North 85 degrees 02 minutes 00 seconds West 70.00 feet;

(3)  South 83 degrees 49 minutes 50 seconds West 102.94 feet;

(4)  South 85 degrees 57 minutes 50 seconds West 4.83 feet; and

(5)  North 53 degrees 07 minutes 20 seconds West 15.41 feet to a point on the easterly side of Sarles Road (formerly Woodside Road);

THENCE northerly along the easterly side of Sarles Road, the following 23 courses and distances:

(1)  North 16 degrees 04 minutes 10 seconds West 11.34 feet;

(2)  North 03 degrees 30 minutes 10 seconds West 70.19 feet;

(3)  North 01 degrees 13 minutes 40 seconds East 14.92 feet;

(4)  North 24 degrees 21 minutes 30 seconds East 22.31 feet;

(5)  North 09 degrees 59 minutes 20 seconds West 12.85 feet;

(6)  North 17 degrees 23 minutes 30 seconds West 17.20 feet;

Page 22 of 34

(7)   North 32 degrees 53 minutes 50 seconds East 37.34 feet;

(8)   North 17 degrees 46 minutes 50 seconds East 56.16 feet;

(9)   North 13 degrees 36 minutes 50 seconds East 31.95 feet;

(10) North 02 degrees 31 minutes 10 seconds East 20.02 feet;

(11) North 17 degrees 43 minutes 50 seconds East 63.97 feet;

(12) North 02 degrees 26 minutes 30 seconds West 46.26 feet;

(13) North 06 degrees 35 minutes 30 seconds West 43.99 feet;

(14) North 17 degrees 56 minutes 30 seconds West 27.92 feet;

(15) North 08 degrees 59 minutes 05 minutes West 21.90 feet;

(16) North 27 degrees 02 minutes 20 seconds West 16.19 feet;

(17) North 09 degrees 58 minutes 35 seconds West 19.05 feet;

(18) North 18 degrees 21 minutes 00 seconds West 27.57 feet;

(19) North 26 degrees 49 minutes 10 seconds West 6.05 feet;

(20) North 37 degrees 06 minutes 00 seconds West 11.42 feet;

(21) North 45 degrees 59 minutes 40 seconds West 28.51 feet;

(22) North 48 degrees 25 minutes 05 seconds West 21.23 feet; and

(23) North 48 degrees 52 minutes 40 seconds West 35.75 feet to
     the aforesaid land now or formerly of Camillo M. and Denise
     Santomero, the point or place of BEGINNING.

PARCEL 2 AS PER SURVEY

ALL that certain plot, piece or parcel of land, situate, lying and being partly in the Town of Bedford, partly in the Town of North Castle and partly in the Town of New Castle, County of Westchester and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of Oregon Road in the Town of Bedford where the same is intersected by the dividing line between the premises herein described and the northeasterly corner of land now or formerly of John S. and E. Patricia Mazella as described in Deed recorded in Liber 7312 cp 521;

RUNNING THENCE northeasterly from said point of beginning along the southerly side of Oregon Road in the Town of Bedford, the following 12 courses and distances:

(1)   North 59 degrees 28 minutes 05 seconds East 24.06 feet;

(2)   North 59 degrees 37 minutes 40 seconds East 111.07 feet;

(3)   North 59 degrees 36 minutes 10 seconds East 82.49 feet;

(4)   North 61 degrees 51 minutes 55 seconds East 64.17 feet;

(5)   North 61 degrees 52 minutes 05 seconds East 137.88 feet;

(6)   North 61 degrees 19 minutes 40 seconds East 30.78 feet;

(7)   North 61 degrees 23 minutes 20 seconds East 38.07 feet;

(8)   North 62 degrees 13 minutes 50 seconds East 20.84 feet;

(9)   North 62 degrees 06 minutes 50 seconds East 90.37 feet;

(10) North 62 degrees 05 minutes 45 seconds East 97.99 feet;

(11) North 61 degrees 06 minutes 20 seconds East 119.52 feet; and

(12) North 59 degrees 19 minutes 50 seconds East 101.38 feet to the westerly line of land now or formerly of Rockefeller University;

THENCE along said last mentioned land, South 18 degrees 39 minutes 30 seconds East 571.16 feet to a corner;

THENCE continuing along said last mentioned land, North 77 degrees 21 minutes 20 seconds East 11.51 feet to a monument;

Page 24 of 34

THENCE continuing along said last mentioned land and partially along a stone wall, the following 9 courses and distances:

(1) North 77 degrees 21 minutes 20 seconds East 67.72 feet;

(2) North 78 degrees 48 minutes 30 seconds East 114.31 feet;

(3) North 77 degrees 52 minutes 30 seconds East 303.46 feet;

(4) North 78 degrees 37 minutes 30 seconds East 78.59 feet;

(5) North 76 degrees 48 minutes 50 seconds East 97.84 feet;

(6) North 79 degrees 12 minutes 50 seconds East 121.08 feet;

(7) North 80 degrees 35 minutes 50 seconds East 114.21 feet;

(8) North 83 degrees 52 minutes 40 seconds East 28.40 feet; and

(9) North 77 degrees 50 minutes 00 seconds East 382.30 feet to the westerly boundary of land now or formerly of the Village of Mount Kisco;

THENCE along the westerly boundary of land now or formerly of the Village of Mount Kisco, the following 14 courses and distances:

(1) South 08 degrees 53 minutes 40 seconds East 693.23 feet;

(2) South 79 degrees 12 minutes 20 seconds West 227.80 feet;

(3) South 17 degrees 32 minutes 40 seconds East 147.00 feet;

(4) South 05 degrees 58 minutes 40 seconds East 280.00 feet;

(5) South 30 degrees 16 minutes 20 seconds West 242.00 feet;

(6) South 10 degrees 52 minutes 40 seconds East 117.00 feet;

(7) South 09 degrees 45 minutes 20 seconds West 105.00 feet;

(8) South 35 degrees 20 minutes 40 seconds East 188.00 feet;

(9) South 12 degrees 29 minutes 40 seconds East 227.00 feet;

(10) South 11 degrees 44 minutes 20 seconds West 97.00 feet;

(11) South 05 degrees 48 minutes 40 seconds East 108.00 feet;

(12) South 21 degrees 16 minutes 20 seconds West 164.00 feet;

(13) South 04 degrees 21 minutes 40 seconds East 180.00 feet; and

(14) South 03 degrees 29 minutes 20 seconds West 131.00 feet to a point and land now or formerly of The Nature Conservancy;

THENCE along said last mentioned land, the following 12 courses and distances:

(1) South 89 degrees 33 minutes 30 seconds West 418.17 feet;

(2) North 84 degrees 02 minutes 25 seconds West 140.33 feet;

(3) South 70 degrees 48 minutes 05 seconds West 77.82 feet;

(4) South 57 degrees 03 minutes 20 seconds West 115.72 feet;

(5) South 18 degrees 21 minutes 20 seconds West 835.19 feet;

(6) South 82 degrees 27 minutes 20 seconds West 219.14 feet;

(7) South 57 degrees 47 minutes 30 seconds West 196.34 feet;

(8) North 84 degrees 08 minutes 25 seconds West 319.91 feet;

(9) North 81 degrees 37 minutes 15 seconds West 22.17 feet;

(10) North 83 degrees 39 minutes 35 seconds West 66.92 feet;

(11) North 86 degrees 37 minutes 10 seconds West 28.66 feet; and

(12) North 84 degrees 18 minutes 40 seconds West 243.31 feet to the easterly side of Oregon Road in the Town of North Castle;

THENCE northerly and westerly along the easterly and northerly sides of Oregon Road in the Towns of North Castle and New Castle, the following 86 courses and distances:

(1) North 20 degrees 28 minutes 30 seconds East 9.06 feet;

(2) North 25 degrees 43 minutes 10 seconds East 18.20 feet;

(3) North 17 degrees 31 minutes 00 seconds East 37.48 feet;

(4) North 12 degrees 12 minutes 20 seconds East 41.44 feet;

(5) North 12 degrees 03 minutes 20 seconds East 49.07 feet;

(6) North 08 degrees 54 minutes 10 seconds East 24.23 feet;

(7) North 00 degrees 45 minutes 25 seconds East 53.73 feet;

(8) North 00 degrees 00 minutes 50 seconds East 37.94 feet;

Page 26 of 34

(9)   North 74 degrees 59 minutes 50 seconds East 2.59 feet;

(10) North 13 degrees 48 minutes 10 seconds West 24.94 feet;

(11) North 08 degrees 26 minutes 25 seconds West 29.77 feet;

(12) North 08 degrees 09 minutes 10 seconds West 38.85 feet;

(13) North 01 degrees 13 minutes 00 seconds West 16.00 feet;

(14) North 10 degrees 54 minutes 50 seconds East 128.81 feet;

(15) North 03 degrees 01 minutes 20 seconds West 12.90 feet;

(16) North 02 degrees 45 minutes 50 seconds East 102.66 feet;

(17) North 01 degrees 03 minutes 20 seconds East 72.67 feet;

(18) North 04 degrees 23 minutes 00 seconds East 50.25 feet;

(19) North 03 degrees 02 minutes 40 seconds East 39.72 feet;

(20) North 07 degrees 53 minutes 55 seconds West 9.10 feet;

(21) North 07 degrees 55 minutes 30 seconds East 13.49 feet;

(22) North 61 degrees 13 minutes 00 seconds West 36.64 feet;

(23) North 61 degrees 08 minutes 50 seconds West 80.86 feet;

(24) North 62 degrees 53 minutes 20 seconds West 41.74 feet;

(25) North 61 degrees 23 minutes 20 seconds West 54.34 feet;

(26) North 51 degrees 42 minutes 35 seconds West 4.12 feet;

(27) North 64 degrees 58 minutes 50 seconds West 47.10 feet;

(28) North 80 degrees 35 minutes 00 seconds West 34.72 feet;

(29) North 86 degrees 09 minutes 30 seconds West 54.62 feet;

(30) North 56 degrees 30 minutes 10 seconds West 3.30 feet;

(31) South 66 degrees 58 minutes 10 seconds West 5.80 feet;

(32) South 87 degrees 15 minutes 10 seconds West 23.16 feet;

(33) North 17 degrees 51 minutes 00 seconds West 22.64 feet;

Page 27 of 34

(34) North 04 degrees 06 minutes 10 seconds West 15.10 feet;

(35) North 22 degrees 26 minutes 50 seconds West 30.77 feet;

(36) North 38 degrees 41 minutes 00 seconds West 7.90 feet;

(37) North 25 degrees 28 minutes 50 seconds West 13.95 feet;

(38) North 32 degrees 45 minutes 30 seconds West 38.35 feet;

(39) North 47 degrees 05 minutes 20 seconds West 21.53 feet;

(40) North 26 degrees 02 minutes 40 seconds West 39.47 feet;

(41) North 56 degrees 15 minutes 20 seconds West 11.92 feet;

(42) North 32 degrees 26 minutes 20 seconds West 23.73 feet;

(43) North 27 degrees 25 minutes 50 seconds West 57.96 feet;

(44) North 36 degrees 18 minutes 25 seconds West 114.20 feet;

(45) North 27 degrees 43 minutes 30 seconds West 45.93 feet;

(46) North 18 degrees 11 minutes 00 seconds West 74.61 feet;

(47) North 37 degrees 26 minutes 10 seconds West 12.57 feet;

(48) North 19 degrees 59 minutes 45 seconds West 22.87 feet;

(49) North 12 degrees 18 minutes 50 seconds West 14.11 feet;

(50) North 24 degrees 11 minutes 40 seconds West 20.33 feet;

(51) North 16 degrees 06 minutes 45 seconds West 16.47 feet;

(52) North 00 degrees 22 minutes 45 seconds East 18.12 feet;

(53) North 13 degrees 02 minutes 40 seconds West 27.78 feet;

(54) North 07 degrees 25 minutes 45 seconds West 45.32 feet;

(55) North 12 degrees 51 minutes 50 seconds West 24.30 feet;

(56) North 00 degrees 07 minutes 00 seconds West 14.83 feet;

(57) North 15 degrees 09 minutes 40 seconds West 49.17 feet;

(58) North 32 degrees 13 minutes 50 seconds West 39.54 feet;

(59) North 30 degrees 20 minutes 40 seconds West 43.29 feet;

(60) North 20 degrees 51 minutes 55 seconds West 25.58 feet;

(61) North 02 degrees 49 minutes 30 seconds West 15.83 feet;

(62) North 29 degrees 38 minutes 50 seconds West 15.46 feet;

(63) North 08 degrees 12 minutes 35 seconds West 12.18 feet;

(64) North 29 degrees 28 minutes 20 seconds West 17.01 feet;

(65) North 16 degrees 45 minutes 00 seconds West 17.31 feet;

(66) North 09 degrees 34 minutes 20 seconds West 28.32 feet;

(67) North 13 degrees 48 minutes 20 seconds West 36.16 feet;

(68) North 03 degrees 45 minutes 40 seconds East 12.35 feet;

(69) North 15 degrees 01 minutes 55 seconds West 46.88 feet;

(70) North 29 degrees 21 minutes 00 seconds West 53.50 feet;

(71) North 23 degrees 46 minutes 40 seconds West 17.29 feet;

(72) North 37 degrees 32 minutes 30 seconds West 14.49 feet;

(73) North 49 degrees 15 minutes 20 seconds West 44.49 feet;

(74) North 71 degrees 28 minutes 20 seconds West 11.64 feet;

(75) North 57 degrees 26 minutes 30 seconds West 10.54 feet;

(76) North 73 degrees 01 minutes 15 seconds West 37.09 feet;

(77) North 82 degrees 18 minutes 20 seconds West 47.87 feet;

(78) North 84 degrees 10 minutes 30 seconds West 22.47 feet;

(79) South 83 degrees 01 minutes 40 seconds West 22.16 feet;

(80) North 84 degrees 54 minutes 00 seconds West 17.10 feet;

(81) South 86 degrees 06 minutes 00 seconds West 27.49 feet;

(82) North 81 degrees 44 minutes 10 seconds West 153.53 feet;

(83) North 79 degrees 42 minutes 00 seconds West 134.00 feet;

(84) North 84 degrees 39 minutes 00 seconds West 43.00 feet;

(85) North 89 degrees 32 minutes 00 seconds West 114.00 feet; and

(86) North 71 degrees 22 minutes 00 seconds West 85.00 feet to a point of curve;

THENCE northeasterly on a curve to the right having a radius of 50.00 feet connecting the northeasterly side of Oregon Road and the southeasterly side of Lower Byram Lake Road in the Town of New Castle, a distance of 68.56 feet to a point on the southeasterly side of Lower Byram Lake Road;

THENCE northerly, northeasterly, southeasterly and northeasterly along the easterly and southerly sides of Lower Byram Lake Road, the following 19 courses and distances:

(1)   North 07 degrees 12 minutes 00 seconds East 134.10 feet;

(2)   North 67 degrees 36 minutes 00 seconds East 171.94 feet;

(3)   North 58 degrees 22 minutes 00 seconds East 68.77 feet;

(4)   North 54 degrees 24 minutes 00 seconds East 61.60 feet;

(5)   South 45 degrees 22 minutes 00 seconds East 61.00 feet;

(6)   South 23 degrees 02 minutes 00 seconds East 19.13 feet to a point of curve;

(7)   Northeasterly on a curve to the left having a radius of 85.00 feet, a distance of 185.47 feet;

(8)   North 31 degrees 57 minutes 00 seconds East 46.34 feet to a point of curve;

(9)   Easterly on a curve to the right having a radius of 60.00 feet, a distance of 36.37 feet;

(10)  North 66 degrees 41 minutes 00 seconds East 138.42 feet to a point of curve;

(11)  Northerly on a curve to the left having a radius of 215.00 feet, a distance of 170.59 feet;

(12)  North 68 degrees 46 minutes 40 seconds West 10.74 feet;

(13)  North 29 degrees 31 minutes 00 seconds East 13.38 feet;

Page 30 of 34

(14) North 25 degrees 41 minutes 40 seconds East 43.31 feet;

(15) North 19 degrees 05 minutes 15 seconds East 15.26 feet;

(16) North 16 degrees 07 minutes 45 seconds East 224.55 feet;

(17) North 18 degrees 19 minutes 50 seconds East 34.60 feet;

(18) North 26 degrees 10 minutes 25 seconds East 63.52 feet; and

(19) North 22 degrees 47 minutes 50 seconds East 11.29 feet to the approximate town line between the Town of New Castle and the Town of Bedford;

THENCE running along said approximate town line and along land now or formerly of John S. and E. Patricia Mazella as described in Deed recorded in Liber 7312 cp 521, South 13 degrees 06 minutes 51 seconds East 644.36 feet to the southwesterly corner of said land now or formerly of John S. and E. Patricia Mazella located in the Town of Bedford;.

THENCE along said last mentioned land, the following 17 courses and distances:

(1)   South 66 degrees 36 minutes 00 seconds East 48.37 feet;

(2)   South 71 degrees 10 minutes 00 seconds East 14.57 feet;

(3)   South 56 degrees 16 minutes 00 seconds East 27.84 feet;

(4)   South 24 degrees 05 minutes 00 seconds East 6.77 feet;

(5)   South 49 degrees 43 minutes 00 seconds East 6.55 feet;

(6)   South 71 degrees 15 minutes 00 seconds East 25.54 feet;

(7)   North 89 degrees 31 minutes 00 seconds East 25.62 feet;

(8)   North 28 degrees 36 minutes 00 seconds East 70.39 feet;

(9)   North 69 degrees 20 minutes 00 seconds East 89.16 feet;

(10) North 76 degrees 50 minutes 00 seconds East 59.96 feet;

(11) North 86 degrees 51 minutes 00 seconds East 16.51 feet;

(12) North 81 degrees 27 minutes 00 seconds East 42.48 feet;

(13) North 78 degrees 13 minutes 52 seconds East 121.74 feet;

(14) North 10 degrees 45 minutes 22 seconds West 242.59 feet;

(15) North 14 degrees 47 minutes 20 seconds West 42.12 feet;

(16) North 10 degrees 37 minutes 41 seconds West 179.17 feet; and

(17) North 12 degrees 08 minutes 58 seconds West 474.81 feet to the southerly side of Oregon Road in the Town of Bedford, the point or place of BEGINNING.

The aforementioned Parcel 3 being the same premises as those shown on a map completed by RKW Land Surveying on November 8, 1995 and based on its survey completed on October 6, 1949 and October 25, 1995. Parcel 3 is more particularly bounded and described on said survey as follows:

PARCEL 3 AS PER SURVEY

ALL that certain plot, piece or parcel of land, situate, lying and being in the Town of Bedford, County of Westchester and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of Oregon Road where the same is intersected by the southerly line of land now or formerly of Frank D. and Susan B. Nordone as described in Deed recorded in Liber 8185 cp 46;

RUNNING THENCE along said land now or formerly of Frank D. and Susan B. Nordone, the following 11 courses and distances:

(1)  South 71 degrees 32 minutes 10 seconds East 173.64 feet to a point of curve;

(2)  In a southerly direction on a curve to the right with a radius of 250 feet, a distance of 304.81 feet to a point of tangency;

(3)  South 01 degrees 40 minutes 40 seconds East 53.82 feet;

(4)  South 03 degrees 16 minutes 30 seconds West 97.52 feet;

(5)  South 04 degrees 33 minutes 40 seconds West 73.76 feet;

(6)  South 08 degrees 20 minutes 30 seconds West 77.16 feet to a point of curve;

(7)  In a southwesterly direction on a curve to the right with a radius of 300 feet, a distance of 196.17 feet to a point of tangency;

(8)  South 45 degrees 02 minutes 35 seconds West 64.15 feet;

(9)  South 38 degrees 27 minutes 50 seconds West 34.41 feet to a point of curve;

(10) In a southwesterly direction on a curve to the left with a radius of 130 feet, a distance of 64.42 feet; and

(11) South 73 degrees 16 minutes 49 seconds East 493.65 feet;

Page 33 of 34

THENCE along said land now or formerly of Frank D. and Susan B.
Nordone and land now or formerly of John and Elizabeth Santora,
North 77 degrees 50 minutes 00 seconds East 675.31 feet to land
now or formerly of the Village of Mt. Kisco;

THENCE along the same, South 08 degrees 59 minutes 20 seconds
East 251.91 feet to land now or formerly of Rockefeller
University;

THENCE along said land now or formerly of Rockefeller University,
the following 10 courses and distances:

(1)   South 77 degrees 50 minutes 00 seconds West 382.30 feet;

(2)   South 83 degrees 52 minutes 40 seconds West 28.40 feet;

(3)   South 80 degrees 35 minutes 50 seconds West 114.21 feet;

(4)   South 79 degrees 12 minutes 50 seconds West 121.08 feet;

(5)   South 76 degrees 48 minutes 50 seconds West 97.84 feet;

(6)   South 78 degrees 37 minutes 30 seconds West 78.59 feet;

(7)   South 77 degrees 52 minutes 30 seconds West 303.46 feet;

(8)   South 78 degrees 48 minutes 30 seconds West 114.31 feet;

(9)   South 77 degrees 21 minutes 20 seconds West 79.23 feet; and

(10)  North 18 degrees 39 minutes 30 seconds West 616.16 feet to
      the easterly side of Oregon Road;

THENCE along the easterly side of Oregon Road, part of the way
along a stone wall, the following 8 courses and distances:

(1)   North 16 degrees 39 minutes 50 seconds East 53.53 feet;

(2)   North 11 degrees 56 minutes 30 seconds East 173.64 feet;

(3)   North 13 degrees 26 minutes 30 seconds East 101.89 feet;

(4)   North 14 degrees 11 minutes 10 seconds East 31.05 feet;

(5)   North 11 degrees 56 minutes 40 seconds East 101.20 feet;

(6)   North 12 degrees 14 minutes 40 seconds East 184.69 feet;

(7)   North 11 degrees 41 minutes 50 seconds East 115.58 feet; and

(8)   North 10 degrees 55 minutes 00 seconds East 78.07 feet to
      the point and place of BEGINNING.

Title # Fidelity # 00- 3702- 55258-W

Oregon & Lower Bryam Lake Road, New Castle
County of Westchester
Town of New Castle
Filed Map:
No.:      Phase/Block:    Unit/Lot:
Dist:     Sect: 94.17     Block: 1         Lot: 9F/K/A52


84 Orgeon Road, North Castle
County of Westchester
Town of North Castle
Filed Map:
No.:      Phase/Block:    Unit/Lot:
Dist:     Sect: 2  Block: 6      Lot: 1 AND 2


80 Oregon Road, Bedford
County of Westchester
Town of Bedford
Filed Map:
No.:      Phase/Block:    Unit/Lot:
Dist:     Sect: 94.18     Block: 1         Lot: 1


52 Oregon Road, Bedford
County of Westchester
Town of Bedford
Filed Map:
No.:      Phase/Block:    Unit/Lot:
Dist:     Sect: 94.14     Block: 1         Lot: 9

Wood Side, Oregon Rd. & Lower Byram Lake Road.
County of West-chester.
Town of New Castle.
Dist: Sect: 94.17 Block 1 Lot: 8 F/K/A of

Record and Returnds:

Reed, Smith, Shaw & Mc Kay Esqs
Attn: Kurt Heffler Esq.

2500 1 Liberty Place / 1650 Market St.
In Philadelphia PA. 19013