## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| JEFFREY A. LOVITKY ) | |
| 1776 K Street, NW, Suite 800 ) | |
| Washington D.C. 20006 ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | Civil Action No. 19-cv-01454-CKK |
| ) | |
| ) | |
| DONALD J. TRUMP, ) | |
| in his official capacity as ) | |
| President of the United States ) | |
| ) | |
| ) | |
| Defendant ) | |
| _____) | |

### PLAINTIFF'S MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, Plaintiff respectfully moves this Court for a preliminary injunction, directing Defendant to amend his financial disclosure statements dated May 15, 2018 and May 15, 2019 for the purpose of segregating voluntarily reported liabilities from liabilities that he was required to report.

Plaintiff also respectfully moves for the Court to advance its determination of the merits pursuant to Rule 65(a)(2) and issue a permanent injunction to the same effect. Pursuant to Local Civil Rule 65.1(d), Plaintiff respectfully requests a hearing on this motion at the Court's earliest possible convenience and within 21 days after the filing of this motion.

In support of this motion, Plaintiff submits the attached memorandum of law and a proposed order.[1]

Respectfully submitted,

/s/ Jeffrey A. Lovitky

_____
D.C. Bar Number 404834
1776 K Street, N.W., Suite 800
Washington D.C. 20036
Tel: (202) 429-3393
Fax: (202) 318-4013
Email: jefflovitky@gmail.com

---

[1] This motion and the accompanying legal memorandum as well as Plaintiff's declaration was served on Defendant together with a copy of the Complaint.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JEFFREY A. LOVITKY <br> 1776 K Street, NW, Suite 800 <br> Washington D.C. 20006 <br> Plaintiff, <br><br><br> v. <br><br><br> DONALD J. TRUMP, <br> in his official capacity as <br> President of the United States <br><br><br> Defendant | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 19-cv-01454-CKK <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION
## FOR A PRELIMINARY AND PERMANENT INJUNCTION

# TABLE OF CONTENTS

Page

I. INTRODUCTION................................................................................................1

II. BACKGROUND AND PROCEDURAL HISTORY.....................................................1

III. STANDARD OF REVIEW................................................................................3

IV.  PLAINTIFF HAS STANDING TO PURSUE THIS ACTION................................4

    (a) Plaintiff Has Suffered an Injury in Fact..................................................4

    (b) Plaintiff Suffered the Specific Injuries That the EIGA Was
       Intended to Prevent.... .........................................................................8

    (c) The President Is Subject to Mandamus/Injunctive Relief and Is
       Also Subject to Declaratory Judgment Relief......................................13

V. PLAINTIFF MAY OBTAIN JUDICIAL REVIEW EVEN THOUGH
    THE EIGA DOES NOT PROVIDE A PRIVATE CAUSE OF ACTION..................20

VI. EACH OF THE PRELIMINARY INJUNCTION FACTORS FAVORS
GRANTING PLAINTIFF'S MOTION..............................................................24

    (a) Plaintiff Is Likely to Succeed on The Merits......................................24

        (1)  The President Had A Ministerial Duty to Differentiate Personal
        Liabilities from Non-Personal Business Liabilities.........................24

        (2)  There Were No Reportable Unrelated Business Liabilities.....................32

        (3)  The President Owes A Duty to Plaintiff to Specifically Identify Personal
        Liabilities.......................................................................................33

    (b) Plaintiff Will Suffer Irreparable Harm in The Absence Of A
    Preliminary Injunction...............................................................35

    (c)  The Balance of Equities Tip in Plaintiff's Favor............................36

    (d) An Injunction Is in The Public Interest..........................................37

CONCLUSION.................................................................................................38

# TABLE OF AUTHORITIES

**Cases**

Page(s)

*Bell v. Hood*, 327 U.S. 678, 66 S. Ct. 773 (1946) ................................................. 19

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D. C. Cir. 1996) ........................................
17,21,23

*Citizens for Responsibility & Ethics in Wash. v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009)
17,19,24

*Clinton v. City of New York*, 524 U.S. 417, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998) ...... 20

*Clinton v. Jones*, 520 U.S. 681, 117 S. Ct. 1636 (1997) ........................................... 20

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288–92 (D.C. Cir. 2009) ....................... 4

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371
(D.C. Cir. 2017) .............................................................................................. 7,13

*Federal Election Comm'n v. Akins*, 524 U.S. 11, 118 S. Ct. 1777 (1998) ...........................
6,10,13

*Franklin v. Massachusetts*, 505 U.S. 788, 112 S. Ct. 2767 (1992) ........................... 15,19

*Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28 (D.D.C. 2011) .................................. 17,24

*Friends of Animals v. Jewell*, 824 F.3d 1033 (D.C. Cir. 2016) ........................................ 7

*Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016) ................................... 7,9,11

*Ganem v. Heckler*, 746 F.2d 844 (1984) ........................................................ 21,22

*Hernandez-Avalos v. INS*, 50 F.3d 842 (10th Cir. 1995) ............................................ 24

*Consol. Edison Co. of N.Y., Inc. v. Ashcroft*, 286 F.3d 600 (D.C. Cir. 2002) ..................... 23

*In re Cheney*, 334 F.3d 1096 (D.C. Cir. 2003) .................................................... 23

*In re Cheney*, 406 F.3d 723 (D.C. Cir. 2005) ....................................................... 5

*Judicial Watch v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20 (D.D.C. 2002) ......... 24

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 233 F. Supp. 2d 16 (D.D.C. 2002) . 17

*Judicial Watch, Inc. v. United States DOC*, 736 F. Supp. 2d 24 (D.D.C. 2010) ................. 24

*Kendall v. United States*, 37 U.S. 524 (1838) ..................................................... 22

*Lawson v. United States*, 176 F.2d 49 (D.C. Cir. 1949) ............................................ 14

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ........................... 4

*Lovitky v. Trump*, 308 F. Supp. 3d 250 (D.D.C. 2018) ............................................... 4

*Lovitky v. Trump*, No. 18-5105, 2019 U.S. App. LEXIS 7658 (D.C. Cir. Mar. 15, 2019) ... 4

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) .. 5,34

*Marbury v. Madison*, 5 U.S. 137, 2 L. Ed. 60 (1803) ............................................... 22

*Mountain States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002) ........................... 17

*Nader v. FEC*, 725 F.3d 226 (D.C. Cir. 2013) ..................................................... 10

*Nat'l Fed'n of the Blind v. Spellings*, 562 F. Supp. 2d 74 (D.D.C. 2008) .......................... 33

*Nat. Res. Def. Council v. Pena*, 147 F.3d 1012 (D.C. Cir. 1998) .................................. 16

*Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917 (D.C. Cir. 1980) .................................
14,15,18

*NTEU v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974) ......................................................
14,16,18,19

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015) ....................................... 28,29

*Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 109 S. Ct. 2558 (1989) ......... 13

*Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43 (D.C. Cir. 1987) ................. 18

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ................................................ 4

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) ................................................................ 16,18

*Timken Co. v. Simon*, 539 F.2d 221 (D.C. Cir. 1976) ........................................................ 24

*United Gov't Sec. Officers, Local No. 52 v. Chertoff*, 587 F. Supp. 2d 209 (D.D.C. 2008) . 19,24

*United States v. Nixon*, 418 U.S. 683, 94 S. Ct. 3090 (1974) ........................................... 21

*United States v. Oakar*, 111 F.3d 146 (D.C. Cir. 1997) .................................................... 10,28

*Washington Legal Foundation v. United States Sentencing Comm'n*, 89 F.3d 897 (D.C. Cir. 1996) ...................................................................................................................... 23

*Waterkeeper All. v. EPA*, 853 F.3d 527 (D.C. Cir. 2017) .................................................. 6

*Zivotofsky v. Sec'y of State*, 444 F.3d 614 (2006) ............................................................. 7,8

**Statutes**

5 U.S.C. app. § 101 ............................................................................................................ 2,3

5 U.S.C. App. § 102 ............................................................................................................

6,27,29,31,33

5 U.S.C. app. § 105 ............................................................................................................ 8,33

5 U.S.C. § 552 ................................................................................................................... 7

28 U.S.C. §1361 ................................................................................................................. 21

28 U.S.C. § 1361 ............................................................................................................... 14,24

**Rules**

5 C.F.R § 2634.305 ............................................................................................................ 6,28

5 C.F.R § 2634.311 ............................................................................................................ 6

5 C.F.R. § 2634.105 ........................................................................................................... 28

5 C.F.R. § 2634.311 ........................................................................................................... 28

5 C.F.R. § 2634.405 ........................................................................................................... 36

5 C.F.R. § 2634.605 ........................................................................................................... 31,32

57 Fed. Reg. 11800 (April 7, 1992) .................................................................................. 28

**Legislative History**

Ethics in Government Act of 1977, House Committee on the Judiciary,

H. Rpt. 95-800, 95th Cong., 1st Sess., Nov. 2, 1977............................................................8,9,10

Public Officials Integrity Act of 1977, Senate Committee on Governmental Affairs,

S. Rpt. 95-170, 95th Cong., 1st Sess., May 16, 1977............................................................9,31

**Other Authorities**

*Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action* 81 Harv. L. Rev. 308 (1967) ............................................................. 21

# I. INTRODUCTION

The Ethics in Government Act ("EIGA") requires public disclosure of the President's liabilities in excess of $10,000. However, the President obscured the liabilities he was required to disclose, i.e., his debts as well as the debts of his spouse and dependent child (hereinafter referred to as "personal liabilities"), by commingling them with liabilities incurred by business entities for which neither he, his spouse, or dependent child were liable (hereinafter referred to as "non-personal liabilities"). As a result, Plaintiff lacks the information to which he is entitled by law, i.e., specific identification of personal liabilities.

The President's failure to specifically identify the personal liabilities he was required to disclose deprives Plaintiff of the information required to evaluate whether the President's decisions have been or will be impacted by personal financial considerations. As a consequence, Plaintiff will suffer irreparable injury, because he will be unable to make an informed voting decision in connection with the March 3, 2020 Texas Presidential primary election, as well as the November 3, 2020 general election. Plaintiff therefore seeks a preliminary injunction requiring the President to disclose his liabilities in a timely fashion, so that he may make informed voting decisions.

# II. BACKGROUND AND PROCEDURAL HISTORY

On May 16, 2016, the President filed a financial disclosure report with the Federal Election Commission (hereinafter "FEC"). This report was required by the provisions of the Ethics in Government Act (hereinafter "EIGA"), 5 U.S.C. app. § 101 et seq.  The President's financial disclosures were made on Office of Government Ethics (hereinafter

"OGE") Form 278e. The President certified his financial disclosures as being "*true, complete and correct*." *Compl.* ¶ 14.

On or about December 15, 2016, Plaintiff filed an application for a copy of the May 16, 2016 report through the website of the OGE. Compl.  ¶ 15.  On December 19, 2016, the OGE sent an email to Plaintiff attaching copies of the May 16, 2016 financial disclosure report. *Id.*

Upon further review and investigation of the President's financial disclosure report, Plaintiff became aware that Part 8 of the report commingled his debts with the debts of various business entities. On January 23, 2017, Plaintiff sent a letter via certified mail to White House Counsel Donald McGahn expressing his concerns pertaining to this matter and requesting his response. Compl. ¶ 12, Ex. 6.[1]  No response was ever received by Plaintiff to this letter. *Id*.

On March 14, 2017, Plaintiff filed an action in the United States District Court for the District of Columbia against President Trump in his official capacity. Compl. ¶ 12. The second amended complaint filed on July 30, 2017 alleged that President Trump obscured his liabilities by commingling them with the debts of business entities for he was not liable.  *Id*. Plaintiff sought relief in the nature of mandamus for the purpose of requiring the President to identify his liabilities in excess of $10,000. The July 30, 2017 amended complaint further sought alternative relief in the form of a Declaratory Judgment adjudicating that the President violated the provisions of the EIGA by failing to identify his debts. *Id*.

---

[1]. The numbered exhibits identified in this memorandum are the numbered exhibits attached to the Complaint. Thus, Exhibit 6 refers to Exhibit 6 of the Complaint.

On April 10, 2018, the district court dismissed the action for want of Article III standing. *Lovitky v. Trump*, 308 F. Supp. 3d 250 (D.D.C. 2018). On April 12, 2018, Plaintiff filed an appeal to the U.S. Court of Appeals for the District of Columbia Circuit. The Court of Appeals issued its decision on March 15, 2019.  *Lovitky v. Trump*, No. 18-5105, 2019 U.S. App. LEXIS 7658 (D.C. Cir. Mar. 15, 2019).  The Court of Appeals held that the President could not be sued in his official capacity, because the challenged May 15, 2016 financial disclosure statements were filed prior to the date he assumed office.

Plaintiff thereafter filed this action challenging the President's financial disclosure reports filed on May 15, 2018 and May 15, 2019. The debts reported on these financial reports are substantially similar to the debts reported on the 2016 financial disclosures. The instant action similarly alleges that the President commingled personal liabilities with non-personal liabilities.  Compl. ¶ 4.

## III. STANDARD OF REVIEW

In order to obtain a preliminary injunction, plaintiff must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in his favor, and (4) an injunction is in the public interest. *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. NRDC*, 555 U.S. 7 (2008)). The D.C. Circuit has adopted a "*sliding scale*" approach when evaluating these factors. *Sherley*, 644 F.3d at 392. Accordingly, if the "*movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make a strong showing on another factor.*" *Davis v. Pension Benefit Guar. Corp.*, 571 *F.3d 1288, 1291–92 (D.C. Cir. 2009). But see League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (stating that the court has "*not yet*

*decided*" whether the sliding scale approach continues to apply post-*Winter*).

## IV.  PLAINTIFF HAS STANDING TO PURSUE THIS ACTION

To establish Article III standing, Plaintiff must show that (1) he has "*suffered an injury in fact*;" (2) the injury is "*fairly traceable to the challenged action of the defendant*" and, (3) it is likely that the injury "*will be redressed by a favorable decision*." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

 (a) <u>Plaintiff Has Suffered an Injury in Fact</u>

In *Federal Election Comm'n v. Akins*, 524 U.S. 11, 118 S. Ct. 1777 (1998), the Supreme Court held that a plaintiff *"suffers an injury in fact when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute*." *Id*. at 21 (quoting *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 449, 109 S. Ct. 2558, 105 L. Ed. 2d 377 (1989)).  As noted in *Waterkeeper All. v. EPA*, 853 F.3d 527, 534 (D.C. Cir. 2017), depriving a member of the public of information to which he is statutorily entitled is "*injury enough*" to confer standing.  No further injuries need be alleged.

Plaintiff satisfied this test because he was entitled under the EIGA to "*full and complete*" disclosure of personal liabilities in excess of $10,000. 5 U.S.C. App. § 102(a)(4); 5 U.S.C. app. § 102(b)(1)(B); 5 U.S.C. app. § 102(e)(1); 5 C.F.R § 2634.305; 5 C.F.R § 2634.311(a)(3). Plaintiff further alleges that the information to which Plaintiff is entitled was not disclosed, because the President obscured the personal liabilities he was required to report by commingling them with voluntarily reported liabilities of business entities. Compl. ¶¶ 1, 4, 45.

In *Friends of Animals v. Jewell, 824 F.3d 1033, 1040-41 (D.C. Cir. 2016)*

*(Friends of Animals I),* the court applied a more stringent test than in *Waterkeeper* to

determine whether sufficient injury exists for standing purposes.[2]  The court held that:

> *a denial of access to information can work an injury in fact for standing purposes, at least where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them.* (internal quotations and citations omitted).

All that is required by *Friends of Animals I,* beyond the mere non-receipt of

information, is that Plaintiff demonstrate that the information '*would help him*.' *Id.*  This

is all that is needed to satisfy the requirement for a "*concrete and particularized*" injury

under *Friends of Animals I.  Id.*, at 1042. Plaintiff satisfied the *Friends of Animals I* test,

by alleging that the information sought would *help* him in (a) making an independent

judgment as to whether the President has been or will be influenced by conflicts of

interests, (b) evaluating the past performance of the President, (c) making an informed

voting decision and (d) participating in the political process in an informed manner.

Compl. ¶¶ 6-8.

In *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (*Friends of*

*Animals II*), the court articulated a somewhat different test to determine whether a litigant

has standing to allege an informational injury. The court held that a party:

> *suffers sufficiently concrete and particularized informational injury where the plaintiff alleges that: (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.*

---

[2] Plaintiff cites in this memorandum *Friends of Animals v. Jewell*, 824 F.3d 1033 (D.C. Cir. 2016) (*Friends of Animals I*), and *Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016) (*Friends of Animals II*).

As further explained in *Friends of Animals II*, the scope of the second prong of this inquiry depends upon the type of harm that Congress sought to remedy in requiring disclosure.  In certain cases, "*a plaintiff suffers the type of harm Congress sought to remedy when it simply seeks and is denied specific agency records.*" *Id.*, quoting *Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 449-50, 109 S. Ct. 2558 (1989) (internal quotations omitted).   An example of an informational injury falling in this category is denial of records that must be produced under the Freedom of Information Act (FOIA), 5 U.S.C. § 552.  *Zivotofsky v. Sec'y of State*, 444 F.3d 614, 617 (2006).  In other informational injury cases, a plaintiff must go a step further, and allege that nondisclosure has caused it to suffer the specific type of harm from which Congress, in mandating disclosure, sought to protect against. *Friends of Animals II*, 828 F.3d at 992. *See also Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017).

Plaintiff satisfies the first prong of the informational injury analysis because he has not received information that, based on his interpretation, the statute required be disclosed, i.e., personal liabilities that the President was required to report. Compl. ¶¶ 1, 4, 6, 8, 40, 45-47. Plaintiff also satisfies the second prong of the injury analysis by virtue of being denied access to information pertaining to these personal liabilities. No further injury need be alleged.

The asserted injury in this case is similar to the injury that is the basis for standing in cases arising under the Freedom of Information Act (FOIA).  In the FOIA context, Congress was not concerned with who the requestor is or the reasons she may be seeking the information.  *See Zivotofsky v. Sec'y of State*, 444 F.3d 614, 617 (2006):

6

> *[a]nyone whose request for specific information has been denied has standing to bring an action; the requester's circumstances—why he wants the information, what he plans to do with it, what harm he suffered from the failure to disclose— are irrelevant to standing.*

Similarly, the EIGA contains no limitations on who is entitled to a copy of the financial disclosure report. The only requirement is that the requester states her name, occupation, and address. 5 U.S.C. app. § 105(b)(2). Nor is there any requirement under the EIGA to state any reason for requesting the report.  Indeed, the financial disclosure report must be disclosed even if a requester has no purpose for seeking the information contained therein.  The only limitation is that the report may not be used for any (a) unlawful purpose; (b) commercial purpose, except by news media; (c) credit rating purpose; or (d) the solicitation of money.  5 U.S.C. app. § 105(c)(1).

It is obvious that Congress intended that financial disclosure reports be made available to all persons, regardless of who they are, or why they want it. It is also clear that Congress did not intend to limit the public availability of these reports only to individuals who have a particular purpose for the information contained therein.

The House Committee Report states as follows with respect to the public financial disclosures:  "*there is no restriction on who may gain access to such information only on what may be done with it after it is obtained*." (emphasis in the original).  Ethics in Government Act of 1977, House Committee on the Judiciary, H. Rpt. 95-800, 95th Cong., 1st Sess., Nov. 2, 1977, at 25. The Committee believed that the objectives of the public financial disclosure requirements would be undermined if Congress attempted to "*narrowly circumscribe the zone of permissible uses*" of financial disclosure reports. *Id*.

Congress believed that it could not require public officials to provide personal financial disclosure reports to government ethics officials, unless those reports were also

made available to the public.  The House Report notes that requiring the submission of detailed financial information by public officials raises significant constitutional concerns. The Committee stated that absent the public disclosure provisions, "*it is doubtful that the reporting and filing requirements would survive the exacting constitutional scrutiny to which they must be put.*" Accordingly, the Committee stated that "*the public availability of disclosed information is not only paramount, but in all likelihood the crucial element of the formula*." H.R. Rep. No. 95-800, at 24.[3]

Congress included the public disclosure provisions at least in part because they were viewed as essential to the statute's ability to withstand constitutional scrutiny. This purpose does not contemplate any specific injury to the public. As such, Plaintiff should not be required to allege any specific injury, in addition to the non-receipt of information to which he is entitled by law.

(b) Plaintiff Suffered the Specific Injuries That the EIGA Was Intended to Prevent

In the alternative, Plaintiff satisfies the standing requirements of *Friends of Animals II,* because the information sought in this litigation is directly related to "*the type of harm Congress sought to prevent by requiring disclosure.*" 828 F.3d at 992. The legislative history of the EIGA states that armed with the information required to be disclosed, "*citizens will be able to form independent judgments as to the integrity of government officials. This information may be relevant to situations where either the appearance or reality of financial impropriety, self-interest, or conflict of interest exists*." H.R. Rep. No. 95-800, at 24 (1977). Also among the purposes of the EIGA is to "*enhance

---

[3] The final adopted version of the provisions of the EIGA mandating public availability of financial disclosure reports was an amalgam of the Senate and House versions of the legislation.  Compare H.R. Rep. No. 95-800, § 205, pp. 5-6, S. Rep. No. 95-170, § 305, p. 95-96, with Pub. L. No. 95-521, § 205, 92 Stat. 1846, 1847 (1978).

*the ability of the citizenry to judge the performance of public officials.*" *United States v. Oakar*, 111 F.3d 146, 148 (D.C. Cir. 1997). The EIGA disclosures were also enacted as a means of deterring public officials from abusing their official positions for personal financial gain. *Id.* Congress believed that the public disclosure provisions were needed for the purpose of restoring public confidence in government.  H.R. Rep. No. 95-800, 95th Cong., 1st Sess. (1977) at 24 (noting that the primary goal of the statute is "*promoting confidence in public officials through [f]ull disclosure of their personal financial status.*").

The information sought by this litigation is precisely tailored to the harms Congress sought to prevent in enacting the EIGA.  The complaint alleged that the President's failure to specifically identify his liabilities deprived Plaintiff of (a) an opportunity to make an independent judgment as to the integrity of the President and whether the President's actions have been or could in the future be influenced by conflicts of interests, and (b) information required to judge the performance of the President. Compl. ¶¶ 6-8.   These are precisely the purposes for which the statute was enacted.  As such, the injury alleged in this case is sufficient for standing purposes, because the information Plaintiff seeks is directly related to the type of harm Congress sought to prevent in enacting the EIGA. *Friends of Animals II,* 828 F.3d at 992.

The Congressional purpose in making financial disclosure reports publicly available was not limited to facilitating informed voting decisions. This is demonstrated by the fact that both elected and non-elected officials are required to make such disclosures. Rather, Congress intended that financial disclosure statements be made available so as to enable the public to take informed actions designed to rectify self-

dealing and conflicts of interests on the part of public officials, both elected and non-elected.  Such actions by citizens may take a myriad of forms.

For example, the information revealed by the financial disclosure reports may be used for the purpose of petitioning members of Congress to enact legislation to strengthen conflicts of interest laws, or to enact laws requiring divestiture of assets giving rise to conflicts of interest. The EIGA disclosures may be used to enlist the news media to publicize conflicts of interests, thereby focusing public attention on the issue. The information may be used for the purpose of speaking intelligently with friends, neighbors, and colleagues concerning actual or potential conflicts of interests on the part of high-level government officials.  All of these and other activities are essential aspects of being able to participate in the political process in an informed manner. Compl. ¶ 7.

Nor may the President object that the injury claimed in this litigation is insufficient for standing purposes because it is not sufficiently concrete or particularized. The mere fact that an injury is "*widely shared*" does not negate standing in informational injury cases.  *FEC v. Akins*, 524 U.S. 11, 24, 118 S. Ct. 1777, 141 L. Ed. 2d 10 (1998). *See also Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 449-50, 109 S. Ct. 2558 (1989), noting that the injury to an individual who has been denied information to which he is entitled is not lessened by virtue of the fact that other citizens may have the identical complaint.

In *Friends of Animals II,* the court held that a party "*suffers sufficiently concrete and particularized informational injury"* when it (a) is deprived of information to which, on its interpretation, it is entitled and (b) it suffers the type of harm Congress sought to prevent in requiring disclosure. *Id.*, *828 F.3d at 992.*  The requirement for "*concrete and*

*particularized*" injury is satisfied when this two-part test is met.  *See also Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017).  Plaintiff satisfied this test, by virtue of alleging the harms that the EIGA was designed to prevent.

Moreover, the value of the information sought by this litigation is significantly diluted with the passage of time.  Information pertaining to the existence of a conflict of interest revealed several years after the fact is primarily of historical value.  Therefore, the President's failure to provide the information sought by this litigation in a timely manner deprived Plaintiff of information required to participate meaningfully in the political process.  *Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 310 F. Supp. 2d 216, 227-28 (D.D.C. 2004).

In addition to the above, the information sought by this litigation is also required by Plaintiff to make an informed voting decision, which is at the heart of the democratic process. Compl. ¶ 8.  In cases arising under the Federal Election Campaign Act (FECA), the courts have held that a litigant alleges a sufficient informational injury for standing purposes "*if the disclosure they seek is related to their informed participation in the political process.*"  *Nader v. FEC*, 725 F.3d 226, 230 (D.C. Cir. 2013).  Informed participation in the political process includes information required to make informed voting decisions.  *See FEC v. Akins*, 524 U.S. 11, 24-25, 118 S. Ct. 1777 (1998).

Congress certainly intended that citizens would use the financial disclosures for the purpose of voting decisions, as is illustrated by the fact that candidates for public office must also make the required disclosures. 5 U.S.C. app. § 101. Moreover, the broad purpose of the statute in providing citizens with information to judge the integrity of

elected officials and evaluate their performance in office necessarily assumes that the information would be used every two or four years in connection with the making of voting decisions. Indeed, the voting decision perhaps represents the most concrete way in which a citizen may effectively utilize the information provided in the financial disclosure statements.

The ability to make a judgment as to whether the President's actions have been or could be influenced by conflicts of interests is a critical element in the making of an informed voting decision.  An informed voting decision requires that Plaintiff have sufficient information to evaluate whether the President's past performance in office has been influenced by personal financial considerations, as well as to determine whether the President could in the future be influenced by personal financial considerations. The President's failure to specifically identify his debts, and the debts of his spouse and dependent child (assuming such debts existed), makes it impossible for Plaintiff to judge the President's past performance in office, as well as the potential for future conflicts of interests.   This in turn precludes Plaintiff from making an informed voting decision in connection with the March 3, 2020 Texas Presidential Primary, as well as the general election on November 3, 2020. Compl. ¶ 8; Declaration of Jeffrey Lovitky, ¶¶ 6-8.

The alleged voting injury is concrete, in that it pertains to specific elections conducted on specific dates. Indeed, as will be discussed in further detail below in connection with Plaintiff's request for a preliminary injunction, the absence of the information sought by this litigation will result in an irreparable voting injury in connection with the March 3, 2020 Texas Presidential Primary, as well as the general election on November 3, 2020.

(c) <u>The President Is Subject to Mandamus/Injunctive Relief and Is Also Subject to Declaratory Judgment Relief</u>

This Court has authority to order relief in the nature of mandamus against the President, or in the alternative issue a declaratory judgment adjudicating the President's legal duties. The controlling legal authority in this judicial circuit on whether mandamus may lie against the President is *NTEU v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974). The issue in *NTEU* was whether the President could be compelled by writ of mandamus to implement a pay raise for federal employees. In *NTEU*, the court noted that the Supreme Court has not decided whether the President may be mandamused. *NTEU* at 606-07. The court found, on the basis of its extensive review of constitutional principles and Supreme Court precedent, that it had jurisdiction under 28 U.S.C. § 1361 to mandamus the President. *Id.,* at 616.

In *NTEU*, the court ultimately determined that a declaratory judgment should be issued in lieu of a writ of mandamus. *Id.* at 616. However, the court's holding that it had authority to issue a declaratory judgment was expressly predicated upon its finding that it had authority to mandamus the President. *Id.,* at 616 (noting that the Declaratory Judgment Act does not provide an independent basis for jurisdiction, but "*because in this case subject matter jurisdiction is present under section 1361, this Court may utilize the tool of declaratory relief*."). Accordingly, the court's holding pertaining to its authority to issue the writ of mandamus was not *dicta*. *See Lawson v. United States*, 176 F.2d 49, 51 (D.C. Cir. 1949) (defining dicta as "*language unnecessary to a decision*.") Rather, *NTEU's* holding that the court had jurisdiction to mandamus the President was a necessary predicate to its determination that it also had jurisdiction to issue a declaratory judgment against the President.

13

Not long after *NTEU*, the D.C. Circuit issued its decision in *Nat'l Wildlife Fed'n v. United States,* 626 F.2d 917 (D.C. Cir. 1980).  In *Nat'l Wildlife Fed'n,* the plaintiff sought a writ of mandamus and a declaratory judgment against the President and the Director of the Office of Management and Budget.  The court declined to order relief due to unresolved issues as to whether the case presented a non-justiciable political question.  *Id.*, at 924-25.  However, in doing so, the court reaffirmed the holding in *NTEU*, stating that "*[m]andamus is not precluded because the federal official at issue is the President of the United States.*" *Id*. at 923.

Subsequent to *NTEU and Nat'l Wildlife Fed'n*, the Supreme Court decided *Franklin v. Massachusetts*, 505 U.S. 788, 112 S. Ct. 2767 (1992).  In *Franklin*, Massachusetts filed suit against the President and the Secretary of Commerce, arguing that the decision to allocate overseas military personnel to particular States for voter reapportionment purposes was arbitrary and capricious agency action in violation of the Administrative Procedure Act (APA), as well as a violation of Article I, § 2, cl. 3 of the U.S. Constitution. The Supreme Court held that the President is not an agency for purposes of the APA. Accordingly, the President's actions are not reviewable under the APA's arbitrary and capricious standard of review. *Franklin*, 505 U.S. at 801.

Separately, in Part III of the opinion, a four-judge plurality stated, "*in general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.*" *Id*., 505 U.S. at 802-803.  The same four Justices who signed the plurality opinion joined with Justice Scalia in a majority opinion, in which the Court held that the duties of the President at issue in *Franklin* were "*not merely ceremonial or ministerial*." *Id*., 505 U.S. at 800.

The statement in *Franklin* that courts do not "*generally*" have authority to enjoin

the President in the performance of an official duty must be read in the context of the fact

that the official duty at issue in *Franklin* was not viewed by the majority as a ministerial

duty. Indeed, the plurality opinion explicitly recognized this point, noting that the

Supreme Court has "*left open the issue of whether the President might be subject to a*

*judicial injunction requiring the performance of a purely ministerial duty.*" *Id.*, 505 U.S.

at 802 (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498-499, 18 L. Ed. 437

(1867)).

In his separate concurring opinion, Justice Scalia also reiterated the plurality's

conclusion that the Supreme Court has never decided whether the President may be

mandamused. *Id.*, 505 U.S. at 827, fn. 2 (Scalia J. concurring). Accordingly, five Justices

in *Franklin* (the four Justice plurality plus Justice Scalia) explicitly stated that the

Supreme Court has never resolved the issue of whether the President may be

mandamused.

As noted above, the D.C. Circuit held in *NTEU v. Nixon*, 492 F.2d 587 (D.C. Cir.

1974), that the President may be mandamused to perform a ministerial duty.  *Franklin* did

not even address, let alone resolve, the fundamental issue in this case, i.e., whether the

President may be mandamused to perform a ministerial duty. To the contrary, five

Justices in *Franklin* explicitly stated that the Supreme Court has never decided whether

the President may be mandamused.

Subsequent to *Franklin*, there have been other decisions in the D.C. Circuit that

suggest a fulsome approach towards judicial review of Presidential actions. In *Swan v.*

*Clinton*, 100 F.3d 973 (D.C. Cir. 1996), the court was presented with the issue of whether

the President could be mandamused for the purpose of reinstating an official whom he

had removed from office.  The Court ultimately did not reach the issue of whether

mandamus may lie against the President, because it found that partial relief could be

granted by mandamusing a subordinate official. *Id*., at 980-81.  However, the majority's

"*implicit conclusion*" was that the President can be mandamused to perform a non-

discretionary act. *Id*., at 990 (Silberman J. concurring).  *See also Nat. Res. Def. Council v.*

*Pena,* 147 F.3d 1012 (D.C. Cir. 1998), citing *Swan* for the proposition that mandamus

against the President "*is appropriate only (1) if petitioner satisfies requirements needed*

*for mandamus relief and (2) if injunction will compel performance of ministerial rather*

*than discretionary obligation*." *Id*. at fn. 5 (internal quotations omitted).

In *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002),

the plaintiff challenged a Presidential Proclamation designating a National Monument,

alleging that the President acted ultra vires and unconstitutionally in making the

designation. The court rejected the claim on the merits. Nonetheless, the court stated: "*In*

*reviewing challenges under the Antiquities Act, the Supreme Court has indicated*

*generally that review is available to ensure that the Proclamations are consistent with*

*constitutional principles and that the President has not exceeded his statutory authority*."

*Id*., at 1136.  *See also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1332 (D. C. Cir.

1996) (finding that the President exceeded his authority in issuing an Executive Order,

and rejecting the notion that the President can "*bypass scores of statutory limitations…*").

There have also been post-*Franklin* district court decisions holding that the

President and Vice-President may be mandamused. In *Citizens for Responsibility &*

*Ethics in Wash. v. Cheney*, 593 F. Supp. 2d 194, 221 (D.D.C. 2009), the district court

denied a motion to dismiss a mandamus claim against the Vice-President, holding that the Presidential Records Act created ministerial obligations that could be enforced through mandamus. The court further denied a motion to dismiss plaintiff's request for a declaratory judgment directed to the Vice-President and the Executive Office of the President. *Id.*, at 222; *see also Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 233 F. Supp. 2d 16, 23 (D.D.C. 2002) (declining motion to certify for interlocutory review due to absence of substantial grounds for difference of opinion as to whether the Vice-President may be mandamused); *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 35-36 (D.D.C. 2011) (denying motion to dismiss mandamus claim against the President).

*NTEU* is still the controlling authority in this judicial circuit on the issue of whether the President may be mandamused. *NTEU* will continue to be the controlling authority on this issue, unless and until reversed by an *en banc* decision of the D.C. Circuit, or by the Supreme Court. *See Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 54 (D.C. Cir. 1987) (Ruth B. Ginsburg, J., concurring).

Plaintiff also seeks injunctive relief, in addition to mandamus and declaratory relief. The availability of injunctive relief against the President is analyzed under the same principles as are applicable to mandamus relief. *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996). *See also Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917 n.1 (D.C. Cir. 1980) ("*an action purportedly requesting a mandatory injunction against a federal official is analyzed as one requesting mandamus.*").[4]

As noted above, both *NTEU* and *Nat'l Wildlife Fed'n* clearly hold that the President may be mandamused to perform a ministerial duty. It necessarily follows that

---

[4] Some courts have held that mandamus is an even more extraordinary remedy than injunctive relief. *Nat. Res. Def. Council v. Lujan*, 768 F. Supp. 870, 890 (D.D.C. 1991).

injunctive relief is also available directing the President to perform a ministerial duty.

Moreover, the opinion in *NTEU* was specifically framed in the context of whether

injunctive relief may be obtained against the President. *See NTEU*, 492 F.2d at 609,

stating "*no immunity established under any case known to this Court bars every suit*

*against the President for injunctive, declaratory or mandamus relief.*" The Supreme

Court subsequently decided in *Franklin v. Massachusetts*, 505 U.S. 788, 801, 112 S. Ct.

2767 (1992) that the President's discretionary determinations are not reviewable under

the APA's arbitrary and capricious standard of review. However, the plurality opinion

declined to decide "*whether the President might be subject to a judicial injunction*

*requiring the performance of a purely ministerial duty.*" *Id.*, 505 U.S. at 802 (quoting

*Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498-499, 18 L. Ed. 437 (1867)).

In sum, injunctive relief ordering the President to perform a ministerial duty is

available in this Circuit based upon the fact that mandamus relief is available under

*NTEU.*  The subsequent decision in *Franklin* does not change this conclusion, because

the Supreme Court expressly refused to decide whether the President may be directed by

injunction or writ of mandamus to perform a ministerial duty.

Plaintiff alternatively seeks a declaratory judgment in the event the Court denies

his request for relief in the nature of mandamus. The court may issue a declaratory

judgment if the court has jurisdiction to order relief in the nature of mandamus. *See*

*NTEU v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974); *Citizens for Responsibility & Ethics*

*in Wash. v. Cheney*, 593 F. Supp. 2d 194, 222 (D.D.C. 2009); "*Where a plaintiff*

*advances a legally cognizable claim for mandamus, the plaintiff necessarily also*

*advances a cause of action on which declaratory relief may lie*." *See also United Gov't Sec. Officers, Local No. 52 v. Chertoff*, 587 F. Supp. 2d 209, 222 (D.D.C. 2008).

Moreover, this Court could award declaratory relief even in the absence of mandamus jurisdiction.  This is consistent with the principle that courts enjoy broad remedial powers.  *See Bell v. Hood*, 327 U.S. 678, 66 S. Ct. 773 (1946) *("[i]t is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.")*.

The Supreme Court has held that a declaratory judgment against the President may be issued, even in cases not arising in the mandamus context. In *Clinton v. City of New York*, 524 U.S. 417, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998), the Supreme Court found that a line item veto exercised by President Clinton was unconstitutional. The Court held that the challengers had standing to seek a declaratory judgment because "*traceability and redressability are easily satisfied [when] injury is traceable to the President's [actions] and would be redressed by a declaratory judgment that the [actions] are invalid*." *Id*. at 433 n.22.

Finally, the President has no legitimate claim of immunity in this case. The Supreme Court has stated that "*immunities are grounded in the nature of the function performed, not the identity of the actor who performed it*." *Clinton v. Jones*, 520 U.S. 681, 695, 117 S. Ct. 1636 (1997) (quoting *Forrester v. White*, 484 U.S. 219, 229, 98 L. Ed. 2d 555, 108 S. Ct. 538 (1988)). In this case, the function to be performed is the identification of personal liabilities on the President's financial disclosure statements. This is a purely administrative task, which in no way implicates the unique constitutional

character of the Presidency. The President is merely being requested to perform the identical duty that is required of thousands of other federal officials in all three branches of government.

Indeed, the President would likely be required to provide the same information sought by this suit, if one of his lenders sued him for failing to fully disclose his debts in a loan application. *Clinton v. Jones*, 520 U.S. 681, 117 S. Ct. 1636 (1997). The President would also be required to furnish the information sought in this case in response to a grand jury subpoena. *United States v. Nixon*, 418 U.S. 683, 94 S. Ct. 3090 (1974).  The office occupied by the President should not shield him from providing the information sought in this action, since he could be ordered to provide the same information in other situations.

Accordingly, the redressability element of standing is established, because the court may either mandamus or enjoin the President, or as in *NTEU*, issue a declaratory judgment adjudicating the President's financial disclosures to be inconsistent with the requirements of the Ethics in Government Act.

## V. PLAINTIFF MAY OBTAIN JUDICIAL REVIEW EVEN THOUGH THE EIGA DOES NOT PROVIDE A PRIVATE CAUSE OF ACTION

Plaintiff has a right to judicial review, even in the absence of a private cause of action under the EIGA. An important case in this area is *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), involving a challenge to a Presidential Executive Order barring the hiring of replacement workers during a lawful strike.  The government argued that the absence of any statutory cause of action barred judicial review of the dispute.   The court held that *"[i]f a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still*

*be able to institute a non-statutory review action*." *Id*. at 1327. The court recognized the long history of permitting judicial review of illegal government action, even in the absence of a statute conferring a right of review. *Id*. at 1327-1328.

Moreover, with respect to the United States District Court for the District of Columbia, there is long standing historical precedent supporting a non-statutory right of review when mandamus relief is sought. *See* Clark Byse & Joseph V. Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action*, 81 Harv. L. Rev. 308, 310-13 (1967). Prior to the 1962 adoption of 28 U.S.C. §1361, the only federal court with the authority to issue a writ of mandamus was the United States District Court for the District of Columbia. *Ganem v. Heckler*, 746 F.2d 844, 851 (1984). This authority is derived from the Act of February 27, 1801, 2 Stat. 103 establishing the District of Columbia, which provided that the laws of Maryland continued in force in that part of the District ceded by Maryland to the United States. *Id*.

In *Kendall v. United States*, 37 U.S. 524, 619-620 (1838), the Supreme Court noted that the common law as it was in force in the State of Maryland at the time of the establishment of the District of Columbia authorized the courts of that State to issue writs of mandamus. The Supreme Court emphasized the historic importance of the common law writ, stating as follows:

> *the power to enforce the performance of the act must rest somewhere, or it will present a case which has often been said to involve a monstrous absurdity in a well organized government, that there should be no remedy, although a clear and undeniable right should be shown to exist.*

*Id*. at 624.

21

Completely absent from any of the common law mandamus cases is any suggestion of a requirement for a statute conferring a private right of action. In *Marbury v. Madison*, there was no statutorily conferred private cause of action pursuant to which Marbury sought a writ of mandamus.  Rather, the Court reached back into English law, and quoting Blackstone stated: "*it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress.*" *Marbury v. Madison*, 5 U.S. 137, 163, 2 L. Ed. 60 (1803). Indeed, at common law, as it is today, it was the <u>absence</u> of any alternative remedy that was the essential predicate for maintaining a mandamus suit.

The D.C. Circuit has previously accepted the principle that there is no requirement for a separate independent cause of action when relief in the nature of mandamus is sought. Perhaps the most prominent case in this regard is *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), which stands for the proposition that a non-statutory cause of action exists when challenging the actions of federal officials. *Id*. at 1327. The D.C. Circuit in *Chamber of Commerce* did not specifically identify mandamus as the non-statutory cause of action it was referring to. However, the cases relied upon in *Chamber of Commerce* were mandamus cases.

Moreover, subsequent D.C. Circuit decisions confirm that *Chamber of Commerce* was indeed referring to mandamus as the applicable non-statutory cause of action.  *See In re Cheney,* 334 F.3d 1096, 1103 (D.C. Cir. 2003), vacated on other grounds by *Cheney v. United States Dist. Court,* 542 U.S. 367, 159 L. Ed. 2d 459, 124 S. Ct. 2576 (2004); *see also Washington Legal Foundation v. United States Sentencing Comm'n*, 89 F.3d 897, 901 (D.C. Cir. 1996).

The court in *In re Cheney* specifically noted the availability of a private cause of action when mandamus was sought against the Vice-President, stating that "*plaintiffs' cause of action against the Vice President arises not under the APA, but under the Mandamus Act*." 334 F.3d at 1103.  *See also Id*. at 1113,  fn. 1, noting that *"[m]andamus was the only basis upon which the actions could have proceeded in the district court. All agree that FACA does not itself create a cause of action."*

Similarly, in *Consol. Edison Co. of N.Y., Inc. v. Ashcroft*, 286 F.3d 600, 604 (D.C. Cir. 2002), the court held that the issue in a mandamus action is not whether the statute providing the substantive rights to be enforced authorizes a private cause of action, but rather whether the common law requirements for mandamus have been satisfied.  *See also Timken Co. v. Simon*, 539 F.2d 221, 227 (D.C. Cir. 1976) (noting that a statute that imposes ministerial duties suggests a Congressional intent to make mandamus available as a remedy).

 Other Courts of Appeals have also accepted the proposition that the 1962 Mandamus Act provides for an independent cause of action.  *See Hernandez-Avalos v. INS*, 50 F.3d 842, 845 (10th Cir. 1995) noting that "*a plaintiff who has alleged a cause of action under the APA <u>or</u> the Mandamus Act need not rely upon an implied right of action under any other statute*." (quoting *Soler v. Scott*, 942 F.2d 597, 605 (9th Cir.1991)) (emphasis added).

There is also ample case law from the United States District Court for the District of Columbia holding that 28 U.S.C. § 1361 affords an independent cause of action, just as an independent cause of action existed under the common law prior to the 1962 codification. *See Citizens for Responsibility & Ethics in Wash. v. Cheney*, 593 F. Supp.

2d 194, 217 (D.D.C. 2009) (noting the availability of mandamus relief even when the statute being violated does not provide for a private right of action); *United Gov't Sec. Officers, Local No. 52 v. Chertoff*, 587 F. Supp. 2d 209, 217 (D.D.C. 2008) (holding that absence of a private cause of action does not bar mandamus relief); *Judicial Watch v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 42 (D.D.C. 2002) (noting that "*the mandamus statute may provide an avenue to remedy violations of statutory duties even when the statute that creates the duty does not contain a private cause of action"),* rev'd and vacated on other grounds by *In re Cheney,* 334 F.3d 1096 (D.C. Cir. 2003); *Judicial Watch, Inc. v. United States DOC*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010) (a cause of action for alleged violations of the Federal Advisory Committee Act may be asserted under the mandamus statute); *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 33-34 (D.D.C. 2011) (plaintiff has a right to review under the mandamus statute in the absence of any other statutory cause of action).

## VI. EACH OF THE PRELIMINARY INJUNCTION FACTORS FAVORS GRANTING PLAINTIFF'S MOTION

### (a) Plaintiff Is Likely to Succeed on The Merits

#### 1. The President Had A Ministerial Duty to Differentiate Personal Liabilities from Non-Personal Business Liabilities

As was the case with respect to the 2016 financial disclosures, the President commingled the debts he was required to report on his 2018 and 2019 financial disclosures, i.e., personal liabilities, with non-personal liabilities incurred by business entities. Specifically, the President is not liable for the debt of the Trump National Golf Club Colts Neck LLC.  Pursuant to Section 3.19 of the mortgage given by the Trump National Golf Club Colts Neck LLC, no member or manager of the LLC is liable for the

debt secured by this mortgage. The disclosure statement identifies President Trump as the

President and member of the Trump National Golf Club Colts Neck LLC. As such, the

President is not liable for the debt secured by the mortgage given by the Trump National

Golf Club Colts Neck LLC. Compl ¶¶ 17-18, 43 and Ex.7.

The President is also not liable for the debts of the following entities identified in

Part 8 of the President's 2018 and 2019 financial disclosure statements: TIHT

Commercial LLC, Trump Park Ave. LLC, Trump Plaza LLC, Trump Tower Commercial

LLC, Seven Springs LLC, and 1125 South Ocean LLC.   In support of this allegation,

Plaintiff notes that the mortgages given by these entities do not directly or indirectly

identify the President as an obligor under any of the loans secured by such mortgages.

Compl. ¶¶ 19-21, 44 and Exhibits 7-15.

The publicly filed UCC-1 financing statement evidencing the debt of the Trump

Old Post Office LLC to Deutsche Bank also does not identify the President as a debtor.

Accordingly, plaintiff alleges that the President is not liable for this loan, which was

listed on both the 2018 and 2019 financial disclosure statements. Compl. ¶¶  19-21, 44

and Ex. 14.

On the other hand, the President is liable for some of the loans listed in his 2018

and/or 2019 financial disclosure statements. Thus, the President is personally identified

as the borrower in his 2018 financial disclosures on the mortgages given on the properties

at 1094 S Ocean Blvd., and 124 Woodbridge Rd.  Compl. ¶¶ 22, 41, and Exhibits 16-19.

The President is also personally identified as the borrower on his 2018 financial

disclosures in connection with a loan from Michael Cohen, the President's former

personal attorney.  The OGE determined that the President was required to report the loan

from Michael Cohen on his financial disclosures.  Compl. ¶ 23.  The President also has

personal liability in connection with the loan to 40 Wall Street LLC.  Compl. ¶ ¶ 24-25,

41, Exhibits 20-21.

Further, there is no information in the public records pertaining to the loans made

to the following entities as listed in Part 8 of the 2018 and 2019 financial disclosure

statements: (a) Trump National Doral, (b) Fifty–Seventh Street Associates, LLC,[5] and (c)

TIHT Chicago. However, the President would not have been required to report these

debts, unless they were personal liabilities. Therefore, these debts must be presumed to

represent his liabilities. Compl. ¶ ¶ 26, 42.

Based on the foregoing, the complaint alleges that the President commingled

liabilities he was required to report, i.e., personal liabilities, with non-personal liabilities

incurred by business entities.    Compl. ¶ 45. Allen Weisselberg, Chief Financial Officer

of the Trump Organization, further supports this allegation. Mr. Weisselberg stated in an

interview with the New York Times that the President "*overdisclosed*" the liabilities in

his financial disclosure reports. Mr. Weisselberg stated that the President was liable for

only a "*small percentage of the corporate debt*" disclosed in his financial disclosure

reports.  However, he declined to identify that portion of the corporate debt for which the

President was liable.  Compl. ¶ 45 and Ex. 26.

The President had a non-discretionary duty to disclose personal liabilities. Compl.

¶¶ 4, 38, 47.   The President breached this duty by commingling personal liabilities, with

non-personal debts of business entities, thereby making it impossible to identify which of

---

[5] The loan to Fifty–Seventh Street Associates, LLC does not appear as an entry on the 2019 financial disclosure statement.

liabilities listed on Part 8 of the disclosure statement represent personal liabilities. Compl. ¶¶ 1, 4, 45, 47.

The President's duty to specifically identify personal liabilities is unambiguously mandated by law.[6] The EIGA requires filers to provide "*a full and complete statement*" as to "*[t]he identity and category of value of the total liabilities owed to any creditor*…." *See* 5 U.S.C. app. § 102(a) & (a)(4).  The term "*liabilities*" as used in the above sentence must refer to liabilities of the filer, as opposed to liabilities of some unidentified third party. Any other interpretation would be absurd in light of the purpose of the statute, which is to "*enhance the ability of the citizenry to judge the performance of public officials.*" *United States v. Oakar*, 111 F.3d 146, 148 (D.C. Cir. 1997).[7]

Moreover, this interpretation is supported by regulations issued by the OGE, which require disclosure of only personal liabilities.  These regulations require disclosure of the "*filer's liabilities exceeding $ 10,000.*").[8]  *See* 5 C.F.R § 2634.305(a). The term "*filer*" refers to the "*reporting individual.*"  5 C.F.R. § 2634.105(g).  Likewise, the regulations mandate disclosure of only the personal liabilities of the filer's spouse and/or

---

[6] Mandamus would be available even if the statute were ambiguous, as long as the statute as interpreted by the court imposed a non-discretionary duty on the President. *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980).

[7] The provisions of 5 U.S.C. app. § 102(a)(4) requiring disclosure of liabilities in excess of $10,000 have been described by the OGE as "*unambiguous.*" See OGE letter dated May 25, 1994, available at https://www.oge.gov/Web/OGE.nsf/All+Advisories/BBCD2048C369D0B985257E96005 FBD8C/$FILE/6279065e8a994d3b9e1de5c413a76bc72.pdf?open (last accessed March 28, 2019).

[8] Mandamus may be based on the failure to comply with legislative regulations. *See In re Medicare Reimbursement Litig. Baystate Health Sys.*, 414 F.3d 7 (D.C. Cir. 2005) (holding that mandamus may be based on regulations issued by the Secretary of Health and Human Services).

dependent children. 5 C.F.R. § 2634.311(a)(3).  These regulations were issued using

notice and comment rulemaking procedures. 57 Fed. Reg. 11800 (April 7, 1992).

Accordingly, they have the force and effect of law. *Perez v. Mortg. Bankers Ass'n*, 135 S.

Ct. 1199, 1204 (2015). Similarly, the Instructions for completion of financial disclosure

reports issued by the OGE require disclosure of only personal liabilities.  Compl. ¶ 27

and Ex. 22.

Moreover, the Public Financial Disclosure Guide issued by the OGE expressly

admonishes filers not to report the liabilities of an LLC, unless the filer, the filer's

spouse, or the filer's dependent children are personally liable for those loans.  Compl., ¶

28 and Ex. 23. The Guide states in pertinent part as follows:  "*Do not include a loan

owed by a LLC, unless you, your spouse or dependent child is also personally liable for

that same loan*."  *See* Guide, January 1, 2019, pp. 209, 357, Compl. Ex. 23.

There is no difference between a duty to disclose personal liabilities, and a duty to

specifically identify personal liabilities when they are commingled with other non-

personal debts.   The duties to disclose personal liabilities, and the duty to specifically

identify personal liabilities when they are commingled with non-personal liabilities,

represent the identical duty.

To the extent there is any ambiguity concerning this issue, it is resolved by the

EIGA's mandate to furnish "*a full and complete statement*" of personal liabilities. 5

U.S.C. app. § 102(b)(1)(B). The "*full and complete*" statement most certainly

encompasses a duty to specifically identify personal liabilities when they are commingled

with non-personal liabilities of business entities. The President did not satisfy that

obligation when he commingled personal liabilities with non-personal liabilities of

28

business entities, thereby making it impossible to determine which of the debts listed on the disclosure statement represented personal debts. Compl. ¶¶ 4, 45.

Plaintiff submits that there is no functional distinction between an outright refusal to disclose personal liabilities, and disclosing a mixture of personal and non-personal liabilities and requiring ethics officials or members of the public to guess which are the personal liabilities. In either case, the result is the same.  Plaintiff lacks the information to which he is entitled by law, i.e., disclosure of the personal liabilities of the filer, the filer's spouse, and/or the filer's dependent children.[9]

The purpose of the EIGA's disclosure provisions is to enable the public to identify any conflicts of interest. Liabilities of a personal nature may reasonably influence an official decision.  On the other hand, a non-personal liability of a business entity may have little or no influence on official decision-making. As a result, the basic purposes of the statute are frustrated when a filer commingles personal with non-personal liabilities, thereby making it impossible to identify the personal liabilities.

---

[9] The President was also required to report the separate liabilities of his spouse and/or dependent child. However, the President's duty to disclose the separate debts of his spouse and dependent child had no impact on his disclosure requirements in this particular case. The reason being that no such separate liabilities existed. Compl., ¶¶ 33-37. Moreover, even if such liabilities existed, the President would still have been required to distinguish the personal liabilities of his spouse/dependent child and the non-personal liabilities of a business entity. Compl. ¶ 37. The reasons that the President was required to distinguish his liabilities from the non-personal liabilities of a business entity apply with equal force to the liabilities of his spouse and dependent child.  The President was required by law to report the personal liabilities of his spouse and dependent child just as he was required to report his liabilities. 5 U.S.C. app. § 102(e)(1).  Therefore, it would have been incumbent upon the President to distinguish the liabilities he was required to report, i.e. the liabilities of his spouse and dependent child, from the non-personal liabilities of business entities.

The President may assert that his reporting of the non-personal liabilities of business entities listed on Part 2 of his financial disclosures serves a salutary public purpose, because he has an investment interest in those business entities. This ignores the fact that the President's reporting of the mortgages listed on Part 8 of his financial disclosures provided little information that was not already readily available to the general public. It can readily be determined whether a business entity listed on Part 2 of the financial disclosures has given a mortgage simply by searching a public records database. On the other hand, information pertaining to whether any parties other than the business entity mortgagor may be liable under the debt secured by such mortgages cannot be definitively ascertained unless one also has access to the underlying note and debt instruments.

Moreover, the entire rationale for requiring filers to disclose their liabilities within certain specified categories of value was so that the public may be able to determine the *magnitude* of any potential conflict of interest. *See* Public Officials Integrity Act of 1977, Senate Committee on Governmental Affairs, S. Rpt. 95-170, 95th Cong., 1st Sess., May 16, 1977, p. 117 stating, "*some range of value is needed to identify the magnitude of a conflict.*"  As further noted by the Senate Report, "*there is a significant difference between the conflict of interest, or appearance thereof, presented by a $2,000 holding and by a holding worth $1,000,000.*" *Id.*

In the instant case, the President's failure to indicate whether he is liable for the debts of the business entities listed on Part 8 deprives Plaintiff of information pertaining to the magnitude of any potential conflicts of interests. The President has frustrated the entire statutory purpose underlying the requirement to assign categories of value to

liabilities. The categories of value assigned to the debts listed on Part 8 do not fulfill their statutory function of advising the public of the magnitude of any conflicts of interest, unless it is also known whether the President is liable for those debts. Indeed, for purpose of analyzing conflicts of interest, it is of little significance whether a business debt is $1,000 or $1,000,000, if that debt does not represent a personal liability of the filer. [10]

Separate and apart from his non-discretionary duty to identify his debts, the President had a further non-discretionary duty to file financial disclosure statements that may be taken at face value. Compl. ¶ 46. This duty is inherent in the requirement to provide *"full and complete"* disclosures. 5 U.S.C. app. § 102(b)(1)(B). It is also inherent in the President's certification of his financial disclosure statements as being "*true, complete, and correct*."

The OGE's regulations recognize a duty on the part of filers to submit reports that may be taken at face value. Agency ethics officials are required to accept a filer's disclosures at "*face value*." See 5 C.F.R. § 2634.605(b)(3). The OGE would not impose this limitation on agency ethics officials, if filers do not have a corresponding duty to provide information that may be taken at face value.

---

[10] At least with respect to his 2018 financial disclosure report, Plaintiff would have no objection to the President's reporting of liabilities which he is not obligated to disclose, provided he differentiated them from the liabilities he was required to disclose. Indeed, this is precisely what the President did in his May 2018 financial disclosure report with respect to his reimbursement of "*expenses*" incurred by his personal attorney, Mr. Michael Cohen. The President stated that *he believed* the payment to Mr. Cohen was "*not required to be disclosed,*" because an obligation to reimburse an expense does not reflect a "*reportable liability*." However, he nonetheless voluntarily disclosed it in the "*interest of transparency*." Compl. ¶ 23 and Ex. 4.

As noted above, the only debts the President was required to report were personal debts. However, the President's disclosures cannot be taken at face value,  because not all of the liabilities listed in Part 8 represent personal obligations. Compl. ¶¶ 46, 48.[11]

The only relief Plaintiff seeks is an order directing the President to amend his financial disclosure statement for the purpose of identifying personal liabilities.  Plaintiff seeks nothing more than the performance of a purely non-discretionary duty, as even the President does not dispute his obligation to disclose personal liabilities in excess of $10,000. The duty to disclose personal liabilities has no meaning, if that duty is not accompanied by a corresponding obligation to separately identify those personal liabilities when they are commingled with liabilities of a non-personal nature.

(2) There Were No Reportable Unrelated Business Liabilities

Prior to 2019, the Public Financial Disclosure Guide required disclosure of non-personal business liabilities in one situation, i.e., when the liabilities of a privately held company are unrelated to the operations of that company. Compl. ¶ 29 and Ex. 24, referencing Guide at pp. 242, 268.  As noted in the Guide, a filer must report both assets and liabilities that are unrelated to the operation of the business. An unrelated business liability is a liability "*unrelated to the operations of that trade or business.*" *Id*. An unrelated business asset is an asset that is "*unrelated to the operations of that trade or business.*"  *Id*. at p. 248.  An example of an unrelated business liability would be a swimming pool services company that incurs a liability to purchase an apartment complex for investment purposes. Compl. ¶ 30 and Ex. 25. An example of an unrelated

---

[11] These allegations must be accepted as true for purposes of deciding a motion to dismiss for lack of subject matter jurisdiction. *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

business asset would be a real estate investment company that buys stock in a bank. *Id*.

An example of an unrelated business liability in the types of business which the President

owns would occur if one of his golf clubs were to take out a loan for the purpose of

operating a casino in Macau.

The complaint alleges that the President had no unrelated business liabilities to

report. Compl. ¶¶ 31-32.  This allegation is based upon the fact that any unrelated

business liabilities for the entities listed in Part 8 of the disclosure statement would be

evidenced in Part 2 of the disclosure statement by an unrelated business asset of that

entity. Part 2 of the President's disclosure statements did not disclose any unrelated

business assets.   As such, no unrelated business liabilities existed. Compl. ¶ 31.  The

complaint further alleged that no such unrelated business liabilities existed because the

terms and conditions of some of the mortgages listed in Part 8 of the disclosure report

expressly prohibit such unrelated business activities. Compl. ¶ 32 and Exhibits 7-8.

Therefore, the existence of any duty to report unrelated business liabilities cannot

in any way have affected the scope of the President's disclosure obligations in this case.

Any putative duty to report unrelated business liabilities has no significance for this case.

(3) <u>The President Owes A Duty to Plaintiff to Specifically Identify Personal Liabilities</u>

Finally, the President owes a duty to Plaintiff to specifically identify any personal

liabilities. The intent of Congress was not simply to make the reports available to the

public, but also to make the information required to be in those reports available to the

public. This is illustrated by the fact that the statute specifies in excruciating detail

exactly what must be disclosed, and when and under what circumstances such disclosures

must be made public. 5 U.S.C. app. § 102; 5 U.S.C. app. § 105. It would illogical for a

court to hold that Plaintiff has a right to the financial disclosure reports, but at the same time find that Plaintiff does not have any right to the information required to be in those reports.

Indeed, the primary purpose of the statute was not to make the information available to agency ethics officials. Rather, the primary purpose of the statute was to make the information available to the public, so that individual citizens can monitor whether public officials have conflicts of interests.  *See* H.R. Rep. No. 95-800, at 24, stating that "*the public availability of disclosed information is not only paramount, but in all likelihood the crucial element of the formula*."

 Accordingly, it cannot be said that the President owes no duty to Plaintiff. Rather, the primary rationale for mandating financial disclosures is to fulfill a duty owed to the public, which is to ensure that "*citizens will be able to form independent judgments as to the integrity of government officials*, and to *"promote confidence in public officials through [f]ull disclosure of their personal financial status."* H.R. Rep. No. 95-800, at 24 (1977). As such, Plaintiff clearly falls within the zone of interests the statute intended to protect.

Additionally, the mere fact that the President caused an injury to Plaintiff necessarily presumes a breach of a duty owed to Plaintiff. *See e.g., Nat'l Fed'n of the Blind v. Spellings*, 562 F. Supp. 2d 74, 82 (D.D.C. 2008) (holding that the tests for standing and demonstrating a clear right to relief for purposes of mandamus are intertwined). Plaintiff has established that he has suffered an "*injury in fact*" as a result of the President's actions. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct.

2130, 119 L. Ed. 2d 351 (1992). As such, there can be little doubt that the President breached a duty owed to Plaintiff.

(b) <u>Plaintiff Will Suffer Irreparable Harm in The Absence of a Preliminary Injunction</u>

The information sought by this litigation is needed by Plaintiff to make an informed voting decision in connection with the March 3, 2020 Texas Republican Presidential primary, as well as the November 3, 2020 general election.  Compl. ¶ 8; Declaration of Jeffrey Lovitky, ¶¶ 6-8. Plaintiff's judgment as to whether the President's actions have been or could be influenced by conflicts of interests will be a critical element in Plaintiff's decision as to whether to vote for the President in the Texas Presidential primary, as well as in the general election. *Id*.[12]

An informed voting decision requires that Plaintiff have sufficient information to evaluate whether the President's past performance in office has been influenced by personal financial considerations. Compl. ¶ 8, Decl. ¶¶ 6-8. An informed voting decision also requires that Plaintiff have sufficient information to determine whether in the future the President's official decisions could be influenced by personal financial considerations. *Id*. However, Plaintiff is unable to evaluate the magnitude or the severity of any actual or potential conflicts of interest unless he knows whether the debts listed in the President's financial disclosure statements represent personal obligations. Compl. ¶ 5; Decl., ¶ 8.

Moreover, the pressure to repay personal loans of the magnitude listed on the President's financial disclosure statements could reasonably cause any individual to be distracted from devoting his or her entire attention to the performance of official duties.

---

[12] A copy of this declaration is attached to Plaintiff's memorandum of points and authorities.  The statements made in the Declaration are herein adopted as a statement of facts to support Plaintiff's argument of an irreparable voting injury.

At worst, the vulnerabilities caused by personal debts of this magnitude could induce an individual to use his or her official position for the purpose of securing the funds necessary to repay the loans.  Accordingly, the issue of whether the debts listed by the President represent personal obligations will be a critical factor in Plaintiff's decision whether to vote for the President in the Texas Presidential primary and the November 3, 2020 general election. Decl., ¶ 7.

Absent a preliminary injunction, there is no other way for Plaintiff to obtain the information sought by this litigation by the date of the March 3, 2020 Texas Republican primary, or the November 3, 2020 general election.  Therefore, granting a preliminary injunction is critical to Plaintiff's ability to make an informed voting decision.

(c)  The Balance of Equities Tip in Plaintiff's Favor

Granting the preliminary injunction would impose a minimal burden upon the President.  The only relief sought by Plaintiff is an amendment to the financial disclosure statements filed on May 15, 2018 and May 15, 2019, indicating which of the listed liabilities are personal, and which are non-personal liabilities of business entities.

The information sought in this case does not relate to any confidential or privileged communications.  Plaintiff is not seeking information that would impair the President's ability to perform his constitutionals duties. The President could in very short order provide all of the relief sought in this litigation simply by placing an asterisk next to the loans for which he is liable. Plaintiff is asking from the President nothing more than is required from thousands of other federal officials who have been required to provide the identical information.

On the other hand, the burden on Plaintiff as a result of the President's violation of the law is far greater.  Plaintiff is deprived of the ability to make an informed voting decision, which is an essential political right in any free society.

(d) <u>An Injunction Is in The Public Interest</u>

Moreover, the public interest also clearly favors granting the relief sought.  The President has broken with longstanding tradition in refusing to publicly release his tax returns, which would likely provide far more detailed information concerning the President's financial interests than is currently available to the public. As a result, the public has less visibility concerning President Trump's financial interests than was the case with respect to his predecessors in modern times.

The President has also not taken the steps followed by his predecessors to eliminate the potential for financial conflicts of interests.  These steps include divestment, and the transfer of assets into a blind trust managed by an independent trustee. Compl. ¶ 53. See also letter from the Office of Government Ethics to Senator Carper dated December 12, 2016, p. 10, attached as Exhibit 27.

According to documents released by the General Services Administration (GSA), the trust established by the President to manage his businesses during his Presidency is under the control of his two adult sons and the CFO of the Trump Organization. Compl. ¶ 54 and Ex. 28. As such, the trust does not meet the requirements for a qualified blind trust set forth in OGE's regulations.  5 C.F.R. § 2634.405.

The President acted contrary to the advice of the OGE in not appointing independent trustees to manage his trust. Compl. ¶ 55 and Ex. 29, OGE Director Shaub's statement to the Brookings Institution that the trust "*doesn't meet the standards that the*

*best of his nominees are meeting and that every President in the last four decades has met*."

The aggregate value of the debts listed on Part 8 of the disclosure statement are at least several hundreds of millions of dollars, and perhaps into the billions.  Liabilities of this magnitude could render any official vulnerable to the influence of wealthy foreign or domestic persons, in order to enlist their assistance for the purpose of repaying the loans. Debts of this size could easily influence the official decisions of any individual, whether it be for the purpose of obtaining favorable terms or conditions from a lender, or seeking a lender's forbearance on collection.  The American public has a strong interest in knowing whether their President is personally liable for debts of this magnitude.

The very foundations of our government could be shaken if the public believes that the financial needs or financial interests of the President are influencing governmental decisions. This factor greatly heightens the public interest in ensuring that the President discloses all of the information required by the EIGA.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction should be granted.

Respectfully submitted,

/s/ Jeffrey A. Lovitky

_____
D.C. Bar Number 404834
1776 K Street, N.W., Suite 800
Washington D.C. 20036
Tel: (202) 429-3393
Fax: (202) 318-4013
Email: jefflovitky@gmail.com

38

CERTIFICATE OF SERVICE

I certify that copies that this Motion, together with the Complaint and Summons, was served upon Defendant on May 22, 2019 by hand delivery to the United States Attorney's Office and the United States Attorney General, and by certified mail on the President. I further certify that I provided on May 21, 2019 a copy of this filing via email to Matthew Glover, Counsel to the Assistant Attorney General, Civil Division, U.S. Department of Justice.

/s/
_____
Jeffrey A. Lovitky