## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JEFFREY A. LOVITKY,

       Plaintiff,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States,

       Defendant.

Civil Action No. 19-1454 (CKK)

## MEMORANDUM OPINION
(July 12, 2019)

Plaintiff Jeffrey A. Lovitky once again sues Defendant Donald J. Trump in his official capacity as President of the United States for his allegedly deficient financial disclosures. Whereas before, Mr. Lovitky challenged President Trump's disclosure report as a candidate, this time Mr. Lovitky raises virtually the same objection to two of the President's disclosure reports while in office.

Seeking mandamus, injunctive, and declaratory relief, Mr. Lovitky, a lawyer appearing *pro se*, wants the President to separately identify his personal liabilities, which are allegedly intermingled with non-personal business liabilities.

This Court dismissed Mr. Lovitky's prior case for lack of standing. Although the Court of Appeals affirmed, it did so on different jurisdictional grounds, finding in pertinent part that the Mandamus Act does not reach an officer's actions while he was a candidate. Although that issue is no longer at hand, Mr. Lovitky fails to satisfy this Court that he has standing to pursue the latest iteration of his claim, or that this Court has subject-matter jurisdiction to hear it.

Upon consideration of the briefing, the relevant legal authorities, and the record as a whole,[1] the Court shall **GRANT** President Trump's [14] Motion to Dismiss the Complaint and **DISMISS** this case.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

In 1978, Congress passed the Ethics in Government Act ("EIGA"), 5 U.S.C. app. § 101 *et seq.*, which, in pertinent part, imposes financial disclosure requirements on individuals holding certain public offices. A sitting President fulfills these EIGA obligations by filing a disclosure report with the Director of the Office of Government Ethics ("OGE"). *See* 5 U.S.C. app. § 101(d), (f); *id.* § 103(b).

According to the Complaint, those disclosures are made using OGE Form 278e. *See* Compl., ECF No. 1, ¶ 16 (alleging manner by which President Trump made disclosures).[2] On Part 8 of that form, the filer discloses certain financial liabilities. *Id.* Instructions for Part 8 indicate that the individual must "[r]eport liabilities over $10,000 that you, your spouse, or your dependent child owed at any time during the reporting period." Pl.'s Opp'n, Ex. 21, at ECF p. 3. With regard to the filer's own liabilities, the statutory bases for this instruction are 5 U.S.C. app. § 102(a) &

---

[1] The Court's consideration has focused on the following documents:

- Mem. in Supp. of Def.'s Mot. to Dismiss Compl., ECF No. 14-1 ("Def.'s Mem.");
- Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss, ECF No. 16 ("Pl.'s Opp'n"); and
- Reply Mem. in Supp. of Def.'s Mot. to Dismiss Compl., ECF No. 17 ("Def.'s Reply").

[2] In their briefing, the parties rely on Mr. Lovitky's allegation that President Trump used OGE Form 278e. *See* Def.'s Mem. at 3; Pl.'s Opp'n at 2. The Court need not determine whether a President could use a different form. Moreover, because there is no dispute, the Court has not hesitated to examine the OGE Form 278e—as well as accompanying instructions and a Public Financial Disclosure Guide attached to Mr. Lovitky's opposition—for purposes of a jurisdictional inquiry. *See Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003). Mr. Lovitky notes that the exhibits are also attached to his Complaint, albeit in a different order and without convenient truncation. Pl.'s Opp'n at 27 n.7.

(a)(4), which specify that the EIGA report "shall include a full and complete statement" as to "[t]he identity and category of value of the total liabilities owed to any creditor other than a spouse, or a parent, brother, sister, or child of the reporting individual or of the reporting individual's spouse which exceed $10,000 at any time during the preceding calendar year," subject to certain exclusions. Those exclusions consist only of mortgages on personal residences for certain filers, and "any loan secured by a personal motor vehicle, household furniture, or appliances, which loan does not exceed the purchase price of the item which secures it." 5 U.S.C. app. § 102(a)(4)(A), (B).[3] Implementing regulations likewise provide that the report "must identify and include a brief description of the filer's liabilities exceeding $10,000 owed to any creditor at any time during the reporting period, and the name of the creditors to whom such liabilities are owed," with certain further requirements and exceptions. 5 C.F.R. § 2634.305(a), (b). The regulations also require a President to list a mortgage on a personal residence. *Id.* § 2634.305(c)(1).

Several enforcement mechanisms appear in the EIGA and follow-on regulations. Officials in each branch—including, in this case, the Director of OGE—must review disclosure reports for compliance, request additional information if needed, and identify further steps necessary to bring the filer into compliance. 5 U.S.C. app. § 106(a), (b); *see also* 5 C.F.R. § 2634.605. Certain officials are authorized to "take any appropriate personnel or other action in accordance with applicable law or regulation against any individual failing to file a report or falsifying or failing to report information required to be reported." 5 U.S.C. app. § 104(c).[4] The responsible officials, including the Director of OGE, are required to refer a case to the Attorney General when they have

---

[3] Moreover, "[w]ith respect to revolving charge accounts, only those with an outstanding liability which exceeds $10,000 as of the close of the preceding calendar year need be reported." 5 U.S.C. app. § 102(a)(4).

[4] The Director of OGE is not expressly listed as one of the officials with this authority.

"reasonable cause to believe [an individual] has willfully failed" to comply with his filing obligations or "willfully falsified" required information. *Id.* § 104(b). If the Attorney General finds that an individual who is required to make financial disclosures under the EIGA "knowingly and willfully falsifies or . . . fails to file or report any information that such individual is required to report," the Attorney General has the authority to pursue a civil penalty and/or to prosecute crimes carrying a punishment of imprisonment and/or fines. *Id.* § 104(a)(1), (2).

Section 105 of the EIGA establishes the minimal requirements for members of the public to obtain copies of these reports through "written application," with certain limitations on their use. *Id.* § 105(b), (c).

### B. Factual Background and Procedural Posture

According to Mr. Lovitky's Complaint, President Trump submitted financial disclosure reports on OGE Form 278e on May 15, 2018, and May 15, 2019.[5] Compl., ECF No. 1, ¶¶ 1, 16. The President did not distinguish in Part 8 between personal liabilities and non-personal business liabilities. *See id.* ¶¶ 1, 16-26. He "certified his financial disclosures as being 'true, complete and correct.'" *Id.* ¶ 14 (emphasis omitted). Reviewing officials found the President's reports "to be in apparent compliance with the disclosure requirements of the Ethics in Government Act." *Id.* Mr. Lovitky downloaded copies of the 2018 and 2019 reports from the OGE website, as "[t]here is no requirement to submit an application for the financial disclosure reports that have been filed by the President while in office." *Id.* ¶¶ 9, 15.

Mr. Lovitky previously challenged the disclosure report that President Trump filed in 2016, when he was a presidential candidate. *See Lovitky v. Trump*, 308 F. Supp. 3d 250 (D.D.C. 2018)

---

[5] Although Mr. Lovitky also discusses President Trump's 2016 and 2017 disclosures, Mr. Lovitky seeks relief in this case as to only the 2018 and 2019 disclosures. *See* Compl., ECF No. 1, ¶¶ 1, 9.

(*Lovitky I*).  This Court dismissed Mr. Lovitky's suit because he lacked standing to pursue either mandamus or declaratory relief.  *See id.* at 258-60.  The Court of Appeals affirmed the dismissal of Mr. Lovitky's suit.  *Lovitky v. Trump*, 918 F.3d 160 (D.C. Cir. 2019) (*Lovitky II*).  Rather than address standing, however, that court decided that the mandamus statute does not apply to a filing made during an official's candidacy.  *See id.* at 161, 163.

On May 19, 2019, Mr. Lovitky filed this second suit against President Trump in his official capacity.  Mr. Lovitky claims that Part 8 of the President's financial disclosures in 2018 and 2019 include the debts of certain business entities for which he himself is "not liable," according to Mr. Lovitky's scrutiny of mortgage agreements and related documents.  Compl., ECF No. 1, ¶¶ 17-21.  Meanwhile, that research suggests to Mr. Lovitky that President Trump himself *is* liable for other debts listed in Part 8.  *See id.* ¶¶ 22-25.  Mr. Lovitky alleges that this purported "commingl[ing] [of] personal liabilities with non-personal liabilities incurred by business entities . . . . makes it impossible to identify exactly which liabilities listed on Part 8 of the President's financial disclosure statements represent personal liabilities."  *Id.* ¶ 45.

Mr. Lovitky's one-count Complaint alleges that the President had "a non-discretionary duty to specifically identify the liabilities that he was required to report."  *Id.* ¶ 50.  The mandamus-type relief he requests would "direct[ ] the President to amend his financial disclosure reports" in 2018 and 2019 "for the purpose of specifically identifying" those liabilities.  *Id.* ¶ 56.  Mr. Lovitky briefly asserts that he is entitled to preliminary injunctive relief as well, "because absent such relief Plaintiff will suffer irreparable injury."  *Id.*  In his prayer for relief, Mr. Lovitky also seeks a declaratory judgment that President Trump's "fail[ure] to provide a full and complete statement of

personal liabilities" on his OGE Form 278e in 2018 and 2019 violated pertinent provisions of the EIGA and an implementing regulation. *Id.* at 21.[6]

Shortly after bringing this suit, Mr. Lovitky filed his [4] Motion for a Preliminary and Permanent Injunction. He argued that a prompt decision was necessary in order to provide him with the information he needed "to evaluate whether the President's decisions have been or will be impacted by personal financial considerations" and "to make an informed voting decision" before the Texas Republican Presidential primary election in March 2020 and the general election in November 2020. Pl.'s Mem. in Supp. of His Mot. for Prelim. and Perm. Inj., ECF No. 4, at 1, 35. The Court expressed its view that the issues would be better addressed on the merits by an expedited ruling. Accordingly, the parties agreed that Mr. Lovitky's motion could be held in abeyance during expedited briefing of President Trump's Motion to Dismiss the Complaint, which he filed on June 5, 2019. Mr. Lovitky has asked the Court to decide President Trump's motion within thirty days of his opposing brief, filed on June 12, 2019, in order to save time for appellate review and any remand. Pl.'s Opp'n at 1. Upon completion of briefing, this motion is now ripe for resolution within the window Mr. Lovitky has requested.

## II. LEGAL STANDARD

### A. Motions Invoking Rules 12(b)(1) and 12(b)(6)

A court must dismiss a case pursuant to Federal Rule of Civil Procedure 12(b)(1) when it lacks subject-matter jurisdiction. In determining whether there is jurisdiction, "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for*

---

[6] The Complaint also requests reimbursement of costs and "such other and further relief as the Court may deem just and proper." Compl., ECF No. 1, at 21.

*Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)) (internal quotation marks omitted). "At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005). In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, still that "[p]laintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citations and quotation marks omitted).

The Federal Rules also require a complaint to include "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* (citing, e.g., *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Instead, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 556, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## B. *Pro Se* Attorney Pleadings

The Court reiterates its prior observation that an attorney proceeding *pro se* is "presumed to have knowledge of the legal system," and "[a]s a result, he is not entitled to the same level of solicitude often afforded non-attorney litigants proceeding without legal representation." *Lempert v. Power*, 45 F. Supp. 3d 79, 81 n.2 (D.D.C. 2014) (Kollar–Kotelly, J.), *aff'd*, 618 F. App'x 3 (D.C. Cir. 2015) (per curiam). Nonetheless, Mr. Lovitky's Complaint would be subject to dismissal even if it were construed as liberally as that of a non-attorney *pro se* litigant.

## III. DISCUSSION

President Trump has challenged Mr. Lovitky's standing to bring this suit, as well as the Court's subject-matter jurisdiction over his claim. "Because Article III courts are courts of limited jurisdiction," the Court must consider its "authority to hear a case before [it] can determine the merits." *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 47 (D.C. Cir. 1999) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 S. Ct. 1003, 1012-13 (1998)). "Where both standing and subject matter jurisdiction are at issue, . . . a court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)). In light of likely appellate review, the Court shall amplify the record by addressing both

threshold issues, even though Mr. Lovitky has failed to carry his burden as to either issue. *See In re Madison Guar. Sav. & Loan Ass'n*, 173 F.3d 866, 870 (D.C. Cir. 1999) (per curiam) (recognizing that "there is no bar to . . . asserting an alternate ground where both deficiencies are jurisdictional").

## A. Article III Standing

It is well established that the Court can hear this suit only if Mr. Lovitky has Article III standing to bring it. "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Allen v. Wright*, 468 737, 751 (1984)). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (internal quotation marks omitted).

Under the familiar requirements of constitutional standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Defs. of Wildlife*, 504 U.S. at 560-61; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). Mr. Lovitky, "as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)).

Although the Court found Mr. Lovitky's failure to establish redressability was dispositive of his prior case, and shall again find as much today, the Court shall begin with the injury prong to show that the serious issues of redressability are unavoidable.

1. Injury in Fact

To meet the constitutional standard, Mr. Lovitky's alleged injury must constitute "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Defs. of Wildlife*, 504 U.S. at 560). An injury is concrete when it "actually exist[s]," whether tangibly or intangibly, and it is particularized when it "affect[s] the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted).

Mr. Lovitky is alleging an informational injury, which "in certain circumstances" suffices for an Article III injury in fact. *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (*EPIC*) (citing *FEC v. Akins*, 524 U.S. 11 (1998); *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 22 (D.C. Cir. 2011)). This kind of injury arises when a plaintiff allegedly "fail[ed] to obtain information which must be publicly disclosed pursuant to a statute," and that "statute grants [the] plaintiff a concrete interest in the information sought." *Nader v. FEC*, 725 F.3d 226, 229 (D.C. Cir. 2013) (first alteration in original; internal quotation marks omitted). A plaintiff that has allegedly suffered an informational injury satisfies the constitutional standard of concreteness and particularity when "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *EPIC*, 878 F.3d at 378 (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (internal

quotation marks omitted); citing *Spokeo, Inc.*, 136 S. Ct. at 1549), *cert. denied*, 139 S. Ct. 791 (2019).

Under the first prong of the *Friends of Animals* inquiry, Mr. Lovitky alleges that he has not received information that the EIGA obligates the President to disclose. According to Mr. Lovitky's interpretation of that statute, the President must distinguish personal liabilities from non-personal business liabilities. "[W]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) (citing *Warth*, 422 U.S. at 501-02), *aff'd in part sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008). That assumption extends to informational standing cases, as the Court of Appeals has expressly recognized in *Friends of Animals* and even more recently. *See Friends of Animals*, 828 F.3d at 992 (examining plaintiff's deprivation "on its interpretation" of a statute); *Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017) (citing *Parker*, 478 F.3d at 377; *Feld Entm't, Inc.*, 659 F.3d at 22-23) (crediting plaintiff's "view of the law" (internal quotation marks omitted)). Abiding by Supreme Court and Circuit precedent, this Court ought to accept Mr. Lovitky's interpretation of the EIGA for standing purposes.

President Trump counters that Mr. Lovitky is entitled to no more than a copy of each year's financial disclosure report. Def.'s Mem. at 24. He cites non-binding authority for the proposition that "a plaintiff does not suffer an injury in fact if it seeks only information that the applicable statute does not require to be disclosed," namely the distinction between President Trump's personal and non-personal business liabilities. Def.'s Mem. at 25 (quoting *Campaign Legal Ctr. v. FEC*, 245 F. Supp. 3d 119, 125 (D.D.C. 2017)) (internal quotation marks omitted); *see also* Def.'s Reply at 15-16 (citing *Friends of Animals*, 828 F.3d at 993; *Wertheimer v. FEC*, 268 F.3d

1070, 1074-75 (D.C. Cir. 2001); *New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 157 (D.D.C. 2016)). But the President takes this proposition out of context. In each of the binding precedents on which the President relies,[7] the Court of Appeals found that the litigant(s) did not actually seek additional factual information. *See Friends of Animals*, 828 F.3d at 993 (characterizing the plaintiff's request as pertaining to a statute's "deadline requirement, not its disclosure requirement"); *Wertheimer*, 268 F.3d at 1074-75 (finding that the plaintiffs sought a "legal determination" not "additional facts"); *see also Feld Entm't, Inc.*, 659 F.3d at 23-24 (finding that plaintiff's desired enforcement of a statutory provision would not result in disclosure of information, "even under [plaintiff's] view" of that provision).

The Court is not persuaded that it may—for standing purposes—override Mr. Lovitky's view of the information that a disclosure statute requires to be disclosed. Here, Mr. Lovitky asserts his entitlement to additional factual disclosure: namely, the denomination of the President's personal liabilities as such. Nor is this a case where Mr. Lovitky simply seeks a legal determination. That Mr. Lovitky also requests a declaratory judgment that the President was required to make this identification is only a means to Mr. Lovitky's desired end of obtaining the more detailed disclosure and making use of the information, as the Court shall describe below. Accordingly, in light of *Parker* and other controlling precedent, the Court shall assume, *arguendo*, that President Trump was obligated to differentiate his personal liabilities from his non-personal

---

[7] Nor is the Court persuaded that the district court cases cited by the President compel his conclusion. The plaintiffs in those cases were effectively seeking something other than informational disclosure, or were relying on a statute that made disclosure contingent on something else. *See Campaign Legal Ctr.*, 245 F. Supp. 3d at 126 (finding that certain plaintiffs failed to properly allege an informational injury because they merely sought "duplicative reporting" or a "legal determination" rather than additional factual information (internal quotation marks omitted)); *New England Anti-Vivisection Soc'y*, 208 F. Supp. 3d at 157 (determining that statutory provision invoked by plaintiffs conditioned data disclosure obligation on extent of data received by agency).

business liabilities on his disclosure forms. There is no dispute that Mr. Lovitky was deprived of his ability to glean this information by perusing those forms.

Turning to the second *Friends of Animals* prong, the Court considers whether the harms allegedly flowing from President Trump's failure to differentiate personal liabilities are within the scope of harms that Congress envisioned. Mr. Lovitky pled that his inability to obtain this information prevents him from "mak[ing] an independent judgment as to the integrity of the President, and whether the President's actions have been or could in the future be influenced by conflicts of interests," and from receiving "information required to evaluate the past and future performance of the President." Compl., ECF No. 1, ¶ 6. These harms appear to align with Congress's intentions for the EIGA. As the Court of Appeals has recognized, the EIGA required certain disclosures, including of "financial liabilities," in order to "increase public confidence in the federal government, *demonstrate the integrity of government officials*, *deter conflicts of interest*, deter unscrupulous persons from entering public service, and *enhance the ability of the citizenry to judge the performance of public officials*." *United States v. Oakar*, 111 F.3d 146, 148 (D.C. Cir. 1997) (citing S. Rep. No. 95-170, at 21-22 (1977), *reprinted in* 1978 U.S.C.C.A.N. 4216, 4237-38, 1977 WL 9629)) (emphasis added). Plaintiff certainly invokes some of these concepts as he aims to assess President Trump's integrity, potential conflicts of interest, and performance.

But if Mr. Lovitky pled no more than this, the Court might agree with President Trump that the allegations are not particularized. *See* Def.'s Mem. at 25 (citing *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam)). In *Lance v. Coffman*, the Supreme Court rejected certain voters' claim that a state constitutional provision limiting the frequency of redistricting violated the federal Constitution. 549 U.S. at 438, 442. Rather than asserting a "particularized stake in the litigation,"

the voters had levied "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court] ha[d] refused to countenance." *Id.* at 442. Mr. Lovitky's alleged harms thus far are similarly generic, rather than specific to him personally. *See Spokeo, Inc.*, 136 S. Ct. at 1548.

However, Mr. Lovitky does allege more particularized—and more concrete—harms than this. He claims that President Trump's personal liabilities must be distinguished "if he is to have an opportunity to participate in the political process in an informed manner." Compl., ECF No. 1, ¶ 7. He enumerates three things he "cannot" do absent the information that he seeks:

> (1) "petition members of Congress to enact legislation to strengthen conflicts of interest laws, or to require the President to take mitigating actions to eliminate any conflicts of interests";
> (2) "enlist the news media to publicize conflicts of interests and thereby bring public attention to the issue"; and
> (3) "speak intelligently with friends, neighbors, and colleagues concerning actual or potential conflicts of interests."

*Id.* The Court need not decide whether these are sufficient though, because Mr. Lovitky provides still further grounds that certainly carry his case across the threshold.

Mr. Lovitky states that he is "registered to vote in the State of Texas" and requires this information in order to "mak[e] an informed voting decision in connection with the Texas Republican Presidential Primary scheduled for March 3, 2020, as well as the general election on November 3, 2020." *Id.* ¶ 8 (citation omitted). He claims that he "will suffer irreparable injury unless the information sought by this litigation is obtained prior to voting in these elections." *Id.*

Depriving Mr. Lovitky of information allegedly required to inform his vote in two specific elections would inflict a sufficiently concrete and particularized injury for Article III purposes. For example, in *FEC v. Akins*, the Federal Election Commission declined to take enforcement action against an organization for not disclosing certain information. 524 U.S. at 15-18. The

Supreme Court held that a group of voters objecting to that decision had suffered an Article III injury in fact because they were unable "to obtain information . . . that, on [their] view of the law, the statute require[d] that [the organization] make public." *Id.* at 21. The court had

> no reason to doubt their claim that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from [the organization], and to evaluate the role that [the organization's] financial assistance might play in a specific election.

*Id.* That was enough for the concreteness and particularity prongs of Article III standing. *Id.*; *see also Nader*, 725 F.3d at 230 (recognizing that litigants establish concrete harm from insufficient Federal Election Campaign Act ("FECA") disclosure when "the disclosure [litigants] seek is related to their informed participation in the political process"). Similarly here, Mr. Lovitky would use the more detailed disclosures to evaluate President Trump's potential conflicts of interest based on his liabilities to particular entities, and Mr. Lovitky presumably would vote accordingly. That other voters could raise similar claims does not render Mr. Lovitky's particularized injury less particularized. *See Akins*, 524 U.S. at 24-25 ("[T]he fact that [an injury] is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts.").

President Trump tries to distinguish *Akins* and *Nader* because the statute at issue in those cases, FECA, expressly permits private enforcement, while the EIGA does not. Def.'s Reply at 16-17 (citing, e.g., 52 U.S.C. § 30109(a)). However, that Congress has not expressly created a private right of action for an EIGA claim does not necessarily preclude standing. *Cf. Steel Co.*, 523 U.S. at 88-89 (recognizing standing as threshold jurisdictional issue and indicating that a court may have jurisdiction even if it ultimately determines that the litigant lacks a valid claim). The Court relies on these FECA cases because the alleged informational harms there echo Mr. Lovitky's assertions here.

Mr. Lovitky has identified certain specific ways in which he would or might use the more detailed disclosure to participate in the political process, namely by evaluating President Trump's integrity, potential conflicts of interest, and performance, and by petitioning, publicizing, conversing, and voting accordingly. Mr. Lovitky's alleged inability to do the aforementioned—absent specific identification of President Trump's personal liabilities—falls within the scope of harms that Congress contemplated when it passed the EIGA. As the Senate report put it, "[b]y having access to financial disclosure statements, an interested citizen can evaluate the official's performance of his public duties in light of the official's outside financial interests." S. Rep. No. 95-170, at 22, *reprinted in* 1978 U.S.C.C.A.N. 4216, 4238, 1977 WL 9629; *see also* H.R. Rep. No. 95-800, at 24 (1977) (indicating that statute would "promot[e] confidence in public officials through a code of ethics and full disclosure of their personal financial status").[8] Altering, or potentially altering, one's voting decision is the quintessential result of evaluating an official's performance. And President Trump has given the Court "no reason to doubt [Mr. Lovitky's] claim that the [additional] information would help [him] (and others to whom [he] would communicate it) to evaluate [a] candidate[ ] for public office." *Akins*, 524 U.S. at 21. The Court concludes that Mr. Lovitky has alleged a sufficient injury in fact to support standing.

2. Redressability

Although Mr. Lovitky has alleged a sufficient injury in fact, and the parties do not dispute that the putative injury is caused by President Trump's conduct, Mr. Lovitky has failed to establish that this injury is redressable by a federal court. This Court reached the same conclusion in Mr.

---

[8] The legislative history cited to the Court is not fine-grained enough to specifically address the separate identification of personal liabilities, but, as discussed above, the Court accepts for the standing inquiry that Mr. Lovitky is entitled to that information.

Lovitky's prior suit.  *See Lovitky I*, 308 F. Supp. 3d at 256-60.  Nevertheless, the Court's fresh analysis of redressability shall, among other things, elucidate the relevant precedents.

The question is whether a sitting President's performance of an official duty is subject to mandamus, injunctive, or declaratory relief.  The case law is unfortunately less definitive than it ought to be, but strongly suggests that this Court is not permitted to grant any of these forms of relief.

Several early Supreme Court precedents figure prominently in the more recent cases. Although it did not directly involve the President, *Marbury v. Madison* recognized that a court could not require a subordinate of the President to perform an act within the President's discretion, but a lower official could be required to perform "a specific duty assigned . . . by law."  5 U.S. (1 Cranch) 137, 165-66, 170-71 (1803).  Whereas in *Mississippi v. Johnson*, the Supreme Court found that it lacked authority to enjoin President Andrew Johnson from enforcing the Reconstruction Acts, which the court found was a discretionary duty rather than a ministerial one.  71 U.S. (4 Wall.) 475, 497, 499, 501 (1866).  Citing separation of powers concerns, the court determined that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.* at 499-501.

Skipping ahead, the Court of Appeals withheld mandamus against President Richard Nixon based on separation of powers concerns, but kept the door open to future applications.  In *National Treasury Employees Union v. Nixon* (*NTEU*), a federal employees union challenged the President's alleged refusal to abide by a statute requiring him to grant federal employees a pay adjustment or propose an alternative to Congress.  492 F.2d 587, 591-92 (D.C. Cir. 1974). Analyzing case law such as *Marbury* and *Johnson*, the Court of Appeals found that the duty at issue was ministerial and that the President could be mandamused to perform it, but that the court

would not do so.  *Id.* at 602-03, 606-16.  Rather, out of "the utmost respect [for] the office of the Presidency and to avoid, if at all possible, direct involvement by the Courts in the President's constitutional duty faithfully to execute the laws and any clash between the judicial and executive branches of the Government," the court instead used its mandamus jurisdiction to issue a declaratory judgment that the President had "a constitutional duty" to effectuate the required pay raise.  *Id.* at 616.

In *National Wildlife Federation v. United States* shortly thereafter, an organization invoked a statute that purportedly required the President to make fuller disclosures and include better explanations with his budget request to Congress.  626 F.2d 917, 918, 921-22 (D.C. Cir. 1980).  The Court of Appeals relied on *NTEU* for the notion that "[m]andamus is not precluded" as to a ministerial duty simply "because the federal official at issue is the President of the United States."  *Id.* at 923 (citing *NTEU*, 492 F.2d 587).  But the court then exercised its discretion not to grant either mandamus or declaratory relief against the President, for doing so "would be improvident" for various reasons, including potential standing issues.  *Id.* at 923-28 & n.13.

Whatever window that *NTEU* may have opened in this Circuit began to close with the Supreme Court's opinions in *Franklin v. Massachusetts*.  A state and two voters objected to certain decisions in the administration of the decennial census, suing the President, the Secretary of Commerce, and others.  505 U.S. 788, 790 (1992).  A three-judge panel of the district court issued injunctions compelling, in pertinent part, the Secretary to take certain action and the President to take further action.  *Id.* at 791, 802.  Tackling the standing issue, a plurality of the Supreme Court opined that the "extraordinary" act of enjoining the President "should have raised judicial eyebrows."  *Id.* at 802.  They reiterated *Johnson*'s finding that injunctive relief as to a President's official duties is generally unavailable, but indicated that *Johnson* "left open the question whether

the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Id.* at 802-03 (citing *Johnson*, 4 Wall. 475, 498-99, 501). That plurality ultimately found, however, that "the injury alleged [was] likely to be redressed by declaratory relief against the Secretary alone," without enjoining the President. *Id.* at 803. Justice Scalia did not join that portion of the opinion but relied on the separation of powers for his stronger assertion that "no court has authority to direct the President to take an official act," nor to "issue a declaratory judgment against the President." *Id.* at 826-27 (Scalia, J., concurring in part and concurring in the judgment). Both the aforementioned plurality and Justice Scalia, however, agreed that the presidential action at issue in that case was *not* ministerial. *Id.* at 800; *id.* at 824 (Scalia, J., concurring in part and concurring in the judgment).

Following *Franklin*, the Court of Appeals expressly cast doubt on any remaining viability of *NTEU* and *National Wildlife*. In *Swan v. Clinton*, the plaintiff challenged the President's decision to remove him from the board of an independent agency within the executive branch and to replace him with someone else. 100 F.3d 973, 974 (D.C. Cir. 1996). The court observed that the recent *Franklin* plurality had taken the *Johnson* view of (the lack of) jurisdiction to enjoin the President, and that a fifth justice agreed. *See id.* at 977 (citing *Franklin*, 505 U.S. at 802-03; *id.* at 826 (Scalia, J., concurring in part and concurring in the judgment)). Neither were mandamus nor a declaratory judgment more readily available. *See id.* at 976 n.1 (treating mandamus within the ambit of injunctive relief, and applying "similar considerations" to declaratory relief). But still, after *Franklin*, it remained unclear whether the court could "exercise power to order the President to perform a ministerial duty," which the Court of Appeals had "never attempted" despite "assert[ing] the authority" to do so in *NTEU* and *National Wildlife*. *Id.* at 977-78. "It [was] not entirely clear . . . whether, and to what extent these decisions remain[ed] good law after *Franklin*."

*Id.* at 978.  The court did not need to decide.  Because a subordinate of the President could provide "partial relief" and therefore "substantially redress" the plaintiff's injury, the plaintiff had standing to sue.  *Id.* at 978-81.

Further Circuit precedent has reinforced that issuing mandamus or similar relief against a sitting President is off limits.  In *Newdow v. Roberts*, plaintiffs challenged the use of certain religious elements in President-elect Barack Obama's inauguration ceremony, as well as future presidential inaugurations.  603 F.3d 1002, 1006-07 (D.C. Cir. 2010).  They sued the Chief Justice of the Supreme Court, certain entities, and two clergymen, all of whom had a role in the President's inauguration ceremony.  *Id.* at 1011.  A preliminary injunction was denied, the inauguration "took place as planned," and further proceedings focused on future inaugurations.  *Id.* at 1007, 1009 & n.3.  The Court of Appeals held that the plaintiffs' injury could not be redressed under either of several forms of relief.  An injunction was unavailable because these defendants were "powerless to direct, say no to, or otherwise stop the future President if he wishes to have his ceremony contain the offending elements," for this was a discretionary decision.  *Id.* at 1011-12.  The plaintiffs could not secure declaratory relief either, for "a declaration with regard to defendants' conduct [would] have no controlling force on the President or President-elect."  *Id.* at 1012.  Nor was "the possibility the future President [would] choose to abide by a declaratory judgment" curative of the redressability problem.  *Id.*  "Beyond the fact that plaintiffs fail[ed] to name future President-elects . . . in their suit," and that a general injunction against "all possible President-elects" would be impermissible, the then-sitting President could not be enjoined either.  *Id.* at 1013.  The court stated in no uncertain terms that "courts do not have jurisdiction to enjoin" the President, and "have never submitted the President to declaratory relief."  *Id.* (citing *Johnson*, 71 U.S. (4 Wall.) at 501; *Franklin*, 505 U.S. at 827-28 (Scalia, J., concurring in part and concurring in the judgment)).

The fact that the President was not a defendant in *Newdow* does not limit the import of this case, for the court squarely addressed the possibility that a President could be subjected to these forms of relief and had to do so to reach its conclusion that the plaintiffs' grievance could not be redressed in any way. *See* Def.'s Reply at 3-4. That said, the *Newdow* court did not address *NTEU* and *National Wildlife*, perhaps because the decisions at issue in *Newdow* were clearly discretionary rather than ministerial.

Notwithstanding some lingering uncertainty, the Court takes Supreme Court and recent Circuit decisions as supplying enough direction: This Court should not grant mandamus, injunctive, or declaratory relief against a sitting President to require performance of a ministerial duty. *See also Lovitky I*, 308 F. Supp. 3d at 256, 259-60; *Lozansky v. Obama*, 841 F. Supp. 2d 124, 132 (D.D.C. 2012) (Kollar-Kotelly, J.); *Newdow v. Bush*, 391 F. Supp. 2d 95, 105-07 (D.D.C. 2005) (construing *Johnson*, *Franklin*, and *Swan* as sending "clear message that an injunction [or declaratory judgment] should not be issued against the President for official acts").[9] Nor is mandamus permissible to compel a discretionary duty, as the Court shall discuss below when it considers whether jurisdiction is available under the mandamus statute.

Moreover, Mr. Lovitky does not rely on *Franklin*, *Swan*, or other precedents that recognize that a lower official may be mandamused. He has not sued any lower officials, such as the Director of OGE. *See* Pl.'s Opp'n at 39 ("[P]laintiff is not challenging any of the decisions made by agency ethics officials in this case."). He also concedes that those officials did their job. *See id.* (citing 5

---

[9] Plaintiff also relies on case law regarding action allegedly in excess of Presidential authority, but those cases are beyond the scope of the present issues. *See* Pl.'s Opp'n at 19 (citing *Mountain States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002); *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)).

C.F.R. § 2634.605(b)(2)) ("These officials did only as much as they were permitted to do by virtue of the regulations that severely limit the scope of their review.").

Because this Court cannot issue mandamus, injunctive, or declaratory relief against a sitting President to compel official action, and Mr. Lovitky has not pursued relief against any lower officials, his alleged injury is not redressable, and he lacks standing to proceed.

## B. Subject-Matter Jurisdiction

Even if Mr. Lovitky did have standing, he has not established that this Court has subject-matter jurisdiction to hear his claim. He fails to meet the elements of mandamus jurisdiction, nor can he secure jurisdiction on any other grounds.

Mr. Lovitky invokes federal-question jurisdiction under 28 U.S.C. § 1331, mandamus jurisdiction under 28 U.S.C. § 1361, and jurisdiction under 28 U.S.C. § 2201 to issue a declaratory judgment. Compl., ECF No. 1, ¶ 1. The last grounds is clearly off the table. Mr. Lovitky has been apprised that the Declaratory Judgment Act, 28 U.S.C. § 2201, "is not an independent source of federal jurisdiction." *Lovitky II*, 918 F.3d at 161 (quoting *Metz v. BAE Sys. Tech. Solutions & Servs. Inc.*, 774 F.3d 18, 25 n.8 (D.C. Cir. 2014)) (internal quotation marks omitted). And the Court of Appeals has effectively collapsed the inquiries for mandamus and for injunctive relief, at least in this type of case: "[A] request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus in this context, where the injunction is sought to compel federal officials to perform a statutorily required ministerial duty." *Swan*, 100 F.3d at 976 n.1 (citing, e.g., *Nat'l Wildlife Fed'n*, 626 F.2d at 918 n.1); *see also id.* (characterizing relief under the "mandamus statute" as a type of "injunctive relief"). And Mr. Lovitky has conceded that [t]he availability of injunctive relief against the President is analyzed under the same principles as are applicable to mandamus relief." Pl.'s Opp'n at 20. Accordingly, the Court shall consider whether Mr. Lovitky has established jurisdiction under the mandamus statute. This discussion shall

assume, *arguendo*, that Mr. Lovitky could secure mandamus against a sitting President, which the Court has already decided that he cannot.

The Mandamus Act provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Mandamus is a "'drastic' remedy, 'to be invoked only in extraordinary circumstances.'" *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980) (per curiam)). "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).[10]

These elements guide the Court's jurisdictional inquiry, though they are "often discussed in merits terms as to whether a writ of mandamus should be issued." *Swan*, 100 F.3d at 976 n.1 (citing *Willis v. Sullivan*, 931 F.2d 390, 395-96 (6th Cir. 1991)); *see Am. Hosp. Ass'n*, 812 F.3d at 189 (identifying these "threshold requirements" as jurisdictional). The Court's finding that Mr. Lovitky has not established mandamus jurisdiction shall also demonstrate that he would fail to state a claim under Rule 12(b)(6). *See In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc) ("[I]f there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action. To this extent, mandamus jurisdiction under § 1361 merges with the merits."); *cf. Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 34 (D.D.C. 2011) (determining based on

---

[10] As "Rule 81(b) of the Federal Rules of Civil Procedure long ago abolished the writ of mandamus in the district courts," it is more "technically accurate" to refer to "mandamus-type relief" rather than "petitions for a writ of mandamus." *In re Cheney*, 406 F.3d 723, 728-29 (D.C. Cir. 2005) (en banc). However, this Memorandum Opinion cites precedents using varying terminology.

sufficiency of pleading whether mandamus claim survives motion to dismiss). Because the Court shall find that Mr. Lovitky has no clear and indisputable right to separate identification of President Trump's personal liabilities, and that the President has no clear duty to make that identification, the Court need not assure itself that no alternative to mandamus exists. *See Am. Hosp. Ass'n*, 812 F.3d at 189.

"Even when the legal requirements for mandamus jurisdiction have been satisfied . . . a court may grant relief only when it finds compelling equitable grounds." *Id.* (quoting *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005)) (internal quotation marks omitted). Those grounds are not present in this case.

### 1. Clear and Indisputable Right to Relief

"The party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable." *Id.* (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)) (internal quotation marks omitted). At the threshold, Mr. Lovitky concedes that the EIGA does not contain a private right of action. *See* Pl.'s Opp'n at 22 ("Plaintiff has a right to judicial review, even in the absence of a private cause of action under the EIGA.").

The Court of Appeals has indeed made clear that nothing in the statute or the statutory scheme supports inferring a private right of action in the EIGA. *See In re Madison Guar. Sav. & Loan Ass'n*, 173 F.3d at 868-69 (reiterating prior finding of "no congressional intent to create such a cause," and indicating that absence of such right "supported and underscored" determination that party lacked standing to sue under EIGA); *Nathan v. Smith*, 737 F.2d 1069, 1077 (D.C. Cir. 1984) (Bork, J., concurring) (indicating that "the constitutional context, the statutory text, and the legislative history . . . demonstrate that the [EIGA] does not create a cause of action").

Rather, Mr. Lovitky argues that common law furnishes "a non-statutory right of review when mandamus relief is sought." Pl.'s Opp'n at 23 (citing Clark Byse & Joseph V. Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action*, 81 Harv. L. Rev. 308, 310-13 (1967)). But the Court need not decide whether Mr. Lovitky properly invokes any such common law right applicable to a mandamus case under the EIGA.[11] President Trump is correct that this is a red herring. *See* Def.'s Reply at 7. Even if the Court *could* grant mandamus relief in connection with a purported violation of the EIGA, Mr. Lovitky still has to show that he has a clear right to the specific relief that he requests, namely that the President separately identify his personal liabilities. Mr. Lovitky fails to do so.

Here the Court cross-references the Circuit precedents finding no private right of action under the EIGA. Those precedents are relevant because they also demonstrate that Mr. Lovitky has no right to obtain separate identification of President Trump's personal liabilities. Nothing on the face of the statute accords Mr. Lovitky that right. Nor do those cases' discussion of the legislative history suggest any such right. Moreover, enforcement authority is expressly accorded to government actors, in this case the Director of OGE and the Attorney General. *See* 5 U.S.C. app. § 104(a)(1), (b), (c); *id.* § 106(b). Mr. Lovitky is concerned that President Trump appears to fall outside the scope of the Director's authority under the regulations to "take certain actions with regard to individual employees if the Director suspects a violation of a noncriminal government ethics law or regulation." 5 C.F.R. § 2638.501; *see also id.* § 2638.603 (defining "employee" to exclude the President); Pl.'s Opp'n at 40. Yet, those regulations do not override the Director's

---

[11] Nor, for the reasons that follow, is it necessary to find whether Congress intended to "withdraw" any right to proceed by mandamus. *See* Pl.'s Opp'n at 38-39.

statutory obligation to review reports for compliance and to refer as needed "the name of any individual" to the Attorney General, who in turn has the authority to file suit. *See* 5 U.S.C. app. § 104(a)(1), (b); *id.* § 106(b). And even if no one in government were given authority to review the President's reports for compliance and/or to refer the President's financial disclosures to the Attorney General, that does not lead to the result that Mr. Lovitky wants. It would simply reinforce that Congress adopted a statutory scheme that expressly provides for certain methods of enforcement and does not contemplate others. *See, e.g.*, *United States v. Thompson*, 921 F.3d 263, 266 (D.C. Cir. 2019) (invoking maxim *expressio unius est exclusio alterius*).

Because the Court finds that Plaintiff has no clear right to relief, the Court need not proceed further. *See Citizens for Responsibility & Ethics in Wash. v. Trump*, 924 F.3d 602, 609 (D.C. Cir. 2019) (citing *In re Trade & Commerce Bank*, 890 F.3d 301, 303 (D.C. Cir. 2018) (per curiam)) (refraining from proceeding to further two prongs of mandamus relief). But the Court shall do so in the interest of completing the record for likely appellate review.

### 2. Clear Duty to Act

Even if the Court had found that Mr. Lovitky had a clear and indisputable right to the differentiation of President Trump's personal liabilities, the President has no clear duty to furnish that information, either generally or to Mr. Lovitky.

At the threshold, the Court observes that only if the President had a *ministerial* duty to do as Mr. Lovitky requests could the Court even contemplate issuing mandamus as to that performance. *See Consol. Edison Co. of New York, Inc. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002). A duty qualifies as ministerial when it is "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Id.* (quoting *Wilbur v. United States* ex rel. *Kadrie*, 281 U.S. 206, 218-19 (1930)) (internal quotation marks omitted); *Oglala Sioux Tribe of Pine Ridge Indian Reservation v. U.S. Army Corps of Eng'rs*, 570 F.3d 327, 334 (D.C. Cir. 2009) (same). By

contrast, a discretionary duty "is not thus plainly prescribed, but depends on a statute or statutes the construction or application of which is not free from doubt." *Consol. Edison Co. of New York, Inc.*, 286 F.3d at 605 (quoting *Wilbur*, 281 U.S. at 218-19) (internal quotation marks omitted).  A ministerial duty is "simple," "definite," and leaves "no room for the exercise of judgment." *NTEU*, 492 F.2d at 607-08.

Even if there is some doubt about the right statutory interpretation at the outset, that uncertainty does not preclude the finding of a ministerial duty.  The Court of Appeals has repeatedly invoked the principle that "a ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act.'" *Swan*, 100 F.3d at 978 (quoting *13th Regional Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)); *see also In re Cheney*, 406 F.3d at 729 ("[I]f there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action.").

The Court has no doubt that the statute does *not* plainly establish the duty that Mr. Lovitky asks this Court to compel.  The statute does not expressly require the President to distinguish his personal liabilities from his non-personal business liabilities, nor does it expressly prohibit him from listing those liabilities together, without distinction.  *See* 5 U.S.C. app. § 102(a) & (a)(4). Nothing about the "full and complete statement" language in Section 102(a) compels the President to differentiate these liabilities as Mr. Lovitky requests.  Nor does the requirement, in the regulations, that "the filer's liabilities" be disclosed lead to that conclusion.  5 C.F.R. § 2634.305(a); *see also id.* § 2634.105(g) (defining "filer" as the "reporting individual" (internal quotation marks omitted)).

At least some liabilities other than the President's personal liabilities must also be disclosed, including the personal liabilities of a spouse and dependent child.[12] *See* 5 U.S.C. app. § 102(e)(1)(E). But as President Trump observes, there is no requirement that those liabilities be distinguished from those of the filer. Def.'s Mem. at 20; Def.'s Reply at 4; *see also* Def.'s Reply at 13 (arguing that "[t]he existence of specific statutory provisions requiring the listing of non-personal liabilities without labeling them as non-personal is clear evidence that no such labeling duty exists"). It is true that the statute treats the listing of a spouse or dependent child's liabilities somewhat differently depending on their valuation. *See* 5 U.S.C. app. § 102(d)(1), (e)(1)(F). But the Court is not persuaded that this point has anything to do with whether the President has a duty to differentiate his personal liabilities from any non-personal business liabilities.

Mr. Lovitky resorts to OGE's instructions in a document called the Public Financial Disclosure Guide. Pl.'s Opp'n at 30. That document tells the filer—in part—"do not include" non-personal business liabilities. But those instructions cannot bear the weight that Mr. Lovitky proposes to put on them. Under the header, "Other Liabilities That Are Not Reportable," those instructions begin by stating that "[y]ou do not need to report the following liabilities in Part 8." Pl.'s Opp'n, Ex. 22 (U.S. Office of Gov't Ethics, Public Financial Disclosure Guide 209 (Dec. 2018)) ("PFDG"). One of the categories that the filer does not need to report is "[l]iabilities of a trade or business, unless you, your spouse, or a dependent child is personally liable." PFDG at 209. Only then do the instructions append a parenthetical containing the language that Mr. Lovitky relies on: "(i.e., *do not include* a loan owed by a LLC, unless you, your spouse, or a dependent child is also personally liable for that same loan)." *Id.* (emphasis added). A verbatim parenthetical

_____

[12] The parties also briefly address—but neither party leans heavily on—a requirement evidently appearing in a prior version of the Public Financial Disclosure Guide that the filer list unrelated business liabilities. *See* Compl., ECF No. 1, ¶¶ 29-32; Pl.'s Opp'n at 36; Def.'s Reply at 13.

appears in a section containing frequently asked questions, in response to the question "Do I have to report loans taken out by a business I own?" *Id.* at 357.

The first problem with Mr. Lovitky's reliance on the instruction "do not include" is that it follows permissive language that excuses a filer from including this type of information. The parenthetical could be interpreted as clarifying the permission not to include the information, rather than affirmatively prohibiting such information from being included. But even if the agency did intend its language to prohibit the filer from including non-personal business liabilities, the Court is not obliged to abide by these instructions. As President Trump observes, Mr. Lovitky has not invoked any authority for the notion that "instructions [in the Public Financial Disclosure Guide] have the force or effect of law sufficient to impose a duty subject to mandamus." Def.'s Reply at 12 n.7.

Nor is Mr. Lovitky's reference to the instructions or "summary of contents" accompanying OGE Form 278e any more supportive of his argument. *See* Pl.'s Opp'n at 30 & Ex. 21; Compl., ECF No. 1, ¶ 27. That guidance does not include any language expressly prohibiting non-personal business liabilities—not even the "do not include" language found in the Public Financial Disclosure Guide.

The Court also notes that other portions of the EIGA excuse the reporting of certain information but do not expressly prohibit that reporting or require that any such reporting separately identify unnecessary information. Def.'s Reply at 12 (collecting provisions); *see, e.g.*, 5 U.S.C. app. § 102(a)(5) (certain reporting "not required"); *id.* § 102(f)(2) ("A reporting individual need not report [certain information] . . . ."); *id.* § 102(g) (certain information "need not be included in any report filed pursuant to this title").

Mr. Lovitky's right to a copy of President Trump's financial disclosures also does not entail any right to the distinction he seeks. *See id.* § 103(b), (d); *id.* § 105(b).

The Court finds no simple, definite, peremptory command in the statute to distinguish between personal liabilities and non-personal business liabilities. *NTEU*, 492 F.2d at 607-08; *Swan*, 100 F.3d at 978. President Trump consequently has no ministerial duty to do so. And the Court lacks mandamus jurisdiction over Mr. Lovitky's case.

### 3. Equitable Considerations

Even if mandamus *could* issue against a sitting President to perform an official duty, and Mr. Lovitky were to establish the elements of mandamus jurisdiction, the Court would have to decide whether equitable grounds warrant that "extraordinary measure." *Am. Hosp. Ass'n*, 812 F.3d at 189; *Swan*, 100 F.3d at 978.

Mr. Lovitky was entitled to obtain, and did receive, a copy of President Trump's financial disclosures. *See* 5 U.S.C. app. § 105(a), (b). Any dispute about the proper content of those disclosures is beyond Mr. Lovitky's purview. The EIGA is not designed for enforcement by private citizens. Congress instead entrusted OGE and the Attorney General with those oversight and enforcement roles. Mr. Lovitky is evidently dissatisfied with the relatively low level of scrutiny that OGE may apply to OGE forms. *See* Pl.'s Opp'n at 35 (citing 5 C.F.R. § 2634.605(b)(3)); *see also* 5 C.F.R. § 2634.605(b)(3) (dictating "face value" acceptance of disclosures, "unless there is a patent omission or ambiguity or the official has independent knowledge of matters outside the report" (internal quotation marks omitted)).[13] But Mr. Lovitky does have a remedy for that: he may lobby Congress to give OGE more enforcement power.

---

[13] The Court rejects Mr. Lovitky's argument that officials' obligation to accept filings at face value, absent specified reasons to inquire further, implies that the President should have separately identified his personal liabilities. *See* Pl.'s Opp'n at 35.

Separation of powers is also at issue when a court is called upon to mandamus a sitting President. That type of concern may be less in this setting—where the Court is considering one limited aspect of a President's otherwise unchallenged financial disclosures—than if, say, the Court were called upon to mandamus the President to enforce a statute like the Reconstruction Acts. *See, e.g.*, *Johnson*, 71 U.S. (4 Wall.) at 497, 499-500. But the concern is still valid.

Lastly, the "presumption of regularity" attaching to officials' activities gives further reason not to disturb President Trump's reading of the EIGA. "[I]n the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties." *Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989) (quoting *United States v. Chemical Found.*, 272 U.S. 1, 14-15 (1926)) (internal quotation marks omitted). In the company of the Court of Appeals, this Court shall not "assum[e] that the President was indifferent to the purposes and requirements of the [EIGA], or acted deliberately in contravention of them." *Id.* at 728.

The Court is also not persuaded by Mr. Lovitky's argument that his desired relief is necessary to countervail President Trump's decision not to address potential conflicts of interest by other means. *See* Pl.'s Opp'n at 43. The Court is more concerned by the foregoing reasons not to issue any of the remedies that Mr. Lovitky seeks. And if the Court were to award relief anyway, in response to President Trump's approach to conflicts issues, that would, in itself, threaten the separation of powers.

Assuming, *arguendo*, that Mr. Lovitky overcame the hurdles which the Court has found that he did not, the Court would not find sufficient equitable reasons to compel Defendant's disclosures in an exercise of the Court's discretion. It is not for this Court to compel the

President—by mandamus or injunction—to take an official action, even if he does have an unfulfilled obligation to disclose more, which it appears he does not.

Likewise, if the Court had jurisdiction under the Mandamus Act, the Court would find, in an exercise of its discretion, that declaratory relief is not warranted based on the foregoing equitable considerations. *See ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 466 (D.C. Cir. 1991) (recognizing court's discretion under Declaratory Judgment Act); *United Gov't Sec. Officers of Am., Local 52 v. Chertoff*, 587 F. Supp. 2d 209, 222 (D.D.C. 2008) (Kollar-Kotelly, J.) (citing *NTEU*, 492 F.2d at 616) (finding that declaratory relief can issue when court has subject-matter jurisdiction pursuant to mandamus statute).

Any arguments that the Court has not addressed in this Memorandum Opinion do not affect the Court's decisions above.

## IV. CONCLUSION

For the foregoing reasons, the Court shall **GRANT** President Trump's Motion to Dismiss and **DISMISS** this case.

An appropriate Order accompanies this Memorandum Opinion.

Dated: July 12, 2019

/s/
_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
